# United States Court of Appeals
# for the Federal Circuit

---

**AQUA PRODUCTS, INC.,**
*Appellant*

v.

**JOSEPH MATAL, PERFORMING THE FUNCTIONS
AND DUTIES OF THE UNDER SECRETARY OF
COMMERCE FOR INTELLECTUAL PROPERTY
AND DIRECTOR, U.S. PATENT AND TRADEMARK
OFFICE,**
*Intervenor*

---

2015-1177

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2013-00159.

---

Decided: October 4, 2017

---

JAMES R. BARNEY, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, Washington, DC, argued for appellant. Also represented by TIMOTHY P. MCANULTY, DAVID MROZ; ANTHONY A. COPPOLA, ANTHONY J. DIFILIPPI, JEFFREY A. SCHWAB, Abelman Frayne & Schwab, New York, NY.

NATHAN K. KELLEY, Office of the Solicitor, United States Patent and Trademark Office, Alexandria, VA, argued for intervenor. Also represented by FARHEENA YASMEEN RASHEED, MEREDITH HOPE SCHOENFELD, SCOTT WEIDENFELLER; MARK R. FREEMAN, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC.

GREGORY A. CASTANIAS, Jones Day, Washington, DC, for amicus curiae Intellectual Property Owners Association. Also represented by DAVID B. COCHRAN, Cleveland, OH; JOHN MARLOTT, Chicago, IL; JACLYN STAHL, Irvine, CA; MARK W. LAUROESCH, Intellectual Property Owners Association, Washington, DC; STEVEN W. MILLER, Global Legal Department, Procter & Gamble Company, Cincinnati, OH; KEVIN H. RHODES, 3M Innovative Properties Company, St. Paul, MN.

BRYAN A. SCHWARTZ, Squire Patton Boggs (US) LLP, Cleveland, OH, for amici curiae Case Western Reserve University School of Law Intellectual Property Venture Clinic, The Ohio Venture Association. Also represented by STEVEN M. AUVIL; TIMOTHY J. O'HEARN, Shaker Heights, OH.

JAMES H. HALL, Blank Rome LLP, Houston, TX, for amicus curiae Houston Intellectual Property Law Association.

JAMES EDWARD TYSSE, Akin, Gump, Strauss, Hauer & Feld, LLP, Washington, DC, for amicus curiae Pharmaceutical Research and Manufacturers of America. Also represented by DIANNE B. ELDERKIN, Philadelphia, PA; DAVID EVAN KORN, Pharmaceutical Research and Manufacturers Association of America, Washington, DC.

HANSJORG SAUER, Biotechnology Innovation Organization, Washington, DC, for amicus curiae Biotechnology Innovation Organization. Also represented by Q. TODD DICKINSON, Polsinelli PC, Washington, DC; COLBY BRIAN SPRINGER, San Francisco, CA.

PETER J. AYERS, Law Office of Peter J. Ayers, Austin, TX, for amicus curiae American Intellectual Property Law Association. Also represented by DAVID R. TODD, Workman Nydegger, Salt Lake City, UT; MARK L. WHITAKER, Morrison & Foerster LLP, Washington, DC.

KEVIN J. CULLIGAN, Maynard, Cooper & Gale, PC, New York, NY, for amicus curiae Askeladden, L.L.C. Also represented by JOHN P. HANISH.

JOHN THORNE, Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., Washington, DC, for amici curiae The Internet Association, Computer & Communications Industry Association, Dell Inc., Garmin International, Inc., Intel Corporation, Red Hat, Inc., Samsung Electronics Co., Ltd., SAP America, Inc., SAS Institute, Inc., Software & Information Industry Association, Symmetry LLC, VIZIO, Inc. Also represented by JOSHUA D. BRANSON. Amicus curiae Intel Corporation also represented by Matthew John Hult, Intel Corporation, Santa Clara, CA.

————————

Before PROST, *Chief Judge*, NEWMAN, LOURIE, DYK, MOORE, O'MALLEY, REYNA, WALLACH, TARANTO, CHEN, and HUGHES, *Circuit Judges*.[*]

————————

[*] Circuit Judge Stoll did not participate.

Opinion filed by *Circuit Judge* O'MALLEY, in which *Circuit Judges* NEWMAN, LOURIE, MOORE, and WALLACH join, and in which *Circuit Judges* DYK and REYNA concur in result.

Opinion filed by *Circuit Judge* MOORE, in which *Circuit Judges* NEWMAN and O'MALLEY join.

Opinion filed by *Circuit Judge* REYNA, in which *Circuit Judge* DYK joins, and in which *Chief Judge* PROST and *Circuit Judges* TARANTO, CHEN, and HUGHES join in part.

Opinion filed by *Circuit Judge* TARANTO, in which *Chief Judge* PROST and *Circuit Judges* CHEN and HUGHES join, dissenting from the judgment, and in which *Circuit Judges* DYK and REYNA join in part in other respects.

Opinion dissenting from the judgment filed by *Circuit Judge* HUGHES, in which *Circuit Judge* CHEN joins.

O'MALLEY, *Circuit Judge*.

In this appeal, we consider the proper allocation of the burden of proof when amended claims are proffered during inter partes review proceedings ("IPRs") under the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, § 6(a)–(c), 125 Stat. 284–341 (2011) (provisions creating inter partes review codified in ch. 31 of Title 35, 35 U.S.C. §§ 311–19 (2012)). Specifically, we consider how the AIA's statutory language in 35 U.S.C. § 316(e), which places "the burden of proving a proposition of unpatentability by a preponderance of the evidence" onto the petitioner in an IPR, applies to claim amendments authorized by 35 U.S.C. § 316(d), and whether the Patent Trial and Appeal Board's ("Board") current practices with respect to amendments accord with that application.

A panel of our court concluded that the Board did not abuse its discretion in denying Appellant Aqua Products, Inc.'s ("Aqua") motion to amend various claims of U.S. Patent No. 8,273,183 ("the '183 patent") during the course of an IPR. *In re Aqua Prods., Inc.*, 823 F.3d 1369, 1373–

74 (Fed. Cir. 2016) (hereinafter "*Panel Decision*"). The court granted Aqua's request for en banc rehearing and vacated the panel decision. *In re Aqua Prods., Inc.*, 833 F.3d 1335 (Fed. Cir. 2016) (en banc) (per curiam).

Upon review of the statutory scheme, we believe that § 316(e) unambiguously requires the petitioner to prove all propositions of unpatentability, including for amended claims. This conclusion is dictated by the plain language of § 316(e), is supported by the entirety of the statutory scheme of which it is a part, and is reaffirmed by reference to relevant legislative history. Because a majority of the judges participating in this en banc proceeding believe the statute is ambiguous on this point, we conclude in the alternative that there is no interpretation of the statute by the Director of the Patent and Trademark Office ("PTO") to which this court must defer under *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). And we believe that, in the absence of any required deference, the most reasonable reading of the AIA is one that places the burden of persuasion with respect to the patentability of amended claims on the petitioner.[1] Finally, we believe that the Board must consider the entirety of the record before it when assessing the patentability of amended claims under § 318(a) and must justify any conclusions of unpatentability with respect to amended claims based on that record.

---

[1] To the extent our prior decisions in *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292 (Fed. Cir. 2015); *Prolitec, Inc. v. ScentAir Techs., Inc.*, 807 F.3d 1353 (Fed. Cir. 2015), *petition for reh'g pending*; *Synopsys, Inc. v. Mentor Graphics Corp.*, 814 F.3d 1309 (Fed. Cir. 2016); and *Nike, Inc. v. Adidas AG*, 812 F.3d 1326 (Fed. Cir. 2016), are inconsistent with this conclusion, we overrule those decisions.

Because the participating judges have different views—both as to the judgment we should reach and as to the rationale we should employ in support of that judgment, as explained below, today's judgment is narrow. The final written decision of the Board in this case is vacated insofar as it denied the patent owner's motion to amend the patent. The matter is remanded for the Board to issue a final decision under § 318(a) assessing the patentability of the proposed substitute claims without placing the burden of persuasion on the patent owner.

## I. PROCEDURAL HISTORY

Automated swimming pool cleaners, such as those disclosed in the '183 patent, typically propel themselves in a swimming pool using motor-driven wheels, water jets, suction, or a combination thereof. *Panel Decision*, 823 F.3d at 1371. The '183 patent discloses a jet-propelled pool cleaner with controlled directional movement and without an electric drive motor. '183 patent, col. 10, l. 41–col. 11, l. 3; *id.* col. 18, ll. 11–20.

The parties began litigating questions of infringement and validity related to this patent in district court. *Aqua Prods., Inc. v. Zodiac Pool Sys., Inc.*, No. 12-09342 (S.D.N.Y.). While that litigation was pending, Zodiac Pool Systems, Inc. petitioned the Board for inter partes review on claims 1–14, 16, and 19–21 of the '183 patent, asserting invalidity under 35 U.S.C. § 102 and § 103 in light of several prior art references. The Board instituted an IPR on claims 1–9, 13, 14, 16, and 19–21 of the '183 patent, but not on claims 10–12. *Panel Decision*, 823 F.3d at 1372.

Aqua then moved to substitute claims 1, 8, and 20 of the '183 patent with proposed claims 22, 23, and 24, respectively. *Id.* Aqua asserted that substitute claims 22–24 complied with 35 U.S.C. § 316(d) because they did not enlarge the scope of the original claims or introduce new matter. *Id.* Aqua further argued that the substitute

claims responded to and were patentable over the obviousness combinations at issue in the IPR. *Id.*

The Board denied Aqua's motion to amend. Although the Board expressly found that Aqua's amendments complied with the requirements of § 316(d) and 37 C.F.R. § 42.121(a)(2)(i)–(ii) (2015), the Board concluded Aqua had failed to prove the substitute claims were patentable. Aqua timely appealed that decision to this court.

On appeal, Aqua argued that it did not bear the burden of proving the patentability of its proposed substitute claims. Aqua relied on the plain language of § 316(e)—which we discuss below—for its contention. The panel rejected Aqua's argument based on this court's precedent, which "has upheld the Board's approach of allocating to the patentee the burden of showing that its proposed amendments would overcome the art of record." *Panel Decision*, 823 F.3d at 1373 (citing *Proxyconn,* 789 F.3d at 1307–08; *Prolitec,* 807 F.3d at 1363; and *Nike*, 812 F.3d at 1333–34). The panel declined to "revisit the question of whether the Board may require the patentee to demonstrate the patentability of substitute claims" and held that "the burden of showing that the substitute claims were patentable rested with Aqua." *Id.* The panel also rejected Aqua's objection to the Board's failure to consider the entirety of the record before it when assessing the patentability of the amended claims. Aqua specifically objected to the Board's refusal to consider: (1) certain arguments Aqua made in its motion to amend; (2) arguments made in its reply to the petitioner's challenge to its motion to amend; (3) substantial evidence in the IPR record that the cited prior art did not teach the limitations it sought to add by amendment; and (4) substantial evidence in the record of objective indicia of non-obviousness. *Id.* at 1373–74. Aqua sought rehearing en banc of that panel decision.

We granted Aqua's petition for en banc rehearing. *In re Aqua Prods., Inc.*, 833 F.3d at 1336. We proposed two questions in the en banc order:

> (a) When the patent owner moves to amend its claims under 35 U.S.C. § 316(d), may the PTO require the patent owner to bear the burden of persuasion, or a burden of production, regarding patentability of the amended claims as a condition of allowing them? Which burdens are permitted under 35 U.S.C. § 316(e)?

> (b) When the petitioner does not challenge the patentability of a proposed amended claim, or the Board thinks the challenge is inadequate, may the Board sua sponte raise patentability challenges to such a claim? If so, where would the burden of persuasion, or a burden of production, lie?

*Id.* We have jurisdiction over this appeal under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## II. THE CONTEXT IN WHICH THE QUESTIONS PRESENTED ARISE

With its enactment of the AIA in 2011, Congress created IPRs to provide "quick and cost effective alternatives to litigation." H.R. REP. NO. 112-98, pt. 1, at 48 (2011). In an IPR, a third party may petition the Director to review previously-issued patent claims in an adjudicatory setting. To initiate an IPR, a petitioner must show a reasonable likelihood that it would prevail with respect to at least one of the claims challenged. *See* 35 U.S.C. § 314(a). Following institution by the Director and a trial before the Board, the Director may "cancel any claim that the agency finds to be unpatentable" under 35 U.S.C. § 102 and § 103, based on cited prior art consisting of patents or printed publications. *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2136 (2016). The Board reaches its conclusions based on a preponderance of the evidence and,

in doing so, employs the broadest reasonable interpretation of the challenged claims for unexpired patents. *Id.* at 2144–46.

In *Cuozzo*, the Supreme Court emphasized that the patent owner's opportunity to amend its patent in IPRs is what justifies the Board's use of the broadest reasonable interpretation standard in IPRs:

> The patent holder may, at least once in the process, make a motion to do just what he would do in the examination process, namely, amend or narrow the claim. § 316(d) (2012 ed.). This opportunity to amend, together with the fact that the original application process may have presented several additional opportunities to amend the patent, means that use of the broadest reasonable construction standard is, as a general matter, not unfair to the patent holder in any obvious way.

*Id.* at 2145.[2] In its statement to the Senate Committee on the Judiciary several years before Congress enacted the AIA, the PTO explained that amendments are a key feature of post-grant proceedings:

> The []PTO's proposal is thus designed to put review of the propriety of patent claims that the

---

[2] We also have recognized this fact when endorsing the use of the broadest reasonable claim interpretation standard in other areas of PTO review. *See, e.g.*, *In re Rambus, Inc.*, 753 F.3d 1253, 1256 (Fed. Cir. 2014) (finding that, in inter partes reexamination, "the sole basis for the 'broadest reasonable interpretation' rubric is the ability to amend claims" (quoting 1 Patent Off. Litig. § 4.70)); *In re Prater*, 415 F.2d 1393, 1404–05 (CCPA 1969) (holding that claims are given their broadest reasonable interpretation during examination "since the applicant may then amend his claims").

public regards as important in the hands of senior, legally qualified officials with experience in dispute resolution. It is designed to be more efficient than litigation, while preserving enough of the full participation accorded to parties in litigation that challengers will be willing to risk being bound by the result. *By providing for the possibility of amendment of challenged claims, the proposed system would preserve the merited benefits of patent claims better than the win-all or lose-all validity contests in district court.*

*Patent Quality Improvement: Post-Grant Opposition: Hearing Before the Subcomm. on Courts, the Internet, and Intellectual Property of the H. Comm. on the Judiciary,* 108th Cong. 10 (2004) (hereinafter "*PTO Gen. Counsel Toupin Statement*") (emphasis added) (statement of PTO General Counsel James A. Toupin).

Indeed, the PTO has more than once acknowledged that use of the broadest reasonable interpretation standard is only appropriate when patent owners have the opportunity to amend. The PTO has explained that, "[s]ince patent owners have the opportunity to amend claims during IPR, [post-grant review and covered business method ("CBM")] trials, unlike in district court proceedings, they are able to resolve ambiguities and overbreadth through this interpretive approach, producing clear and defensible patents at the lowest cost point in the system." Office Patent Trial Practice Guide, 77 Fed. Reg. 48756, 48764 (Aug. 14, 2012). Simply put, the patent owner's right to propose amended claims is an important tool that may be used to adjust the scope of patents in an IPR. *See* 35 U.S.C. § 316(d)(3) (entitled "Scope of claims."); *see also Cuozzo*, 136 S. Ct. at 2144 (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 816 (1945)).

Congress deemed the patent owner's right to amend so important that, in § 316(d), it mandated that the patent owner be permitted to amend the patent *as of right* at least once during the course of an IPR, provided certain specified statutory conditions were met. 35 U.S.C. § 316(d)(1); *see also* S. REP. NO. 110-259, at 22 (2008) (stating that, "[d]uring the proceeding, the patent holder has one opportunity as a *matter of right* to amend the claims . . ." (emphasis added)); 154 CONG. REC. 22626 (2008) (statement of Sen. Kyl on S. 3600) (concluding that written institution decisions would be desirable because they give the "patent owner a sense of what issues are important to the board and where he ought to focus his amendments"). Four Congresses considered the post-grant review procedures that eventually became the AIA with little debate or controversy on the issue of amendment. *Compare, e.g.*, S. 3818, 109th Cong. § 318 (2006), *with* H.R. 1249, 112th Cong. § 326 (2011). The right to amend actually was given added emphasis during this time. In the Patent Reform Act of 2006, the language authorizing amendments shifted from "entitled to request" to the present text providing for the opportunity for amendment as of right through a motion to amend. *Compare* H.R. 2795, 109th Cong. § 327 (2005), *with* S. 3818, 109th Cong. § 318 (2006). The Senate report on S. 1145 stated that patent owners would be given "one opportunity as a matter of right to amend the claims." *See, e.g.*, S. REP. NO. 110-259, at 22 (2008).

The House Report for the AIA, in its "Section-by-Section" explanation of the bill as finally enacted, states that the statute provides that:

> *The patent owner may submit one amendment with a reasonable number of substitute claims,* and additional amendments either as agreed to by the parties for settlement, for good cause shown in post-grant review, or as prescribed in regulations by the Director in inter partes review.

H. REP. NO. 112-98, pt. 1, at 76 (2011) (emphasis added). In this report, several representatives noted with approval the high rate of "modification or nullification" of patent claims in inter partes reexamination and their desire to retain this feature in IPRs. *Id.* at 164. In other words, Congress saw the amendment process in IPRs as analogous to narrowing reissues, albeit prompted by a third-party challenger.

Despite repeated recognition of the importance of the patent owner's right to amend during IPR proceedings—by Congress, courts, and the PTO alike—patent owners largely have been prevented from amending claims in the context of IPRs. A February 2017 study noted that the Board has only granted eight motions to amend in post-issuance review proceedings (six in IPRs and two in CBM proceedings). Binal J. Patel et al., *Amending Claims at the PTAB—A Fool's Errand?*, Managing Intellectual Property (Feb. 24, 2017), http://www.managingip.com/Article/3663698/Amending-claims-at-the-PTABa-fools-errand.html. The PTO's statistics confirm that patent owners have consistently failed to obtain their requested relief on motions to amend. As of April 30, 2016, the Board had completely denied 112 of 118 motions to amend made by patent owners in IPRs, and partially denied motions to amend in four of the six remaining trials. USPTO, PTAB Motion to Amend Study, 2–4 (Apr. 30, 2016), https://www.uspto.gov/sites/default/files/documents/2016-04-30%20PTAB%20MTA%20study.pdf. Aqua and its amici contend that these statistics are a direct result of the Board's placement of the burden of proving the patentability of amended claims on the patent owner, its requirement that the patent owner satisfy that burden on the face of a 25-page motion to amend—without regard to the remainder of the record—and its requirement that the patent owner prove patentability, not just in response to the grounds of unpatentability asserted by the petitioner,

but on all possible grounds and in light of all prior art known to the patent owner. *MasterImage 3D, Inc. v. RealD Inc.*, No. IPR2015–00040, 2015 WL 10709290, at *2–4 (P.T.A.B. July 15, 2015) (clarifying *Idle Free Sys., Inc. v. Bergstrom, Inc.*, No. IPR2012–00027, 2013 WL 5947697, at *4 (P.T.A.B. June 11, 2013)).

We now assess whether the Board's current practice of placing the substantive burden of proving patentability on the patent owner with regard to claim amendments proffered in IPRs may be employed in pending IPRs. We conclude it may not.

## III. Relevant Statutory and Regulatory Schemes

The AIA provides that a patent holder in an IPR "may file 1 motion to amend the patent," either by cancelling any challenged patent claim or by "propos[ing] a reasonable number of substitute claims." 35 U.S.C. § 316(d)(1). Additional joint motions to amend may be permitted to "materially advance the settlement of a proceeding under section 317." *Id.* § 316(d)(2). Section 316(d)(3) dictates that an amendment "may not enlarge the scope of the claims of the patent or introduce new matter." *Id.* § 316(d)(3).

In the same statutory section that discusses motions to amend, the following subsection appears:

> (e) Evidentiary Standards.—In an inter partes review instituted under this chapter, the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence.

*Id.* § 316(e). This subsection immediately follows the provision describing a patent owner's right to propose substitute claims in lieu of those challenged in an IPR.

When an IPR is instituted and not dismissed subsequently, the Board "shall issue a final written decision

with respect to the patentability of any patent claim challenged by the petitioner and any new claim added under section 316(d)." *Id.* § 318(a). The statute provides that, following the final written decision and any subsequent appeal, the Director shall incorporate "in the patent . . . any new or amended claim determined to be patentable." *Id.* § 318(b).

The AIA delegates authority to the Director to "prescribe regulations . . . establishing and governing inter partes review" and, relevant to this appeal, to "set[ ] forth standards and procedures for allowing the patent owner to move to amend the patent" under § 316(d). *Id.* §§ 316(a)(4), (a)(9). Invoking this authority, the Director promulgated 37 C.F.R. § 42.121, which sets forth several procedures for amending claims during an IPR. This regulation permits a patent owner to file one motion to amend after conferring with the Board but "no later than the filing of a patent owner response" unless the Board has provided an alternative due date. 37 C.F.R. § 42.121(a)(1). Under this regulation, the Board may deny a motion to amend if the amendment does not satisfy the requirements of § 316(d)(3)—i.e., if it expands the claim scope, introduces new matter, or if it "does not respond to a ground of unpatentability involved in the trial." *Id.* § 42.121(a)(2). The patent owner is also restricted to proposing a "reasonable number of substitute claims." *Id.* § 42.121(a)(3).

The Director promulgated 37 C.F.R. § 42.20 to govern all motion practice before the Board. In relevant part, Rule 42.20(a) requires that any "[r]elief, other than a petition requesting the institution of a trial, must be requested in the form of a motion." Rule 42.20(c) states additionally that "[t]he moving party has the burden of proof to establish that it is entitled to the requested relief."

While these rules do not say so expressly, the PTO claims in this appeal that the Board has interpreted Rules 42.20 and 42.121 to place the burden of persuasion on a patent owner to demonstrate, by a preponderance of the evidence, that any proposed amended claims are patentable, that it must do so in light of prior art not already part of the IPR, and that the Director has endorsed that interpretation. Specifically, in *Idle Free*, a six-member panel of the Board held that the patent owner must show why the proposed amended claims are patentable over not only the prior art at issue in the IPR, but also "over prior art not of record but known to the patent owner." 2013 WL 5947697, at *4.[3] Then, in *MasterImage*, another Board panel discussed *Idle Free*'s holding that "the burden is . . . on the patent owner to show patentable distinction over the prior art of record *and* also prior art known to the patent owner." 2015 WL 10709290, at *1 (quoting *Idle Free*, 2013 WL 5947697, at *4) (emphasis altered from original).[4] Among other things, the panel emphasized that the ultimate burden of persuasion regarding the question of patentability is on the patent owner. *Id.*

None of the specifics set forth in these two panel decisions regarding a patent owner's burden are set forth in either Rule 42.20 or Rule 42.121 and none were discussed in the 2012 Federal Register comments relating to the

---

[3] The Board designated the *Idle Free* decision "representative." According to the PTO, representative opinions "provide a representative sample of outcomes on a matter" but are not binding authority.

[4] The Board designated *MasterImage* as a "Precedential Decision." To designate a Board decision as precedential, the full Board is given the opportunity to review and vote on the opinion and the Director must approve the designation.

promulgation of those Rules. And neither opinion was published in the Federal Register.

## IV. OUR PRIOR DECISIONS

As in this case, prior panels of this court have endorsed the Board's practice of placing the burden of demonstrating the patentability of amendments over the prior art on the patent owner, or have been interpreted as doing so. *See Proxyconn*, 789 F.3d at 1307–08; *Prolitec*, 807 F.3d at 1363; *Synopsys*, 814 F.3d at 1323–24; *Nike*, 812 F.3d at 1333–34; *Panel Decision*, 823 F.3d at 1373.

In *Proxyconn* and *Prolitec*, given the parties' arguments, we did not engage in any statutory analysis—with respect to § 316(d), § 316(e), or otherwise. We also did not analyze whether the Board either did or properly could impose the burden of proving the ultimate patentability of amended claims on the patent owner.

It was not until *Synopsys* and *Nike* that we had occasion to address § 316(e). In *Synopsys*, Mentor objected to the denial of its motion to amend, which the Board predicated on Mentor's failure to prove patentability over prior art references not at issue in the IPR—and over all other prior art of record. *Synopsys*, 814 F.3d at 1323. Relying on *Proxyconn*, we concluded that the scope of the burden imposed by the Board was not unreasonable. *Id.* We then turned to Mentor's argument that *Proxyconn* was distinguishable because—unlike the patent owner in *Proxyconn*—Mentor objected to bearing the burden of proving the patentability of its proposed amended claims, relying on § 316(e). *Id.* We rejected Mentor's argument in one paragraph:

> Section 316(e) does not alter our analysis. . . . The introductory phrase referring to an "inter partes review instituted under this chapter" makes clear that this provision specifically relates to claims for which inter partes review was initiated, *i.e.*, the

> original claims of the patent that a party has challenged in a petition for review. Inter partes review was not initiated for the claims put forward in the motion to amend.

*Id.* at 1323–24.

We revisited § 316(e) in *Nike*. There, we read § 316(e) narrowly for the reasons cited in *Synopsys*. *Nike*, 812 F.3d at 1334. We also relied on the Director's authority under § 316(a)(9) to set "standards and procedures . . . ensuring that any information submitted by the patent owner in support of any amendment entered under subsection (d) is made available to the public." *Id.* at 1333 (quoting 35 U.S.C. § 316(a)(9)). On these grounds, we concluded that Nike's "attempt to undo our conclusion in *Proxyconn* . . . is not persuasive." *Id.* at 1334.

We, thus, have had limited opportunity or cause to address the first question posed and fleshed out in this en banc proceeding. We now examine these earlier holdings in light of the language of § 316(d) and § 316(e) and the governing statutory scheme of which they are a part.

## V. DISCUSSION

### A. The Petitioner Bears the Burden to Prove All Propositions of Unpatentability

Our first en banc question asks whether the PTO may require the patent owner to bear the burden of persuasion or a burden of production regarding the patentability of amended claims, given the language of 35 U.S.C. § 316(d) and § 316(e). *In re Aqua Prods.*, 833 F.3d at 1336.

The parties do not dispute that Congress delegated authority to the Director to promulgate regulations "setting forth standards and procedures for allowing the patent owner to move to amend the patent under [§ 316(d)]." 35 U.S.C. § 316(a)(9). It is upon this authority and its own reading of § 316(d) that the PTO claims it

predicates its practices regarding motions to amend in IPRs and the attendant burdens it imposes in that context. We review the PTO's regulations and statutory interpretation pursuant to *Chevron* and *Auer v. Robbins*, 519 U.S. 452 (1997).

*Chevron* requires a court reviewing an agency's construction of a statute it administers to determine first "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842. If the answer is yes, the inquiry ends, and we must give effect to Congress's unambiguous intent. *Id.* at 842–43. If the answer is no, the court must consider "whether the agency's answer [to the precise question at issue] is based on a permissible construction of the statute." *Id.* at 843. The agency's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (citing *United States v. Mead*, 533 U.S. 218, 229–30 (2001)). When a statute expressly grants an agency rulemaking authority and does not "unambiguously direct[]" the agency to adopt a particular rule, the agency may "enact rules that are reasonable in light of the text, nature, and purpose of the statute." *Cuozzo*, 136 S. Ct. at 2142 (citing *Mead*, 533 U.S. at 229, and *Chevron*, 467 U.S. at 843). When the PTO does adopt rules, moreover, "[w]e accept the [Director's] interpretation of Patent and Trademark Office regulations unless that interpretation is plainly erroneous or inconsistent with the regulation." *In re Sullivan*, 362 F.3d 1324, 1326 (Fed. Cir. 2004) (citing *Auer*, 519 U.S. at 461–62, and *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945) (internal quotations omitted)).

### 1. *Chevron* Step One

Thus, we begin our examination of § 316(d) and § 316(e) with the language of the statute. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) ("As in any case

of statutory construction, our analysis begins with the language of the statute." (internal quotation marks and citation omitted)). In considering that language, we must assure ourselves that we have employed all "traditional tools of statutory construction" to determine whether Congress intended to resolve the issue under consideration. *Chevron*, 467 U.S. at 843 n.9. We also "must read the words 'in their context and with a view to their place in the overall statutory scheme.'" *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

We believe Congress explicitly placed the burden of persuasion to prove propositions of unpatentability on the petitioner for all claims, including amended claims. This interpretation is compelled by the literal text of § 316(e), the overall statutory scheme for IPRs set forth in the AIA, and its legislative history. We believe, moreover, that this interpretation is consistent with the language and purpose of § 316(d).

a. Section 316(d) Does Not Impose Any Burden of Proof Regarding the Patentability of Proposed Amended Claims

The PTO claims that § 316(d)(1) unambiguously places the burden on the patent owner to prove the patentability of any proposed amended claim. Its statutory argument is twofold. First, the PTO argues that the fact that § 316(d)(1) states the patent owner may "propose" substitute claims unequivocally allows the Board to deny any motion at its discretion. Specifically, the PTO believes that Congress's use of the words "may" and "propose" indicates *not* that a patent owner is given a discretionary choice about whether to amend in the circumstances described, but rather that the Board has the unfettered discretion to refuse an amendment. This, the PTO believes is true even where the amendment falls within the statutorily-authorized categories of amendments and where the amendment satisfies the require-

ments of § 316(d)(3)—i.e., is non-broadening and does not introduce new subject matter.

The PTO's reading of § 316(d)(1) is contravened by the plain language of the statute: § 316(d)(1) says "the patent owner may" move to amend, not that the Board may or may not allow such a motion regardless of its content. It is also inconsistent with the purpose of § 316(d) which, as noted above, was to provide a patent owner with the ability to amend a challenged claim at least once as a matter of right, so long as the proposed amended claim conforms to the statutory requirements and any reasonable procedural rules. Indeed, the PTO's reasoning would render the amendment process virtually meaningless, rather than make the possibility of amendment the central feature of the IPR process it was intended to be. We are charged with construing statutes, "not isolated provisions." *King*, 135 S. Ct. at 2489 (quoting *Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010)); *United States v. Morton*, 467 U.S. 822, 828 (1984) ("We do not, however, construe statutory phrases in isolation; we read statutes as a whole.").

Second, the PTO contends that, because § 316(d)(1) says the patent owner may seek to amend by "motion," the amendment process unequivocally puts the burden of persuasion regarding the patentability of the amendment on the patent owner because movants bear the burden of proof on motions. For these reasons, the PTO contends that § 316(e) is not even relevant to the amendment process. Specifically, the PTO asserts: "Contrary to Aqua Products' argument, the statute providing for motions to amend in inter partes review proceedings places the burden of showing patentability on the patent owner when it states, 'the patent owner may file one motion to amend the patent,' as the <u>movant</u> bears the burden on a motion." PTO Intervenor Br. 19 (quoting 35 U.S.C. § 316(d)) (emphasis in original). It claims that, because

§ 316(d) says proposed amendments may be introduced by motion, the substantive burden of persuasion on the patentability of that amendment *must be* imposed on the movant.  We reject that contention.[5]

The PTO's argument begs the question:  what is the relief sought by the "motion" authorized in § 316(d)(1)?  As noted, the patent owner may proffer amendments that propose to cancel any challenged claim and propose a reasonable number of substitute claims as long as the substitute claims (1) do not impermissibly enlarge the scope of the claims, and (2) do not introduce new subject matter.  35 U.S.C. § 316(d)(1), (d)(3).  These requirements describe a threshold showing the Board must deem satisfied before the amended claims can be considered in—i.e., "entered into"—an IPR.  This showing by the patent owner is *not* the same as the burden of proof on the question of patentability.

The "request" made by a motion to amend is—*in the PTO's own words*—for "entry" into the IPR, not for entry of an amended claim into the patent.  Once entered into the proceeding, the amended claims are to be assessed for patentability alongside the original instituted claims.  The PTO acknowledged this structure in its explanation of final Rule 42.121:

> [T]he first motion to amend need not be authorized by the Board.  *The motion will be entered so long as it complies with the timing and procedural requirements.*  Additional motions to amend will require prior Board authorization.  *All motions to*

---

[5]  We are unanimous in this conclusion.  None of the other opinions endorse the PTO's conclusion that § 316(d) unambiguously answers the burden of persuasion question; they only conclude that the statutory scheme is ambiguous with respect to that question.

> *amend, even if entered, will not result automatically in entry of the proposed amendment into the patent.*

Changes to Implement Inter Partes Review Proceedings, Post-Grant Review Proceedings, and Transitional Program for Covered Business Method Patents, 77 Fed. Reg. 48,680, 48,690 (Aug. 14, 2012) (hereinafter "*Changes to Implement IPRs*") (emphases added). Thus, any propositions of substantive unpatentability for amended claims are assessed *following* entry of the amended claims into the IPR proceeding, under the standards that apply to all claims in the proceeding. The PTO justifies the burden it seeks to impose on the movant under § 316(d)(1) by mischaracterizing the nature of the relief sought by a motion made under that provision. Once the motions at issue are properly characterized, the PTO's statutory argument falls apart.

To conclude otherwise would conflate two concepts that are traditionally treated as distinct: the use of motions to raise evidentiary issues in adversarial proceedings versus the overall allocation of evidentiary burdens to the respective parties when rendering decisions on such motions. For example, although the movant has the burden to file a well-supported summary judgment motion before a court will consider it, if the underlying burden of persuasion rests with the other party, that underlying burden never shifts. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

We have noted that the "shifting burdens . . . in district court litigation parallel the shifting burdens . . . in inter partes reviews." *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378–81 (Fed. Cir. 2015). In district court, the party asserting invalidity of a patent claim bears the burden of establishing invalidity. 35 U.S.C. § 282(a). That burden of proof never shifts to the

patent owner. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359–60 (Fed. Cir. 2007). *Cuozzo* explains that the burden of proof in an IPR is one of the "adjudicatory characteristics" of an IPR that "make these agency proceedings similar to court proceedings." 136 S. Ct. at 2143. Congress expressly considered the *degree* of proof in IPRs and made clear in § 316(e) that it is to be by a preponderance of the evidence—unlike that required in district court proceedings. Congress knew how to create distinctions between trial proceedings and IPRs when it so chose; Congress chose not to do so when allocating the burden of proving unpatentability.[6]

---

[6] This interpretation also makes IPRs consistent with other PTO-based proceedings. There is no evidence that Congress intended to deviate from this well-established rule or that it intended to permit the PTO to do so. Other PTO-based proceedings have (or had) the same distribution of burdens. In pre-AIA inter partes reexamination proceedings, "the examiner retain[ed] the burden to show invalidity." *In re Jung*, 637 F.3d 1356, 1365–66 (Fed. Cir. 2011). In pre-AIA interference proceedings, a party challenging an existing claim bore the burden of showing that "the claims of the . . . application were unpatentable." *Velander v. Garner*, 348 F.3d 1359, 1369–70 (Fed. Cir. 2003). In ex parte reexaminations, the PTO bears the burden to demonstrate unpatentability. *See* 35 U.S.C. § 305. And in reissue proceedings, the patent owner is not required to come forward with affirmative evidence showing that it has not added new matter; instead, the PTO must evaluate this question. *See* 35 U.S.C. § 251. When enacting the AIA, Congress acted against this backdrop. "[A] fair reading of statutory text" includes recognition that "'Congress legislates against the backdrop' of certain unexpressed presumptions." *Bond v.*

For these reasons, we believe that the only reasonable reading of the burden imposed on the movant in § 316(d) is that the patent owner must satisfy the Board that the statutory criteria in § 316(d)(1)(a)–(b) and § 316(d)(3) are met and that any reasonable procedural obligations imposed by the Director are satisfied before the amendment is entered into the IPR. Only once the proposed amended claims are entered into the IPR does the question of burdens of proof or persuasion on propositions of unpatentability come into play. It is at that point, accordingly, that § 316(e) governs, placing that burden onto the petitioner.

### b.  The Unambiguous Language of § 316(e)

We have explained that, "[i]n an *inter partes* review, the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence,' 35 U.S.C. § 316(e), and that burden never shifts to the patentee." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1375 (Fed. Cir. 2016) (quotation marks and citation omitted). The parties do not dispute that § 316(e) places the burden of persuasion for already issued, challenged claims on the petitioner. Based on the plain and unambiguous language of this provision, we believe that § 316(e) applies equally to proposed substitute claims.

An instituted proposition of unpatentability is considered throughout the IPR. It is only finally determined when the Board issues a final written decision. Both by statute and by the PTO's own directives, any proposed amendment must seek to cancel a *challenged* claim and/or propose a substitute for a *challenged* claim, and it must do so by responding to *an instituted ground of unpatentability*. *See* 35 U.S.C. § 316(d)(1); *see also* 37 C.F.R.

---

*United States*, 134 S. Ct. 2077, 2088 (2014) (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)).

§ 42.121(a)(2)(i).  The structure of an IPR does not allow the patent owner to inject a wholly new proposition of unpatentability into the IPR by proposing an amended claim.  The patent owner proposes an amendment that it believes is sufficiently *narrower* than the challenged claim to overcome the grounds of unpatentability upon which the IPR was instituted.  When the petitioner disputes whether a proposed amended claim is patentable, it simply continues to advance a "proposition of unpatentability" in an "inter partes review instituted under this chapter."  35 U.S.C. § 316(e).

Contrary to other provisions of Chapter 31, which repeatedly make distinctions between original and amended claims, the "proposition of unpatentability" referenced in § 316(e) is not tethered to only one type of claim.  For example, §§ 316(a)(9) and 316(d) distinguish a "challenged claim" from "substitute claims."  Similarly, § 314(a) only applies to "claims challenged in the petition."  In § 318(a), Congress distinguished between "any patent claim challenged by the petitioner" and "any new claim added under section 316(d)."  And in § 318(b), Congress explained the procedure for issuing a certificate confirming the patentability of claims "and incorporating in the patent . . . any new or amended claim determined to be patentable."  In § 318(c), Congress provided for intervening rights with respect to "proposed amended or new claim[s] determined to be patentable" and incorporated into the patent following an IPR.

In contrast, § 316(e) does not reference "claims" at all, nor does it use the broader term "patent" to limit its scope.  And, contrary to the dissent's reading of it, there is no language in § 316(e) that confines its application to original claims for which an IPR has been instituted under § 314(a).  Section 316(e) reaches every proposition of unpatentability at issue in the proceeding.  Congress could have distinguished between proposed amended claims and originally challenged claims in § 316(e), but it

did not.  Congress is presumed to have acted intentionally when it made the distinction between challenged and amended claims in multiple parts of the AIA statutory scheme, yet declined to do the same in § 316(e).  *See Bates v. United States*, 522 U.S. 23, 29–30 (1997) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *Russello v. United States,* 464 U.S. 16, 23 (1983))).

Section 316(e) uses the term "unpatentability," which may refer to either pending or issued claims, rather than the term "invalidity," which both courts and the PTO apply only to issued claims.  *See, e.g.*, 35 U.S.C. § 282(a) (explaining that a "presumption of validity" attaches to issued patent claims and assigning "[t]he burden of establishing invalidity of a patent or any claim thereof" to the challenger); *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1080 n.7 (Fed. Cir. 2012) ("[I]n the litigation context, validity, rather than patentability, is the issue."); MPEP § 706 (9th ed. Rev. 7, Nov. 2015) (explaining that "issues pertinent to patentability" arise in "the course of examination and prosecution," while "validity" is applicable after the claims issue).  Congress's use of "unpatentability," rather than "invalidity," in § 316(e) to assign the burden of proof to the petitioner in IPRs is significant—Congress's choice reflects its intention that the burden of proof be placed on the petitioner for *all* propositions of unpatentability arising during IPRs, whether related to originally challenged or entered amended claims.

The Director is instructed by § 318(a) to issue a final decision on the patentability of both "any patent claim challenged by the petitioner *and* any new claim added under section 316(d)."  *Id.* § 318(a) (emphasis added).  And § 318(b) uses "patentable" in connection with *both*

issued claims and amended claims. *See id.* § 318(b). If the Board decides that an original or entered amended claim overcomes the petitioner's unpatentability challenge, the claim is "patentable" and treated as a valid claim, regardless of how the claim arose. *See id.* § 318(a) (referring to determining "the *patentability* of any patent claim challenged by the petitioner and any new claim added under section 316(d)" (emphasis added)); *accord id.* § 318(b). Whether a claim is "patentable" or "unpatentable" depends on the content of the claim, *not* who carried the burden of persuasion. *See id.* § 318(b) (characterizing an original claim as "unpatentable" when a cancellation certificate issues or "patentable" when a confirmation certificate issues, even though the petitioner has the burden of persuasion in both instances).

The terms "patentability" and "unpatentability" do not raise separate inquiries; if they did, Congress would not have placed the burden of proving "unpatentability" on the petitioner in § 316(e) and then required the Board to issue a decision on "patentability" in § 318(a) as if that were a disparate concept. Read together—which is how related statutory sections should be read—§ 316(e) and § 318(a)–(b) explain that, if the petitioner does not prove a claim (whether original or amended) to be "unpatentable," the Board should find the claim to be "patentable." *See, e.g., Coit Indep. Joint Venture v. Fed. Sav. & Loan Ins. Corp.*, 489 U.S. 561, 573 (1989); *see also Brown & Williamson*, 529 U.S. at 133.

The introductory clauses of § 316(e) ("In an inter partes review instituted under this chapter"), § 316(d)(1) ("During an inter partes review instituted under this chapter"), and § 318(a) ("If an inter partes review is instituted and not dismissed under this chapter . . .") lend further support to our reading of § 316(e). All of these clauses use essentially the same introductory language. If the introductory clause in § 316(e) were limited to only original claims—as we concluded in *Synopsys* and *Nike*—

the introductory clauses of § 316(d)(1) and § 318(a) also would have to be so limited. *See Sorenson v. Sec'y of the Treasury*, 475 U.S. 851, 860 (1986) ("The normal rule of statutory construction assumes that 'identical words used in different parts of the same act are intended to have the same meaning.'" (quoting *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87 (1934) (quoting *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932)))). This conclusion would make little sense, however; as discussed above, the plain language of § 316(d)(1) and § 318(a) refers to both original and amended claims. "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). A patent owner may only file a motion to amend as part of an already-instituted IPR. Because proposed amended claims are "entered into" and become part of the "inter partes review instituted under this chapter" so long as the patentee shows that they are non-broadening, supported by the specification, and responsive to a ground already at issue in the IPR, it would be illogical to construe these introductory clauses in an inconsistent fashion.

The location of § 316(e) within § 316 itself further indicates that this provision applies to *all* claims in an IPR—whether existing or proposed to be amended. Section 316(e) is one of the five subsections in § 316, entitled "Conduct of inter partes review." Section 316(e) *immediately follows* the subsection discussing the requirements for amended claims in IPRs. The lack of any reference to a burden of persuasion in the amendment subsection of § 316(d), while including an express reference to it one subsection later, indicates that Congress intended § 316(e) to apply to all claims considered in an IPR, including those authorized in the immediately preceding subsection. *See* 35 U.S.C. § 316. None of the

other provisions in § 316 limit the application of § 316(e) in IPRs, nor are any of these subsections meant to be read in isolation—they describe the conduct of the proceeding as a whole. Indeed, Congress did not speak to burdens of proof or persuasion in IPRs anywhere else in the AIA; § 316(e) stands as its only command on that issue.

For all these reasons, the dissent's contention that "Congress was writing a rule only for the class of claims that it recognized as necessarily having been challenged as unpatentable by a 'petitioner'" in § 316(e) is untenable. Taranto Op. at 13. To accept that proposition, one would have to divorce consideration of proposed amended or substitute claims from the issued and challenged claims which they, by right, seek to modify or replace. But, both by virtue of the text of § 316(d) and the plain language of Rule 42.121, that cannot be done; the very unpatentability challenges by the petitioner are the same unpatentability challenges to which any proposed amendment must respond and which continue throughout the proceeding. These are not different "classes" of claims.

c. Reading § 316(e) in the Context of the AIA

As noted before, an Act of Congress "should not be read as a series of unrelated and isolated provisions." *Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 570 (1995); *see also King*, 135 S. Ct. at 2489. Because the presence of ambiguity in the meaning of a term "may only become evident when placed in context" within the statute, we next examine how § 316(e) fits within the overall statutory framework of the AIA. *King*, 135 S. Ct. at 2489 (citation omitted).

The Supreme Court has instructed us to look to "[t]he text of the . . . provision [at issue], along with its place in the overall statutory scheme, its role alongside the Administrative Procedure Act [("APA")], the prior interpretation of similar patent statutes, and Congress's purpose in crafting inter partes review" to interpret each provision

of the AIA. *Cuozzo*, 136 S. Ct. at 2141. The ultimate meanings of § 316(d) and § 316(e) must be "compatible with the rest of the law." *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2442 (2014).

Read in context of the overall statutory scheme, we believe that § 316(e) does not permit placing the burden of persuasion on the patent owner. Based on the requirements outlined in §§ 311–13, the petitioner defines the scope of the IPR through the petition, similar to how a plaintiff uses traditional pleadings to define the scope of litigation before federal courts. These sections make clear that amendments do not create a "new" claim for the Board's consideration; they merely respond to at least one ground of unpatentability originally raised by the petitioner. Sections 314 and 316, when read together, explain that the patent owner may use amendment as a tool to narrow claim scope in an effort to ensure its patentable subject matter remains properly protected. The provision of the AIA relating to the estoppel effect of IPRs, § 315(e), is consistent with the remainder of the statute *only if* the petitioner bears the burden to prove its propositions of unpatentability for all claims. And, §§ 316(d)(2) and 317, in combination, contemplate the use of amendments as a settlement tool, indicating that Congress contemplated narrowing amendments which would relieve a petitioner of any threat of infringement, while allowing the patent, as amended, to survive.

When read in conjunction with the directive of § 318, we believe that the Board must assess the patentability of all claims in the proceeding, including amended claims that have been entered into the proceeding after satisfying the requirements outlined in § 316(d), and must do so through the lens of § 316(e).

i. Petitioner Controls the Scope
of the IPR:  §§ 311–13

Section 311(a) provides that a person "not the owner of a patent" may file a petition to institute an inter partes review.  35 U.S.C. § 311(a).  Section 311 also limits the scope of the proceeding to grounds that "could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications."  *Id.* § 311(b).

Section 312 sets forth the various statutory requirements to which each petition challenging the validity of a patent must conform before the PTO may institute an inter partes review.  *Id.* § 312(a) ("A petition filed under section 311 may be considered *only if*—" (emphasis added)).  The petition must identify, "in writing and with particularity, each claim challenged, the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim . . . ."  *Id.* § 312(a)(3).  This provision confirms that the petitioner, not the patent owner, controls the scope of the IPR.  The language of § 311 and § 312 tracks the language of § 316(e)—all reference the "grounds or propositions of unpatentability" that carry throughout the proceeding.

Section 313 further explains that the patent owner has the right, but not the obligation, to file a preliminary response to the petition.  *Id.* § 313 ("[T]he patent owner *shall have the right to file* a preliminary response to the petition . . . ." (emphasis added)).  This provision makes sense in context because the patent owner has no burden to overcome a petitioner's assertions.

Given the statutory and regulatory requirements for amending claims in an IPR, amendments cannot and do not create new and different claims for consideration. Amendments cannot add new claim scope or new matter; they are in fact *prohibited* from doing so by the require-

ments of § 316(d). And, per the PTO's regulatory re-
quirements in Rule 42.121, proposed amended claims
must respond to a ground of unpatentability *raised by the
petitioner* and upon which the IPR was instituted. The
ground must carry through the entire proceeding; other-
wise, amendments adding limitations to the challenged
claims to "overcome" an asserted challenge would make
no sense.[7]

## ii. Institution: § 314

Relevant to this appeal, § 314(a) explains that the Di-
rector must determine that "there is a reasonable likeli-
hood that the petitioner would prevail with respect to at
least 1 of the claims challenged in the petition," based on
the petition and any patent owner response under § 313.
35 U.S.C. § 314(a).

---

[7]    Judge Taranto's contention that it is meaningful
that these initial sections do not discuss a petitioner's
obligations vis-à-vis proposed amendments is perplexing.
Of course they do not. The statutory sections relating to
IPRs are ordered in temporal fashion. Sections 311–13
deal with showings that must be made prior to institution
or as part of the institution process. Proposed amend-
ments come after *and in response to* the grounds on which
institution is granted. The PTO acknowledges this fact in
its briefing. PTO Suppl. Br. 24 ("The petition phase of a
review, of course, does not involve amended claims—a
patent owner cannot seek to *amend* in an inter partes
review unless the petitioner has first filed a *petition* for
inter partes review." (emphasis in original)). It is notable
that it is only *after* laying out all steps of the IPR proce-
dure, other than those dealing with what the Director
must do to resolve an IPR, that Congress outlines the
nature and placement of the burden of proof regarding
propositions of unpatentability in the IPR.

It is only after the institution decision that the patent owner may elect to adjust the scope of its patent grant by proposing narrowing amendments to protect its patentable subject matter.  In this way, IPR functions as a process for refining and limiting patent scope, similar to the inter partes reexamination process.  *See Cuozzo*, 136 S. Ct. at 2144.

### iii.  Application of Estoppel to IPRs:  § 315

Section 315 describes how an IPR interacts with other patent-related proceedings, including examination, administrative review, and federal court litigation.  Section 315(e) provides that, where institution occurs and the proceeding results in a final written decision under § 318(a), the petitioner, real party in interest, or privy of the petitioner are all estopped with respect to "any ground that the petitioner raised or reasonably could have raised during that inter partes review" against that claim.  35 U.S.C. § 315(e).

This provision is only consistent with the remainder of the AIA if the petitioner bears the burden to prove all propositions of unpatentability.  Where the petitioner bears the burden, it is logical to estop the petitioner from raising that ground in the future, whether related to originally challenged claims or entered amended claims.  If the patent owner were to bear the burden to demonstrate the patentability of proposed amended claims and to do so by reference to prior art not addressed in the IPR, it would be illogical to say that the *petitioner* is thereafter estopped from anything as to those claims.

### iv.  The Impact of Settlements:  §§ 317–18

Section 317, the section of the statute immediately following Congress's express statement in § 316(e) regarding the proper burden of persuasion for all claims, contemplates, in conjunction with the opportunity for additional uncontested amendments under § 316(d)(2), the possibil-

ity that the amendment process will be used as a settlement tool in IPRs. This too makes sense; a petitioner in an IPR may decline to maintain a challenge to a narrower amended claim if the patent owner agrees not to seek to enforce any claim scope broader than the scope of the proposed amendment. The first sentence of § 317(a) states that the PTO *must* terminate the participation of a particular petitioner, in a particular IPR, based on the filing of a joint motion and settlement by that petitioner and the patent owner. At that point, either (1) the patent owner is the only party remaining in the IPR, and the PTO can terminate the review or proceed to a final written decision as described in § 318(a); or (2) other petitioners are still participating in the IPR, and the IPR moves forward as usual.

If a settlement occurs and the IPR is terminated, no certificate incorporating the amendment into the patent ever issues. Section 318(b) makes clear that no certificate either reaffirming a challenged claim or substituting an amended claim for a challenged one issues *unless and until* the Board chooses to issue a final judgment under § 318(a) in which it assesses the patentability of both categories of claims. In the absence of a final written decision, the patent survives as originally written, subject to any narrowing agreements or covenants not to sue between the original parties. And, it survives subject to any later IPR or court challenges it might face.

The final sentence of § 317(a) gives the Board the option to proceed to final judgment in any proceeding where the original petitioners choose not to continue their challenge. The Board might do this for any number of reasons. For example, the Board may decide that the showing of unpatentability with respect to the challenged claims is so strong that the public is better served by a cancellation of those claims; it may decide that even the narrower, amended claims are unpatentable in the face of the prior art on which the IPR was predicated and that

confirmation of that fact is important; or it may decide that the amended claims are patentable in the face of the prior art challenges precisely because they are narrower than the original claims, and that it is important for the patent to be amended to reflect that fact so the public can benefit from that narrowing.

Should the Board elect to continue to a final written decision in this scenario, § 318(a) requires the Board to undertake a patentability analysis on all original and amended claims in the proceeding. Thus, it is *at that point*, and not earlier, that the statute contemplates consideration of an amended claim's patentability. As the Supreme Court recognized in *Cuozzo*, where the challenger ceases to participate in the IPR and the Board proceeds to final judgment, *it is the Board* that must justify any finding of unpatentability by reference to the evidence of record in the IPR. *See* 136 S. Ct. at 2144. This accords with traditional requirements of agency adjudication under the APA. There is no reason dictated by either the language or the logical structure of the statute, or by *Cuozzo*'s recognition of the Board's obligations when a petitioner absents itself from an IPR, to conclude that this burden does not apply equally to amended claims. Indeed, as we noted before, the language in § 318(a) mirrors that of § 316(e).

v.  The Overall AIA Framework

Read in their entirety and collectively analyzed, the statutory provisions of the AIA lay out an internally consistent, logical, and unambiguous structure for the conduct of IPRs. Understanding the statutory structure in this way is consistent with the concept that "inter partes review helps protect the public's 'paramount interest in seeing that patent monopolies . . . are kept within their legitimate scope.'" *Cuozzo*, 136 S. Ct. at 2144 (quoting *Precision Instrument Mfg. Co.*, 324 U.S. at 816).

There is a legitimate scope for properly-crafted patent protection. The goal underlying the AIA is twofold: (1) eliminating patents that foster abusive litigation; and (2) affirming and strengthening viable patents. The legislative history reflects these dual objectives. As early as 2006, Senator Leahy explained that the AIA:

> [I]s not an option but a necessity. . . . I also want to ensure the delicate balance we have struck in the post-grant review process and make certain that the procedure is both efficient and effective at *thwarting some strategic behavior in patent litigation and at promoting a healthier body of existing patents.*

152 CONG. REC. 16834 (2006) (statement of Sen. Leahy on S. 3818) (emphasis added). Allowing narrowing amendments during an IPR helps strengthen and clarify patents. As the PTO itself testified before Congress, providing a patent owner with a meaningful opportunity to amend subject to minimal statutory and regulatory criteria helps "preserve the merited benefits of patent claims better than the win-all or lose-all validity contests in district court." *PTO Gen. Counsel Toupin Statement*, at 10.

The AIA achieves these dual goals through a defined mechanism allowing for a limited category of challenges—an adversary proceeding where the Board is the arbiter of, rather than a party to, challenges asserted under only § 102 and § 103 of Title 35. The AIA relies on the adversarial nature of IPRs to ensure quick but thorough adjudication of the merits: the petitioner raises its best arguments at the outset; the patent owner has the opportunity to adjust the scope of its claims if need be; and the Board provides a speedy ruling as to the patentability of the original and amended claims.

### d. Legislative History of § 316(e)

While legislative history generally carries little weight when interpreting the text of issued statutes, "[w]hen aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no rule of law which forbids its use, however clear the words may appear on superficial examination." *Train v. Colo. Pub. Interest Research Grp., Inc.*, 426 U.S. 1, 10 (1976). The clarity of the statutory provision here, both alone and in context, obviates the need to rely on the legislative history of the AIA. The legislative history nevertheless strongly supports our conclusion that the language of § 316(e) unambiguously places the burden of proving the unpatentability of all claims on the petitioner.

As noted, Congress made clear that patent owners may propose amendments to their patents as of right at least once in an IPR. The congressional record reflects Congress's desire to protect the patent owner's right to propose amendments by placing the burden of proving the unpatentability of amended claims entered into an IPR on the petitioner.

Earlier drafts of § 316(e) stated that "*[t]he presumption of validity* in § 282 shall apply in post-grant review proceedings." PTO Suppl. Br. 20 (emphasis in original) (quoting S. 3600, 110th Cong. § 5(c) (2008) (proposing 35 U.S.C. § 331(a)). These drafts also stated that "[t]he petitioner shall have the burden of proving a proposition of *invalidity* . . . ." S. 3600, 110th Cong. § 5(c) (2008) (emphasis added) (proposing 35 U.S.C. § 331(b)); *see also* S. 1145, 110th Cong. § 5(c)(1) (2008) (proposing 35 U.S.C. § 331(b) ("The petitioner . . . shall have the burden of proving a proposition of *invalidity* . . . ." (emphasis added))). At this stage in the drafting process, § 316(a)(9) had not been added to the statute. In the enacted version, Congress changed "invalidity" to the broader term "unpatentability," and also delegated rulemaking authority to

the Director for "setting forth standards and procedures for allowing the patent owner to move to amend the patent" under § 316(d). These simultaneous changes reflect Congress's intent to direct the PTO to adjudicate amended claims based on the specific burden of proof stated in § 316(e), rather than to promulgate regulations *changing* that substantive burden. Had Congress intended that the patent owner bear the burden of persuasion on the patentability of amended claims, or to leave such assignment to the PTO, it could have left the term "invalidity" in § 316(e).

A Senate Report on the Patent Reform Act of 2009 explains that the burden of proving unpatentability in post-grant proceedings *is always on the challenger*:

> The examinational model places the burden on the PTO to show that a claim is not patentable, and requires a series of filings, office actions, and responses that make this system inherently slow. By contrast, in an oppositional system, *the burden is always on the challenger* to show that a claim is not patentable.

S. REP. NO. 111-18, at 57 (2009) (emphasis added). The comparison to examination proceedings—which necessarily relate to proposed *new* claims—is telling. It indicates that Congress viewed the petitioner's unwavering burden broadly, as covering all claims in the IPR.

In the March 2011 Senate debates involving the replacement of inter partes reexamination with the AIA's IPRs, Senator Kyl articulated Congress's intention to create an adjudicative proceeding where the petitioner bore the burden of showing unpatentability:

> One important structural change made by the present bill is that inter partes reexamination is converted into an adjudicative proceeding in which the petitioner, rather than the Office, bears

the burden of showing unpatentability. . . . In the present bill, section 316(a)(4) gives the Office discretion in prescribing regulations governing the new proceeding. The Office has made clear that it will use this discretion to convert inter partes into an adjudicative proceeding. *This change also is effectively compelled by new section 316(e), which assigns to the petitioner the burden of proving a proposition of unpatentability by a preponderance of the evidence.*

157 CONG. REC. 3386 (2011) (emphasis added) (statement of Sen. Kyl). Again, there is no indication in this language that the drafters intended § 316(e) to apply narrowly, rather than to both original and amended claims.

Indeed, in earlier versions of the AIA, Congress considered language regarding the burden of proof that looked a great deal like the language the PTO wants us to read into Rule 42.20(c). *See, e.g.*, H.R. 1908, 110th Cong. (2007) ("§ 328 Proof and Evidentiary Standards (b) Burden of Proof—The party advancing a proposition under this chapter shall have the burden of proving that proposition by a preponderance of the evidence."); *see also* H.R. 1260, 111th Cong. (2009) (same). But Congress changed its language on the burden of proof to state explicitly both that the *petitioner* bears the burden of proof in the enacted version and that the standard of proof is by a preponderance of the evidence. *See* 35 U.S.C. § 316(e) ("Evidentiary standards.—In an inter partes review instituted under this chapter, the *petitioner* shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence." (emphasis added)). We believe Congress's change removed the possibility that the PTO could assign the burden of proving patentability to the patent owner for *any* claim, rejecting the very interpretation the PTO now argues conforms with the statute.

As noted, the AIA outlines a logical framework for the PTO's adjudication of these proceedings.  By reading too much into § 316(d) and too little into § 316(e), the PTO effectively injects illogic into that framework and undermines its function and purpose.

### e.  There Is No Potential for Issuance of "Untested" Amended Claims

Despite the AIA's clear framework and placement of the burden of proving unpatentability for all claims onto the petitioner, at least one of our earlier decisions expressed concern about the potential issuance of "untested" amended claims.  *See Nike*, 812 F.3d at 1333.  The panel in *Nike* explained that "placing this burden [to show patentability] on the patent owner for its newly formulated claims is appropriate," as IPRs "are distinctly different from a typical PTO examination or reexamination where a patent examiner performs a prior art search and independently conducts a patentability analysis of all claims, whether newly proposed or previously existing."  *Id.*  The dissent echoes that concern.  *See* Taranto Op. at 16–17.

Respectfully, both the *Nike* decision and the dissent overstate the likelihood that an *untested* amended claim might issue.  During oral argument, the parties agreed that amended claims are virtually never uncontested.  Oral Arg. at 25:15–23, 47:11–21, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=20 15-1177_1292016.mp3.  When a petitioner does contest an amended claim, the Board is free to reopen the record to allow admission of any additional relevant prior art proffered by a petitioner or to order additional briefing on any issue involved in the trial.  *See* 37 C.F.R. § 42.20(d); *see also id.* § 42.123.  The Board may then consider all art of record in the IPR, including any newly added art, when rendering its decisions on patentability.

More importantly, amended claims added to an IPR *are neither untested nor unexamined.*  The original claims

issued following an examination under all criteria set forth in Title 35. Because proposed amended claims must be narrower in scope and cannot add new matter, they necessarily were subjected to that same earlier examination and are reassessed to determine whether they are supported by the patent's written description.[8] The only remaining question is whether they are unpatentable in the face of the prior art cited in the IPR and any new art relevant to § 102 or § 103 that the petitioner asks be introduced into the IPR. *See* 35 U.S.C. § 316(d)(3). These "amended claims" do not, moreover, issue as part of the patent unless and until the Board both decides to render a final decision and finds those claims not unpatentable. *Id.* § 318(b).

Even when a petitioner ceases participation in the IPR, we see little potential for harm from "untested" claims. In a scenario where the Board reviews the record presented in the IPR, including any entered amended claims, and concludes that those entered amended claims are not unpatentable, the "worst" possible outcome is that a patent issues in which the previously-examined claims have been narrowed and clarified in such a way that the petitioner does not fear its ability to continue to make, use, or sell its own product, and the public is put on notice of exactly how to innovate around those claims in the future. *See id.* §§ 316(d)(3), 318(b). In this scenario, moreover, the PTO will have been unable to conclude that any issued amended claims are unpatentable under very

---

[8]    Here, the Board found that all these requirements were satisfied. *Zodiac Pool Sys., Inc., v. Aqua Prods., Inc.*, No. IPR2013-00159, 2014 WL 4244016, at *22–26 (P.T.A.B. Aug. 22, 2014) (noting that the proposed amended claims satisfied all criteria under both § 316(d) and Rule 42.121, were not indefinite, and satisfied the written description requirement).

relaxed standards—preponderance of the evidence and broadest reasonable interpretation.  Finally, not only will any issued amended claims be subject to the intervening rights of anyone already practicing them and limit the scope of the patent owner's damages, if any, but any issued amended claims will remain subject to challenge in various future proceedings, including subsequent IPRs, ex parte reexaminations, district court litigations, or through the Director's ability to initiate an ex parte reexamination pursuant to 37 C.F.R. § 1.520.

Accordingly, while we recognize that our views on this question have not garnered a majority of the available votes, we believe that Congress intended that the petitioner bear the burden of persuasion as to all claims in an IPR, whether original or amended.  Because we believe that "the intent of Congress is clear" in § 316(d) and § 316(e), moreover, we believe "*that [should be] the end of the matter*." *Chevron*, 467 U.S. at 842 (emphasis added).

### 2. *Chevron* Step Two

We believe there is no need to consider whether deference to any interpretation of § 316(d) and § 316(e) that is contrary to ours is appropriate.  Because, of the eleven judges participating in this en banc rehearing, six believe the relevant statutory scheme is ambiguous, however, we must and do reach *Chevron* Step Two.  Where there is an ambiguity in a statute, we first must determine whether the ambiguity is attributable to the fact that Congress was less than clear about the result it intended, or to the fact that Congress did not intend any particular result and instead meant to allow the agency to resolve the question.  Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law*, 1989 DUKE L.J. 511, 516 (1989).  If it is the first, we are to resolve that ambiguity by traditional principles of statutory construction.  In other words, it remains a simple question of law to be resolved by the courts.  *Id.*  Only where the latter is the

case do we move on to a traditional *Chevron* Step Two analysis. *Id.*

As discussed above, we think Congress was clear that it wanted to place the burden of persuasion for all propositions of unpatentability on the petitioner. If, as our colleagues urge, however, Congress's failure to mention amended claims expressly in § 316(e) makes its intention with respect to amended claims less than clear, we believe clarity can be achieved through the traditional statutory interpretation in which we have engaged above. Congress considered both the standard of proof to be employed in IPRs and the placement of that burden. The legislative history outlined above reflects the extent to which those concepts were key considerations when structuring the IPR process. We see nothing to indicate that Congress meant to leave any aspect of that substantive decision to the PTO.

Because we are forced to assume a scenario in which there is an ambiguity in the statute with respect to the substantive burden of persuasion on motions to amend that is irresolvable, we must determine: (1) whether the PTO has adopted a rule or regulation through APA-compliant procedures that have the force and effect of law; (2) if so, whether that rule is within the scope of the PTO's rulemaking authority; and (3) if so, whether that rule is based on "a permissible construction of the statute." *Chevron*, 467 U.S. at 843. If we conclude that the answer to either of the first two inquiries is no, then it is our obligation to interpret the governing statute without deference. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016). Because we conclude that the answer to at least the first question is no, we proceed to analyze the relevant statutory provisions in the first instance.

The PTO's argument that it is entitled to *Chevron* deference is primarily based on its misinterpretation of

§ 316(d), discussed above. The Supreme Court has explained that deference to misinterpretation of a statute is impermissible. *See Smith v. City of Jackson*, 544 U.S. 228, 267 (2005) (O'Connor, J., concurring) ("Of course, it is elementary that 'no deference is due to agency interpretations at odds with the plain language of the statute itself.'" (quoting *Pub. Emps. Ret. Sys. v. Betts*, 492 U.S. 158, 171 (1989))).

The PTO turns to a regulatory argument only as a fallback. Section 316(a)(9) grants the Director the authority to "set[] forth standards and procedures for allowing the patent owner to move to amend the patent under subsection (d) to cancel a challenged claim or propose a reasonable number of substitute claims." The PTO argues that it is pursuant to this authority that it promulgated Rules 42.20 and 42.121, which the PTO claims place the burden of proving the proposition of the patentability of amended claims on the patent owner. Notably, the PTO does not, as does Judge Taranto, argue that Rules 42.20 and 42.121 *unambiguously* assign this burden to the patent owner. As discussed below, this is likely because neither rule uses the term "burden of persuasion" or "patentability" and the PTO never indicated to the public in its rulemaking process that either rule was intended to address that substantive issue. Instead, the PTO attempts to back into its request for *Chevron* deference by arguing that it is entitled to *Auer* deference for its interpretation of Rules 42.20 and 42.121, including its conclusion that those rules, together, *impliedly* address the burden of persuasion for amended claims in IPRs and limit the scope of § 316(e). But the regulations on which the PTO relies do not support that strained interpretation. And *Auer* does not authorize an agency to rewrite its regulations in the guise of "interpretation."

### a. The PTO Has Not Adopted a Rule or Regulation Governing the Burden of Persuasion on the Patentability of Proposed Amended Claims

We use the same interpretive rules to construe regulations as we do statutes; we consider the plain language of the regulation, the common meaning of the terms, and the text of the regulation both as a whole and in the context of its surrounding sections. *Tesoro Haw. Corp. v. United States*, 405 F.3d 1339, 1346–47 (Fed. Cir. 2005); *Lockheed Corp. v. Widnall*, 113 F.3d 1225, 1227 (Fed. Cir. 1997); *Lengerich v. Dep't of the Interior*, 454 F.3d 1367, 1370 (Fed. Cir. 2006). If the regulatory language is clear and unambiguous, no further inquiry is usually required. *Roberto v. Dep't of the Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006). But "[d]eference is undoubtedly inappropriate, for example, when the agency's interpretation is 'plainly erroneous or inconsistent with the regulation.'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (quoting *Auer*, 519 U.S. at 461).

Neither Rule 42.20 nor Rule 42.121 addresses the *burdens of proof or persuasion* with respect to propositions of unpatentability once an amended claim has been entered into the IPR. Rule 42.20 is a general provision establishing procedures for motion practice in IPRs. As noted previously, when the patent owner files a motion to amend claims during an IPR, the patent owner's "requested relief" under Rule 42.20 is the Board's permission to enter a reasonable number of substitute claims into the IPR. That is the "motion" practice contemplated and, indeed, spelled out in § 316(d). To the extent Rule 42.20(c) imposes a burden on the patent owner as the "movant," it is a burden to show that the amendments do "not enlarge the scope of the claims of the patent or introduce new matter" as required by 35 U.S.C. § 316(d)(3), not a burden to prove the overall patentability of the amended claim.

Likewise, Rule 42.121(a)(2)(i) merely requires the patent owner to show that its proposed amendment is responsive to *at least one ground of unpatentability* at issue in the IPR.[9] In connection with its promulgation, the PTO explained to the public that this requirement was merely to ensure that the proposed amendment had a minimal level of relevancy to the IPR. *Changes to Implement IPRs*, 77 Fed. Reg. at 48,705. The PTO said that this procedural rule was intended to streamline IPRs, not to create a substantive requirement that the patent owner bear the burden of persuasion on the patentability of an amended claim:

> As the PTO explained, [Rule 42.121(a)(2)(i)] is meant to "enhance efficiency of review proceedings . . . . [A]ny amendment that does not respond to a ground of unpatentability most likely would cause delay, increase the complexity of the review, and place additional burdens on the petitioner and the Board."

*Proxyconn*, 789 F.3d at 1308 (second alteration in original) (quoting *Changes to Implement IPRs*, 77 Fed. Reg. at 48,705). Like Rule 42.20, Rule 42.121 *does not* address the underlying issue of where the burden of persuasion

---

[9] Aqua argued before the panel that the PTO lacked authority to require that any proposed amendment "respond to a ground of unpatentability" involved in the IPR. We conclude, however, that this procedural requirement fits within the Director's delegated authority to "set[] forth standards and procedures for allowing the patent owner to move to amend the patent," 35 U.S.C. § 316(a)(9), and does not go so far as to eviscerate the right to amend Congress granted patent owners in § 316(d). Indeed, Rule 42.121 is consistent with the directive in § 316(d)(1) that a motion to amend be directed to "challenged claims."

lies for the proposed amended claims once entered into the proceeding. The language of Rule 42.121 does not suggest that the Board must deny a motion to amend if a patent owner fails to prove the ultimate patentability of the proposed amended claims in that motion. Both by statute *and by its own rules*, the Board has only limited grounds for denying a motion to amend: (1) if the amendment "does not respond to a ground of unpatentability involved in the trial," 37 C.F.R. § 42.121(a)(2)(i); or (2) if the amendment "seeks to enlarge the scope of the claims of the patent or introduce new subject matter," *id.* § 42.121(a)(2)(ii).

We do not read these regulations, separately or together, to say that the patent owner must bear the burden of proving the patentability of amended claims or to require satisfaction of that burden on the face of the motion to amend. These regulatory requirements simply do not address the ultimate relief sought by the petitioner in the IPR: a determination of unpatentability, leading to the cancellation of challenged patent claims—as originally issued or amended—after a final written decision. They address preconditions to entry of the amended claims into the IPR. *Auer* deference does not permit the PTO to write words into a regulation, or to interpret a regulation in ways that are not supported by the very language employed in the regulations. *See, e.g.*, *Christopher*, 567 U.S. at 155 (*Auer* "[d]eference is undoubtedly inappropriate, for example, when the agency's interpretation is 'plainly erroneous or inconsistent with the regulation.'" (quoting *Auer*, 519 U.S. at 461)).

More fundamentally, the PTO's contention that its regulations actually address and interpret the scope of § 316(d) and § 316(e) finds no support in the language of, or commentary relating to the adoption of, those regulations. Other than language parroting the basic requirements of § 316(d)(3), there is no other reference to either statutory section, no reference to proving propositions of

patentability or unpatentability, and no mention of the words "burden of persuasion." And, there is no place in the regulations or relevant commentary where reference to an ambiguity or statutory silence in either § 316(d) or § 316(e) is claimed, explored, or mentioned. *Chevron* does not apply where an agency has not actually addressed the issue it purports to be within its discretion to address. *See, e.g., Encino*, 136 S. Ct. at 2127 (holding *Chevron* deference is not warranted where the agency "did not analyze or explain why the statute should be interpreted" in a particular manner).

*Auer* cannot be invoked to substitute for an agency's failure to analyze the relevant statutory provisions in the first instance. *See Gonzales v. Oregon*, 546 U.S. 243, 257 (2006) ("Simply put, the existence of a parroting regulation does not change the fact that the question here is not the meaning of the regulation but the meaning of the statute. An agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language."). Of course, "if Congress has directly spoken to an issue then any agency interpretation contradicting what Congress has said would be unreasonable." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 n.4 (2009).

The PTO's decisions in *Idle Free* and *MasterImage* do not alter our conclusion that the PTO's regulations do not speak to either § 316(e) or the ultimate burden of persuasion regarding patentability.

First, the *Idle Free* decision is not entitled to deference. It has been designated as an "interpretive" non-binding discussion not approved by the Director, and later redesignated as a "representative" non-binding discussion. Such musings are not sufficient to command *Chevron* or *Auer* deference of any sort. *See, e.g., Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (collecting cases

and noting, "[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."); *see also Mead*, 533 U.S. at 230 ("It is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force."); *Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 260 F.3d 1365, 1378 (Fed. Cir. 2001) ("*Chevron* deference does not normally apply to informal proceedings.").

Second, *Idle Free* just does not say what the PTO reads into it. There, a panel of the Board examined 35 U.S.C. § 316(a)(9) and § 316(d) in the context of discussing "Claim-by-Claim Analysis" and the requirement that an amendment may be denied where it introduces new matter. *See Idle Free*, 2013 WL 5947697, at *1–5. But the panel did not cite to any other statutory provision. Nowhere in that decision is § 316(e) cited or interpreted. The leap the PTO asks us to take based on *Idle Free* is simply too great. The PTO enacted regulations that do not interpret § 316(e). Then, a Board panel issued a decision discussing those regulations, which also never addresses § 316(e). Despite this, the PTO asks that we defer to its current contention that both the regulations and *Idle Free* do, *in fact*, define the scope of that statutory provision. We do not.

The PTO next points to *MasterImage*. Again, the Board did not purport to interpret any statutory provision in *MasterImage*. While the Board provided policy explanations for its practice of requiring the patent owner to provide patentable distinctions over a broad range of prior art, it did not explain how that interpretation is consistent with, or supported by, the governing statutes. The Board did not analyze the PTO's rulemaking authority

under 35 U.S.C. § 316(a)(9); it did not analyze the requirements for motions to amend under § 316(d); and it did not analyze the burden of proof designation under § 316(e).

To be entitled to *Chevron* deference, "an agency must cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983); *see also Encino*, 136 S. Ct. at 2127. No such cogent explanation has ever been provided by either the Director or the Board. *See, e.g.*, *Waterkeeper All. v. EPA*, 853 F.3d 527, 530, 534–38 (D.C. Cir. 2017) (vacating an EPA Final Rule and concluding that *Chevron* Step One ended the inquiry, where the EPA failed to point to any statutory ambiguity authorizing its Final Rule).

If, moreover, as the PTO contends, *Idle Free* and *MasterImage* actually concluded that Rule 42.20 *requires* the assignment of the burden of persuasion to the patent owner regarding the ultimate patentability of amended claims—despite the texts of § 316(d), § 316(e), and the regulations themselves—that burden shift would be a substantive change in the law. *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 849 (2014); *Dir., Off. of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267, 271 (1994). But the PTO itself represented to the public that Rule 42.20 was purely "procedural and/or interpretative," not substantive. Rules of Practice for Trials Before the Patent Trial and Appeal Board and Judicial Review of Patent Trial and Appeal Board Decisions, 77 Fed. Reg. 48,612, 48,651 (Aug. 14, 2012) (hereinafter "*Final Rules of Practice*"). This is important.

If an agency purports to rest its authority to act on an express grant of rulemaking authority—as the PTO suggests it may do here—then it may only act consistently with its obligations under the APA. One such obligation

is to inform the public of the substance of the subjects its rulemaking purports to address. 5 U.S.C. § 553(b)(3) (Federal Register notice must include "either the terms or substance of the proposed rule or a description of the subjects and issues involved."). Notice of agency rulemaking is insufficient "where interested parties would have had to divine [the Agency's] unspoken thoughts." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1260 (D.C. Cir. 2005) (citation and quotation marks omitted, alteration in original). If notice is inadequate where an agency's explanations are unclear, it is surely inadequate when the agency expressly denies it is adopting a practice it later attempts to insert into a rule by interpretation.

In connection with the adoption of its rules governing IPRs, including Rule 42.20, the PTO defended its choice not to employ all of the rulemaking procedures under the APA by explaining, repeatedly, that nothing it was doing in its rules was substantive and nothing in its rules would impact final decisions on patentability. The Director stated:

> Although the Office sought the benefit of public comment, these rules are procedural and/or interpretive. *Stevens v. Tamai,* 366 F3d. [sic] 1325, 1333–34 (Fed. Cir. 2004) (upholding the Office's rules governing the procedure in patent interferences). *The final written decisions on patentability which conclude the reviews will not be impacted by the regulations, adopted in this final rule, as the decisions will be based on statutory patentability requirements.*

*Final Rules of Practice,* 77 Fed. Reg. at 48,651 (emphasis added). And the Director went on to cite *Cooper Technologies Co. v. Dudas*, 536 F.3d 1330, 1336–37 (Fed. Cir. 2008), "for the proposition that 5 U.S.C. [sic] 553, and thus 35 U.S.C. [sic] 2(b)(2)(B), does not require notice and

comment rulemaking for 'interpretive rules, general statement of policy, or rules of agency organization, procedure or practice.'" *Id.* The PTO cannot say that its rules do not relate to issues of patentability and then later apply those very rules to impose substantive burdens of persuasion with respect to patentability on the patent owner.

As Judge Moore explains in her concurrence, moreover, improperly characterizing a rule regarding burdens of proof as "procedural" does not excuse failure to comply with the Director's obligations under the APA. Section 316(a)(9) is a narrow grant of rulemaking authority to carry out an express congressional goal: to allow the patent owner to move to amend the patent as authorized by § 316(d). In the face of that grant of rulemaking authority, the Director may only set forth such "standards and procedures" through the rulemaking *identified* in § 316(a)(9), with all of the requirements and obligations that accompany the exercise of that authority. There are no doubt circumstances in which agencies may address unanticipated policy challenges, carry out generally-worded statutory charges, or set forth internal operating procedures, even through ad hoc adjudication. *See, e.g., NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 293–94 (1974). This is not one of those circumstances, however.

On this point, Judge Hughes conflates the broader rulemaking authority granted under § 316(a)(4)—which broadly references procedures for IPRs—with the narrow authority granted under § 316(a)(9). He also confuses *Chevron* deference with *Auer* deference. Because *Chevron* deference displaces judicial discretion to engage in statutory interpretation, it requires a relatively formal expression of administrative intent, one with the force and effect of law. Indeed, the very cases from which Judge Hughes quotes demonstrate far more formality than his chosen quotations imply out of context. Later interpretations of an agency's formal expression can, of course, occur, and

would be entitled to *Auer* deference. But later interpretations cannot rewrite formal administrative expressions or be used as a vehicle to skirt the obligations to engage in the necessary formalities in the first instance. Judge Hughes may have concerns about the future of administrative law, but nothing in our opinion, as properly understood, justifies those concerns.

Judges Taranto and Hughes separately say that the PTO's post-2012 consideration of the issue supports their view that the PTO's interpretations of its own regulations are both clear and entitled to deference. Specifically, they cite to the Board decisions in *Idle Free* and *MasterImage* for the proposition that, by then, it was understood that the PTO was interpreting the reference to burdens of proof in Rule 42.20 to include the burden of persuasion on patentability for amended claims. Taranto Op. at 28; Hughes Op. at 11. They then cite to some roundtables and solicitation of comments from 2014, saying these together were informative about where the Director thought Rule 42.20 placed the burden of proof. They finally cite to Federal Register commentary from 2015, where the Director confirmed that she did not intend to "change her practice" of placing the burden of persuasion of proving the patentability of amended claims on the patent owner, as proof that she must have always understood that to be the practice.

But neither opinion explains how this post-2012 consideration of the issue can cure the fact that Rule 42.20 never mentions the burden of persuasion, never addresses any of the relevant statutory provisions, was described by the PTO as purely a procedural—not a substantive—rule, and was publicly characterized by the PTO as a rule that applied when a determination was being made about whether *to enter* an amendment into an IPR and had nothing to do with the Board's patentability determinations. While the Board's view of how it wished to deal with amendments authorized by § 316(d) may have

changed over time—and it may have become obvious that it had given the Board's virtually universal denial of motions to amend—nothing the PTO did post-2012 can cure what it failed to do before then and still has not done.[10] We have already addressed the weakness of the PTO's reliance on *Idle Free* and *MasterImage*, and will not repeat those points here. Reference to the 2014 and 2015 commentaries is equally weak, if not more so.

Once more, those commentaries lack any substantive consideration of any regulation and do not purport to analyze what Congress intended when it contemplated an amendment as of right in § 316(d) or discussed the burden of proving propositions of unpatentability in § 316(e). Reference to these post-hoc rationalizations to justify deference is not just a stretch—it is *Auer* on steroids. *See Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 77 (2007) (Thomas, J., dissenting) ("[A] court may not, in the name of deference, abdicate its responsibility to interpret a statute."). All the PTO did was cite policy rationales for continuing to place the burden of proving the patentability of proposed amended claims on the patent owner; it never said it found a gap or ambiguity in the AIA that allowed it to regulate that practice. Its comments say no more than *Idle Free* and *MasterImage* did. There is no cogent, considered examination of the relevant statutory provisions. "Even under *Chevron*'s deferential framework, agencies must operate within the bounds of reasonable interpretation. . . . An agency has no power to tailor legislation to bureaucratic policy goals." *Util. Air Regulatory Grp.*, 134 S. Ct. at 2442, 2445 (internal quotations and citation omitted). "[A]n agency may not rewrite clear statutory

---

[10]   Even the PTO does not suggest in its briefing to us that anything in any of its Federal Register commentaries supports its position.

terms to suit its own sense of how the statute should operate." *Id.* at 2446.

To the extent the PTO's 2015 commentary relied on this court's endorsement of its practices in *Proxyconn*, as discussed above, *Proxyconn* never considered § 316(e) or whether the ultimate burden of persuasion on the patentability of amended claims could be placed on the patent owner; neither issue was ever in debate. And, to the extent the PTO's 2016 commentary relied on *Synopsys* and *Nike*, it is well established that an agency's belief that a statute or court decision compels or authorizes its practices is not the type of analysis to which deference is due. *See, e.g.*, *Negusie v. Holder*, 555 U.S. 511, 521 (2009); *Nat'l Org. of Veterans' Advocates v. Sec'y of Veterans Affairs*, 314 F.3d 1373, 1379 n.7 (Fed. Cir. 2003) ("It is, of course, impermissible for the Department to adopt regulations . . . on the ground that particular regulations are *required* under the unambiguous language of the statutes." (emphasis added)). Indeed, it is an indication that no reasoned analysis occurred.

In sum, the PTO has failed to make any determination on the ambiguity of either § 316(d)(1) or § 316(e) at any point before the briefing before this court. Even in its briefing, moreover, the PTO initially contends that § 316(e) does not govern amended claims at all, and only points to its interpretations of its own rules in the alternative. We therefore conclude that the Board's decisions do not reflect "a reasonable accommodation of manifestly competing interests . . . [where] the agency considered the matter in a detailed and reasoned fashion, and the decision involves reconciling conflicting policies," and, thus, conclude that no basis for deference under either *Chevron* or *Auer* exists. *Chevron*, 467 U.S. at 865 (footnotes omitted).

We do not, as Judge Hughes claims, purport to require "magic words" in either the PTO's regulations or its

interpretations of those regulations. We require that the PTO comply with its obligations under the APA and make clear to the public both what it is doing and why what it is doing is permissible under the statutory scheme within which it is operating. Agency rulemaking is not supposed to be a scavenger hunt. It must, moreover, be tied to the congressional purpose for which that rulemaking authority was granted. We conclude that, even if we were to find § 316(e) to be ambiguous, or that the AIA statutory framework authorizes the Director to promulgate a regulation governing burdens of persuasion, the Director has never clearly done so. In fact, the PTO failed to acknowledge at any point prior to the briefing in this appeal that § 316(e) might even apply to or conflict with its current practices regarding motions to amend. Calling upon *Auer* to allow the agency to rectify all these failures after the fact—as Judge Hughes and the PTO both do— simply does not suffice under the law. For these reasons, we, like Judges Dyk and Reyna, find there is no interpretation of either § 316(d) or § 316(e) to which this court must defer.[11]

---

[11] We do not accept Judge Taranto's suggestion that our analysis of *Chevron* should be less thorough. The *Chevron* question developed slowly in this case. In its initial brief, Aqua argued that the PTO could not resort to a request for *Chevron* deference because § 316(e) *unambiguously* prohibited the PTO's amendment practices, regardless of how they were put in place. The PTO, similarly, argued that § 316(d) *unambiguously* justified its practices, and only discussed the concept of deference to the Board's practices in the alternative. It was not until our decisionmaking process that questions of *Chevron* and *Auer* deference loomed large. It is because the four dissenters conclude that *Chevron dictates* the result here, and because Judges Chen and Hughes believe *Auer*

### b. Is A Rule Regarding the Burden of Persuasion on Patentability Within the Rulemaking Authority of the PTO?

Judge Taranto concludes that § 316(a)(9) gives the PTO the express authority to regulate burdens of proof and persuasion with respect to amendments authorized under § 316(d). We disagree.

First, the PTO's regulations may not countermand the express burden of proof set forth in § 316(e). *See Chevron*, 467 U.S. at 843–44 (explaining that, where there is a statutory gap for an agency to fill, we "give[] controlling weight [to the agency's regulations] unless they are arbitrary, capricious, or *manifestly contrary to the statute*" (emphasis added)). Importantly, the language of § 316(a)(9) says that the Director may set forth "standards and procedures *for allowing* the patent owner to amend the patent" under § 316(d); this directive does not grant the PTO the power to make substantive modifications to the statutory scheme. (emphasis added). The PTO cannot regulate away the statutory directive in § 316(d)(1) that patent owners be permitted to propose amendments to challenged claims at least once as of right when the amendments comply with the requirements of that provision. While the Director certainly may pass regulations regarding the timing of motions to amend or the page limits applicable to them, may confirm the statutory threshold showings needed before the proposed amendment may become part of the ongoing IPR, and may set forth reasonable threshold preconditions for entry of an amendment into an IPR, he may not rewrite, or countermand the purpose of, substantive statutory mandates.

---

does the same, that the rest of the court has been forced to address *Chevron* and *Auer*. Having been taken there, we choose to address those concepts fully.

Even if we were to accept the proposition that there is an ambiguity in the statutory scheme that is irresolvable by normal tools of statutory construction, it is not clear to us that the phrase "standards and procedures" in § 316(a)(9) was meant to encompass burdens of proof. A "standard" of proof is not the same as a burden of proof. As the Supreme Court explained in *Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91, 100 n.4 (2011), a standard of proof describes the quantum of evidence necessary to prove an issue, whereas a burden of proof establishes which party must provide that evidence. The latter is a legal principle that affects the substantive rights of the parties, not some procedural mechanism designed to streamline or maintain order in agency proceedings. *Medtronic*, 134 S. Ct. at 849 ("'[T]he burden of proof' is a 'substantive aspect of a claim.'" (quoting *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20–21 (2000), *Greenwich Collieries*, 512 U.S. at 271 (The "assignment of the burden of proof is a rule of substantive law . . . ."), and *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 249 (1942) ("[T]he burden of proof . . . [is] part of the very substance of [the plaintiff's] claim and cannot be considered a mere incident of a form of procedure.")). While this issue is not controlling of the question before us, even assuming an ambiguity in the statutory context of which § 316(a)(9) is a part, the plain language of § 316(a)(9) arguably is not broad enough to authorize the Director to set a "burden of proof" for the patentability of amended claims in IPRs.

Assuming the PTO were permitted to regulate the substantive burden of proof or persuasion regarding the patentability of amended claims under the "standards and procedures" language of § 316(a)(9), moreover, it is also unclear that we would have an obligation to defer to such a rule. The point of *Chevron* is to encourage courts to defer to agencies on issues that "implicate[] agency expertise in a meaningful way." *Sandoval v. Reno*, 166 F.3d 225, 239 (3d Cir. 1999); *see Chevron*, 467 U.S. at 865; *see*

*also Singh v. Ashcroft*, 383 F.3d 144, 151 (3d Cir. 2004). Pure questions of law—such as the substantive burden of proof or persuasion, or interpretation of the interplay between § 316(d) and § 316(e)—are not issues that implicate the PTO's expertise. *See, e.g.*, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 (1987) (noting that a "pure question of statutory construction [is] for the courts to decide"); *see also Goncalves v. Reno*, 144 F.3d 110, 127 (1st Cir. 1998) (citing *Cardoza-Fonseca*, 480 U.S. at 446, 448). Those are issues that seem to reside firmly within the expertise of Article III courts. *Cardoza-Fonseca*, 480 U.S. at 446. After all, it is the prerogative of the judiciary "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803).

### c.  De Novo Statutory Analysis Places the Burden of Proof on the Petitioner

With nothing to which we must defer for our interpretation of § 316(d) and § 316(e), we are left to determine the most reasonable reading of those provisions. Specifically, we are tasked to decide in the first instance whether the AIA either requires or authorizes placing the burden of proving the patentability of amended claims on the patent owner rather than the petitioner. For all the reasons discussed in section V.A.1 of this opinion, we believe that the most natural reading of the statute is that it does not.

For these reasons, we, along with Judges Dyk and Reyna, conclude that the Board erred when it imposed the burden of proving the patentability of its proposed substitute claims on Aqua. We reach this conclusion today by following two different analytical paths:  we address this issue as part of a *Chevron* Step Two analysis, while Judges Dyk and Reyna follow the approach laid out in *Encino*, where the Supreme Court treated the question of whether the agency had engaged in the type of regulatory action to which deference would be due as a threshold

inquiry. Once it concluded that the agency actually had not analyzed the statute or explained why the statute should be interpreted in a given way, the Supreme Court dispensed with further reference to *Chevron*; it ordered the court of appeals to interpret the statute in the first instance. *Encino*, 136 S. Ct. at 2126–27. The Supreme Court has vacillated on whether this inquiry is always a threshold inquiry, however, rather than one that falls under *Chevron* Step Two. *Compare id.* at 2124–26, *with, e.g., Michigan v. EPA*, 135 S. Ct. 2699, 2707–08 (2015) (addressing sufficiency of agency rulemaking at *Chevron* Step Two).

Because we believe a thorough discussion of the statutory scheme at the outset lends context to the deference inquiry, and because we ultimately must interpret the statutory scheme either way, we address deference at Step Two. Judges Dyk and Reyna chose the alternative route. But, we end up in the same place under either approach: (1) there is no considered statutory interpretation that has been undertaken by the agency to which we must defer; and (2) in the absence of regulatory action to which we must defer, the burden of proving the unpatentability of all claims in an IPR—both original and amended—is on the petitioner.

## B. The Board Must Base Its Patentability Determinations on the Entirety of the Record Before It

Our en banc order also asks whether the Board may sua sponte raise patentability challenges to a proposed amended claim. Having fully considered the record, however, we conclude that the record does not present this precise question. We believe it should be reserved for another day, as, apparently, do the other members of the court. The record and the panel decision in this case, however, directly pose a different question: whether the Board may base its patentability determinations with respect to amended claims solely on the face of the motion

to amend, without regard to the remainder of the IPR record. The panel decision in this case answered that question in the affirmative. We do not.

Section 318(a) provides that, where it proceeds to a final written decision, the Board is to issue a decision on the patentability of both originally issued, challenged claims and any amended claims. That final substantive decision must be based on *the entirety* of the record. Basic principles of administrative law compel this conclusion.

First, an agency must explain why it decides any question the way it does. *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained."). That obligation means that the agency must "articulate a satisfactory explanation" of its reasoning; it may not simply provide a conclusion. *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001) (quoting *State Farm*, 463 U.S. at 43); *see also In re Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002) (agency has an obligation "to provide an administrative record showing the evidence on which the findings are based, accompanied by the agency's reasoning in reaching its conclusions").

Second, an agency's refusal to consider evidence bearing on the issue before it is, by definition, arbitrary and capricious within the meaning of 5 U.S.C. § 706, which governs review of agency adjudications. *Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010). That means that the agency must take account of all the evidence of record, including that which detracts from the conclusion the agency ultimately reaches. *Id.* (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88 (1951)); *see also Princeton Vanguard LLC v. Frito-Lay N. Am. Inc.*, 786 F.3d 960, 970 (Fed. Cir. 2015) ("[S]ubstantial evidence review 'requires an examination of the record as a whole, taking into account both the evidence that justifies

and detracts from an agency's opinion.'" (quoting *Falkner v. Inglis*, 448 F.3d 1357, 1363 (Fed. Cir. 2006))); *In re Lee*, 277 F.3d at 1345 ("The Board's findings must extend to all material facts . . . ."); *Morall v. DEA*, 412 F.3d 165, 177–78 (D.C. Cir. 2005) (an agency decision that fails to consider relevant contradictory evidence is an arbitrary and capricious one).

Neither of these obligations is one the Director may obviate by rule, moreover. "Reasoned decisionmaking is not a procedural requirement." *Butte County*, 613 F.3d at 195; *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) ("Scrutiny of the facts does not end, however, with the determination that the Secretary has acted within the scope of his statutory authority. Section 706(2)(A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." (citations omitted)). Certainly, these are not requirements that the Board may eschew simply by the adoption of practices it employs when considering the patentability of amended claims during the course of an IPR.

In the context of this case, accordingly, we believe that the Board's decision to reject Aqua's proposed amended claims without consideration of the entirety of the IPR record was an abuse of discretion which provides an independent basis for our judgment vacating and remanding this matter to the Board. While our colleagues do not address this question, we believe it is a fairly uncontroversial proposition under the APA.

## C. Part III of Judge Reyna's Concurrence

Before closing, we address the final section of Judge Reyna's concurrence. We find it odd on a number of levels.

First, though it has no proposed judgment attached to it, all four dissenters "join" Part III of Judge Reyna's concurrence. Indeed, not only is no proposed judgment attached to this section, but the dissenters *disagree* with the only judgment Judges Dyk and Reyna believe is the correct one—that the matter must be vacated and remanded for the Board to place the burden of persuasion on the petitioner with respect to the patentability of the proposed amended claims. Where written words are not in support of any judgment, they cannot logically serve as an opinion of the court or any of its members. Certainly, they cannot serve as a collective opinion of those who disagree on the judgment. *See, e.g.*, *United States v. Epps*, 707 F.3d 337, 348 (D.C. Cir. 2013) (concluding that the controlling opinion must "represent a common denominator" of a court's reasoning, and such a position must "support the judgment" (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc))).

Second, that section of Judge Reyna's concurrence expressly concedes that the entire discussion is dictum. It leads off by pointing out what "Aqua has not challenged" and then proceeds to discuss those very issues. And the concurrence ends by citing to and discussing PTO Rule 42.22, while noting that rule is not at issue in this case. Indeed, not once in these proceedings—here or below—has any party or any of the many amici involved relied upon Rule 42.22 or its accompanying commentary for any reason; it appears *nowhere* in any of the briefing and was not mentioned during oral argument. While Judge Reyna calls this section a "judgment" of the court describing what the Board may do "regarding the burden of production on remand in this case," that, respectfully, cannot be

true. Only two of the six judges who join in that conclusion have concurred in the judgment vacating the Board's decision denying Aqua's motion to amend and ordering a remand; that is the only judgment this court enters today. And, on remand, no questions regarding any burden of production remain. As noted, in its final written decision, the Board expressly concluded that the proposed substitute claims satisfied all statutory and rule-based production requirements applicable to them, were not indefinite, and satisfied all written description requirements. The only question that remains is whether the amended claims are patentable over the asserted prior art. It is that question which the Board must reconsider.

Disparate members of the court cannot come together and purport to rule on the applicability or validity of any rule that has never been briefed or argued to us and on which the Board did not rely below. Indeed, it is elemental that an appellate court must avoid ruling on matters neither presented nor passed upon below. *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1344 (Fed. Cir. 2001) (citing *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)); *see also* 19 James Wm. Moore et al., Moore's Federal Practice § 205.05, at 205–55 (3d ed. 1997) ("It is a long-standing rule that, in order to be reviewable on appeal, a claim or issue must have been 'pressed or passed upon below.'"). "This is because appellate courts are courts of review and '[n]o matter how independent an appellate court's review of an issue may be, it is still no more than that—a review.'" *Id.* (quoting *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997)).

Third, the discussion of Rule 42.22 appears contrary to everything else said by Judge Reyna today. He seems to opine that a rule that (1) does not mention motions to amend, (2) never considers § 316(d) and its contemplation of a right to amend in IPRs, and (3) never addresses the language of § 316(a)(9), which only grants the Director the

authority for "setting forth standards and procedures for *allowing* the patent owner to move to amend" its claims, can be rewritten and expanded by the Director's Federal Register commentary. That is directly at odds with the rationale he and Judge Dyk employ to support the principles justifying the judgment they resolve to be correct.

Finally, it appears that the purpose of Judge Reyna's closing dictum is to create a hole in the very judgment he and Judge Dyk endorse today, to say that, as long as the Director calls something a burden of production, the Board can place any substantive burden it chooses on the patent owner's ability to propose amendments under § 316(d). Without knowing what burdens Judge Reyna has in mind, it is hard to know whether such burdens could be characterized fairly as falling within the bounds of "standards and procedures for allowing the patent owner to move to amend the patent under [§ 316(d)]." But that is the only authority to engage in rulemaking regarding motions to amend Congress granted to the PTO under § 316(a)(9). Even if the unspecified burdens Judge Reyna envisions could be squeezed into that linguistic basket, any such burdens would still have to be reasonable. No matter how characterized, moreover, they may not operate to negate the right to amend that Congress granted in § 316(d), nor render § 316(e)'s express placement of the burden of persuasion on the petitioner meaningless. Nor can they obviate the Board's obligation to base its patentability determinations under § 318(a) on the entirety of the record.

## VI. CONCLUSION

This process has not been easy. We are proceeding without a full court, and those judges who are participating disagree over a host of issues. As frustrating as it is for all who put so much thought and effort into this matter, very little said over the course of the many pages that form the five opinions in this case has precedential

weight. The only legal conclusions that support and define the judgment of the court are: (1) the PTO has not adopted a rule placing the burden of persuasion with respect to the patentability of amended claims on the patent owner that is entitled to deference; and (2) in the absence of anything that might be entitled deference, the PTO may not place that burden on the patentee. All the rest of our cogitations, whatever label we have placed on them, are just that—cogitations. Even our discussions on whether the statute is ambiguous are mere academic exercises.

The final written decision of the Board in this case is vacated insofar as it denied the patent owner's motion to amend. The matter is remanded for the Board to issue a final decision under § 318(a) assessing the patentability of the proposed substitute claims without placing the burden of persuasion on the patent owner. The Board must follow this same practice in all pending IPRs unless and until the Director engages in notice and comment rule-making. At that point, the court will be tasked with determining whether any practice so adopted is valid.

**VACATED AND REMANDED**

COSTS

No costs.

# United States Court of Appeals
# for the Federal Circuit

_____

**AQUA PRODUCTS, INC.,**
*Appellant*

v.

**JOSEPH MATAL, PERFORMING THE FUNCTIONS
AND DUTIES OF THE UNDER SECRETARY OF
COMMERCE FOR INTELLECTUAL PROPERTY
AND DIRECTOR, U.S. PATENT AND TRADEMARK
OFFICE,**
*Intervenor*

_____

2015-1177

_____

Appeal from the United States Patent and Trademark
Office, Patent Trial and Appeal Board in No. IPR2013-
00159.

_____

MOORE, *Circuit Judge*, with whom *Circuit Judges*
NEWMAN and O'MALLEY join.

This case involves one straightforward question of
statutory interpretation: Does 35 U.S.C. § 316(e) place
the burden of proving unpatentability of an amended
claim on the petitioner? I conclude that it does and join
Judge O'Malley's opinion. Our court has, however, con-
cluded by a 6–5 vote that the statute is ambiguous.
Because of this, we are forced to address a much harder
question: Whether the agency ought to be afforded defer-
ence for its decision to place the burden of persuasion on

the patentee regarding the patentability of amended claims. The agency explains that it is entitled to adopt legal standards related to motions to amend (including upon whom to place the burden of persuasion) pursuant to Congress' delegation of gap-filling authority to the Director in § 316(a)(9). The agency claims that a number of different agency actions are each entitled to *Chevron* deference. This panoply of claims by the PTO has engendered the five opinions in this case. This opinion is limited to a single issue: Are Board opinions entitled to *Chevron* deference in this case?[1]

I join Judge O'Malley's opinion in its entirety and agree with Judge Reyna's conclusion that the agency actions at issue are not entitled to *Chevron* deference. I write separately to address problems with the Director's attempt to extend *Chevron* deference beyond any prior applications of the doctrine. In this case, the Director argues, not for the first time, that Board decisions are entitled to *Chevron* deference. The Director argues that the Board's informative decision in *Idle Free*,[2] and its

---

[1]   This opinion is limited to addressing the PTO's claim that its Board opinions are entitled to *Chevron* deference for the statutory interpretation and gap filling performed therein because Congress authorized it to do so in § 316(a). This opinion does not address the distinct question of whether the Board opinions would be entitled to *Auer* deference to the extent they interpret agency regulations. *Chevron* deference applies to an agency's statutory interpretations, *Auer* deference applies to an agency's regulatory interpretations.

[2]   I have trouble understanding how the pronouncement in *Idle Free* fits within even the agency's own claims for *Chevron* deference as that opinion is designated "informative," not precedential, and was not voted upon

precedential decision in *MasterImage,* represent the agency's authoritative determination reached through formal adjudicative processes and are therefore entitled to *Chevron* deference. The Director explains that designating a Board decision as precedential requires a vote to do so by a majority of the nearly 300-person Board and concurrence with the precedential designation by the Director. *See* Director Br. 12 n.1. Once designated as precedential, the Board decision would then bind future panels of the Board. The Director argues that the designation of *MasterImage* as precedential warrants *Chevron* deference for the Board's decision that the patentee shall bear the burden of persuasion on the patentability of its proposed amended claims in motions to amend. I write separately to explain why these Board opinions are not entitled to *Chevron* deference.

In some circumstances, rules articulated in formal agency adjudication have been entitled to *Chevron* deference. *See United States v. Mead*, 533 U.S. 218, 230 (2001). I am not certain as a general matter whether precedential Board decisions are "formal administrative procedure[s] tending to foster the fairness and deliberation that should underlie a pronouncement of such force." *Id*. Accepting without deciding that the precedential Board decision in *MasterImage* is such a "formal agency adjudication," I still conclude in light of the statute it is not entitled to *Chevron* deference.

*Chevron* explains: "The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Chevron, U.S.A., Inc. v.*

---

by the full Board or approved by the Director, and is not binding on future panels.

*Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) (quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)). *Chevron* continues: "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute *by regulation*." *Id.* at 843–44. To be sure, *Chevron*, and later *Mead*, explains that there can be express or implicit delegation on a particular question by Congress to the agency. *See id.* at 843–44; *Mead*, 533 U.S. at 228–29. Those arguing for agency deference in this case conclude that Congress expressly delegated in § 316(a)(9) authority to the Director to fill just such an explicitly acknowledged gap:

> Regulations. —The Director shall prescribe ***regulations***—
>
> (9) setting forth standards and procedures for allowing the patent owner to move to amend the patent under subsection (d) . . . .[3]

Even assuming that the Director has the authority to adopt a standard placing the burden of persuasion upon the patentee to prove the patentability of its proposed amended claims, Congress *only* delegated the Director the

---

[3]   Section 316(b) reiterates Congress' choice to authorize the Director to gap fill *through regulations* and only after considering particular policy considerations which Congress intends to guide the Director's actions: "In *prescribing regulations* under this section, the Director shall consider the effect of any *such regulation* on the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings instituted under this chapter."

authority to do so through ***regulations***.  On this point there is no ambiguity in the statute.  The clear and undisputed language of the statute is that the Director may fill this gap, the need for standards and procedures related to allowing the patent owner to move to amend the patent, but must do so through *regulations*.

The Supreme Court explained in *Mead*:

> We granted certiorari in order to consider the limits of *Chevron* deference owed to administrative practice in applying a statute.  We hold that administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that *the agency interpretation claiming deference was promulgated in the exercise of that authority*.

533 U.S. at 226–27.  *Mead* explains that *Chevron* deference is tied to the delegation of legislative authority, and in particular to the indication of "congressional intent." *Id.* at 227.  Congressional intent to give the agency the authority to gap fill regarding standards applicable to allowing the patent owner to move to amend the patent is expressed clearly in the statute itself—the agency may do so by regulation.

In light of Congress' clearly expressed intent, we do not assume that Congress also implicitly gave the agency every other known means to gap fill.  As the Supreme Court explained in *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2124 (2016), "In the usual course, when an agency is authorized by Congress to issue regulations *and promulgates a regulation* interpreting a statute it enforces, the interpretation receives deference . . . ."  And the Court in *Encino* added:  "A premise of *Chevron* is that when Congress grants an agency the authority to admin-

ister a statute by issuing regulations with the force of law, it presumes the agency *will use that authority* to resolve ambiguities in the statutory scheme." *Id.* at 2125.

In *Mead*, the Supreme Court held, "On the face of the statute, to begin with, the terms of the congressional delegation give no indication that Congress meant to delegate authority to Customs to issue classification rulings with the force of law." 533 U.S. at 231–32. Likewise, on the face of the statute at issue here, Congress gave no indication that the Director may gap fill standards applicable to allowing the patent owner to move to amend the patent by issuing Board opinions. Congress expressly delegated authority to gap fill to the Director by regulation only. Thus, while in some circumstances, formal adjudication may suffice to entitle an agency to *Chevron* deference, *see Mead*, 533 U.S. at 230, this is not true here where Congress' delegation expressly articulates the means by which the agency is permitted to gap fill. *See also Gonzales v. Oregon*, 546 U.S. 243, 258 (2006) ("*Chevron* deference, however, is not accorded merely because the statute is ambiguous and an administrative official is involved. To begin with, *the rule must be promulgated pursuant to authority Congress has delegated* to the official.").

*Chevron* transfers to the executive the function of interpreting statutes and filling gaps in law from the judicial and legislative branches which are normally accorded these functions. *Chevron* deference stems from a delegation by the legislature to the executive of specific rulemaking authority. *See Gonzales*, 546 U.S. at 255–56 ("Deference in accordance with *Chevron*, however, is warranted only 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" (quoting *Mead*, 533 U.S. at 226–27)). Where Congress has delegated authority to "prescribe regula-

tions," I cannot agree that *Chevron* deference ought to be expanded to encompass other means by which the agency may offer its "rules." In short, Congress may, by statute, expressly determine upon what *and how* the Director may promulgate rules.

There are dozens of very specific grants of rulemaking authority by Congress to the Director. In some circumstances, Congress has delegated to the Director rulemaking authority without specifying the means of enactment. *See, e.g.*, 35 U.S.C. § 21 ("The Director may by rule prescribe . . ."); § 23 ("The Director may establish rules for taking affidavits . . ."); § 25 ("The Director may by rule . . ."); § 27 ("The Director may establish procedures . . ."); § 111(c) ("the Director may prescribe the conditions . . ."); § 119(b)(2) ("the Director may establish procedures . . ."). In other circumstances, Congress has delegated to the Director rulemaking authority and specified that it be by promulgated regulation. *See, e.g.*, 35 U.S.C. § 115(h)(1) ("the Director shall establish regulations under which such additional statements may be filed."); § 119(a) ("The Director may prescribe regulations . . ."); § 123(a)(1) (granting the Director the authority to "define in regulations" who qualifies as a small entity); § 132(b) ("The Director shall prescribe regulations to provide for the continued examination of applications . . ."). Where Congress has chosen to delegate rulemaking authority by regulation, including in the grant of delegated authority before us today, the exercise of that delegated authority must be through the promulgation of regulations in order to be entitled to *Chevron* deference. Congress has the power to determine what grants to make and how the Director must exercise that delegated rulemaking authority. If Congress has delegated to the executive specific gap-filling functions and the precise means by which the agency may promulgate such rules, we cannot and should not expand the executive's gap-

filling or rulemaking authority beyond the delegation by Congress.

It is not for courts to second guess Congress' decision that the Director must effect such rulemaking through regulation. Nonetheless, I note that there are certainly procedural differences which may undergird Congress' choice between rulemaking achieved through regulation and through adjudication. The promulgation of substantive regulations, consistent with the APA, requires notice of proposed rulemaking published in the Federal Register and an opportunity for comment before the rules may take effect. 5 U.S.C. § 553(b)–(c).[4] It requires an agency to "notify the public of the proposal, invite them to comment on its shortcomings, consider and respond to their arguments, and explain its final decision in a statement of the rule's basis and purpose." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1211 (2015) (Scalia, J., concurring).

Agency adjudication, as this case highlights, can take many forms. The informative decision in *Idle Free* which the Director claims ought to be given *Chevron* deference appears to have none of the formal indicia associated with substantive rulemaking. Board decisions are designated informative by the Chief Judge "for any reason." PTAB Standard Operating Procedure 2 (Rev. 9), at 3. The majority of the Board does not vote on the opinion or the designation, the Director need not approve it, and the

---

[4]    Certain rules, including rules on procedure, are exempt from the notice-and-comment rulemaking requirements of § 553. 5 U.S.C. § 553(b)(A). Even the agency concedes that the rule at issue relates to a legal standard that it created and does not fall within § 553(b)'s exceptions to notice and comment rulemaking. Director Br. 10 ("A 'standard of proof' is one of a number of common legal 'standards.'").

decision is, according to the Board, still "not binding authority." *Id.* at 3–4. Making a Board decision precedential, in contrast, requires a majority vote of the Board judges and approval by the Director, and the decision then becomes binding on the Board in subsequent matters.[5] *Id.* at 2–3. But precedential Board decisions are not subject to notice and comment. Precedential Board decisions are posted on the Board's website and are not published in the Federal Register, and there is no opportunity for public comment prior to the designation as precedential.[6] Finally, neither the authority to designate opinions as precedential nor the process for doing so is to be found in the statute; rather this agency grant of power to itself is articulated only in the agency's own Standard Operating Procedures. Regardless of whether preceden-

---

[5] On May 16, 2017, the PTO Director explained that she intends to expand agency adjudication through precedential decision making and streamline the procedure for such decision making. *See* Bryan Koenig, *PTAB Not Mowing Down Patents, USPTO Head Says*, LAW360 (May 16, 2017), https://www.law360.com/articles/924461/ptab-not-mowing-down-patents-uspto-head-says; *see also* Director Michelle K. Lee, Keynote Address at the George Washington University School of Law (May 16, 2017), https://www.uspto.gov/about-us/news-updates/remarks-director-michelle-k-lee-george-washington-university-school-law.

[6] In fact, the opinion can be designated precedential without even the parties to the case being given any opportunity for comment. The Board's procedure allows any member of the public to request that an opinion be designated precedential, but neither that person, nor the interested public has the opportunity for any further input into the Board's determination.

tial Board decisions constitute formal agency adjudica-
tion, they are not subject to the same requirements as
notice and comment rulemaking through regulation.
Rulemaking through regulation is different from rulemak-
ing through adjudication.

Assuming § 316(a)(9) grants the Director authority to
place the burden of persuasion upon the patentee, this
statutory delegation of authority is limited to prescribing
regulations. A majority of judges agree; where a statute
delegates to the Director the authority *to prescribe regula-
tions* adopting standards, only notice and comment rule-
making by regulation will be given *Chevron* deference.
*See* O'Malley Op. at 54–55 (joined by Judges Newman,
Lourie, Moore, and Wallach); Reyna Op. at 10 (joined by
Judge Dyk).

Congress here gave the agency the authority to "pre-
scribe regulations" on *standards and procedures* related to
allowing the patent owner to move to amend the patent.
If this rulemaking authority gives the Director authority
to place the burden of persuasion on the patentee in
motions to amend, it is not surprising that Congress
purposefully limited the exercise of that rulemaking to
APA-compliant regulations. The delegation of rulemak-
ing authority to the Director has traditionally been quite
narrowly proscribed by Congress. *See* John M. Golden,
*Working Without* Chevron*: The PTO as Prime Mover*, 65
DUKE L.J. 1657, 1691 (2016) ("[T]he PTO's powers remain
significantly limited, particularly with respect to its
ability to bind courts to an agency interpretation of sub-
stantive provisions of the Patent Act."); Joseph Scott
Miller, *Substance, Procedure, and The Divided Patent
Power*, 63 ADMIN. L. REV. 31, 32–33 (2011) ("It is settled
that Congress has given the Patent Office the power to
issue procedural rules for patent examination at the

Office, *not* substantive rulemaking power of the sort federal agencies typically possess.").[7] It is not for the courts to second guess Congress' choice regarding agency rulemaking.

This is not to say that the agency cannot, absent regulation, adopt a position and apply it to an individual case in the course of its adjudication. Of course it can, and does. But it is a distinct question whether *Chevron* deference ought to be extended to such a statutory interpretation, as *Mead* and other authorities make clear. Courts generally review questions of statutory interpretation *de novo*.[8] If *Chevron* deference applies then judicial review

---

[7]   35 U.S.C. § 2(b)(2)'s broad grant of authority to the Office to establish regulations to "govern the conduct of proceedings in the Office" does not eliminate the requirement that the PTO, like other agencies, must comply with the requirements of the APA. Notably, § 2(b)(2) expressly requires the agency's regulations "shall be made in accordance with section 553 of title 5." Even if the delegation to the Director had not specified that the Director must prescribe regulations to create legal standards governing motions to amend, § 553 requires notice and comment rulemaking for agency action purporting to adopt substantive standards as opposed to interpretive rules or rules of agency procedure.

[8]   An agency interpretation not entitled to *Chevron* deference may nonetheless be entitled to *Skidmore* deference which the Supreme Court describes as follows: "Such a ruling may surely claim the merit of its writer's thoroughness, logic, and expertness, its fit with prior interpretations, and any other sources of weight." *Mead*, 533 U.S. at 235. *Skidmore* deference is a somewhat ethereal concept as it amounts to deference which the Supreme Court explains is proportional to the ruling's

is substantially narrowed; we would review the agency's statutory interpretation only to determine if it contradicts an unambiguous congressional choice and, if not, whether it is reasonable. In this case, where Congress delegated the agency rulemaking authority to be exercised through regulation, I cannot agree to extend *Chevron* deference to agency rulemaking achieved through other means. I would thus review the relevant legal question—who has the burden of persuasion—without giving *Chevron* deference to the agency position articulated in its Board opinions.

Judge Hughes argues that when Congress enacts legislation that says "The Director shall prescribe regulations . . ." it does not *really* mean regulations. According to Judge Hughes, the term regulation is "generic." Hughes Op. at 14. According to Judge Hughes, it includes agency rules apparently without regard to *how* they are adopted.[9] *Id.* Judge Hughes believes that when the

---

"power to persuade." *Id.* This feels a lot like saying I defer to your interpretation because I have determined that it is correct.

[9]    Because the Supreme Court stated in *Cuozzo* that § 316(a) "allows the Patent Office to issue rules," Judge Hughes concludes that "rules" and "regulations" must have identical scope. Hughes Op. at 14–15. He concludes that the terms are "interchangeable" and that Congress' delegation to the PTO to "prescribe regulations" should thus be construed as granting the agency much broader authority, namely the authority to adopt rules by any means (including through Board opinions). *Id.* I do not agree. And I see no inconsistency in the Supreme Court's reference to a regulation as a rule. It is correct to say regulations are rules, it is not correct to say that all rules

patent statute authorizes the Director "to prescribe regulations" for some things (like legal standards), but permits the Director "to establish procedures" or "to establish rules" for other things, those differences are without meaning. I cannot agree with such a squishy approach to statutory interpretation. I believe that Congress, by authorizing the agency to "prescribe regulations" in § 316(a) while using broader language in other provisions of the statute, has chosen *how* the PTO is permitted to exercise the authority delegated by § 316(a) and the prescribed process does not include Board decisions, whether precedential or not. Congress can choose what to delegate to agencies and *how* the agencies are permitted to exercise that delegated authority.[10]

---

are regulations. An apple is a piece of fruit, but not all fruit are apples.

[10] Judge Hughes suggests that since three decisions have given *Chevron* deference to something other than a regulation even where the statute delegated authority to regulate, we should too. *See* Hughes Op. at 15–16 (citing *Cooper Techs. Co. v. Dudas*, 536 F.3d 1330 (Fed. Cir. 2008); *Tibble v. Edison Int'l*, 729 F.3d 1110 (9th Cir. 2013), *vacated on other grounds*, 135 S. Ct. 1823 (2015); *Mylan Labs. Inc. v. Thompson*, 389 F.3d 1272 (D.C. Cir. 2004)). The *Mylan* decision never mentions the statutory grant of authority (or the fact that it refers to regulations), so surely that case does not amount to a deliberate holding that when the statute only delegates authority to regulate, the agency is free to act in a less formal manner and still be entitled to *Chevron* deference. To the extent the remaining two decisions can be read to afford *Chevron* deference to agency action which differed from that expressly and exclusively delegated by Congress to the agency, I do not agree with them. These decisions are

Unlike Judge Hughes, I conclude that when Congress expressly delegates to the Director the ability to adopt legal standards and procedures *by prescribing regulations*, the Director can only obtain *Chevron* deference if it adopts such standards and procedures *by prescribing regulations*. "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001). The Board may adopt a legal standard through a precedential decision in an individual case, but that legal standard will not receive *Chevron* deference when Congress only authorized the agency to prescribe regulations.

CONCLUDING THOUGHTS

*Chevron* has effected a broad transfer of legislative and judicial function to the executive. *See Michigan v. EPA*, 135 S. Ct. 2699, 2712–14 (2015) (Thomas, J., concurring) (questioning the constitutionality of *Chevron* deference under the separation of the powers); *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1149–58 (10th Cir. 2016) (Gorsuch, J., concurring) (*Chevron* "permit[s] executive bureaucracies to swallow huge amounts of core judi-

---

nonetheless easily distinguished from ours. *Cooper* treated the interpretation at issue as addressing a matter of procedure (procedural rules are exempt from notice and comment rulemaking under § 553(b)). 536 F.3d at 1336. *Tibble* held that the regulatory preamble at issue had in fact gone through full notice and comment and appeared in the agency's final rule. The PTO seeks *Chevron* deference for the legal standard it adopted in two Board opinions, not a procedural rule, and these Board opinions did not go through notice and comment rulemaking.

cial and legislative power and concentrate federal power in a way that seems more than a little difficult to square with the Constitution of the framers' design."); *Egan v. Del. River Port Auth.*, 851 F.3d 263, 278–83 (3d Cir. 2017) (Jordan, J., concurring) ("The deference required by *Chevron* not only erodes the role of the judiciary, it also diminishes the role of Congress."); Philip Hamburger, Chevron *Bias*, 84 GEO. WASH. L. REV. 1187, 1189 (2016) (asking, "even where agencies have congressional authority to exercise their judgment about what the law is, how can this excuse the judges from their constitutional duty, under Article III, to exercise their own independent judgment?"); Jeffrey A. Pojanowski, *Without Deference*, 81 MO. L. REV. 1075, 1079 (2016) (summarizing scholarly critique of the *Chevron* doctrine).  I do not agree with the agency's attempts to expand *Chevron*.  We cannot by judicial fiat usurp legislative authority and hand it over to the executive.

# United States Court of Appeals
# for the Federal Circuit

---

**AQUA PRODUCTS, INC.,**
*Appellant*

**v.**

**JOSEPH MATAL, PERFORMING THE FUNCTIONS
AND DUTIES OF THE UNDER SECRETARY OF
COMMERCE FOR INTELLECTUAL PROPERTY
AND DIRECTOR, U.S. PATENT AND TRADEMARK
OFFICE,**
*Intervenor*

---

2015-1177

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2013-00159.

---

REYNA, *Circuit Judge*, joined by *Circuit Judge* DYK; and in which *Chief Judge* PROST and *Circuit Judges* TARANTO, CHEN, AND HUGHES join only to Part III.

SUMMARY

My colleagues today join one of two thorough and well-reasoned opinions, Judge O'Malley's opinion and Judge Taranto's dissent. Both opinions begin and end with a *Chevron* analysis. They operate under the premise that whether *Chevron* deference is warranted is a yes-or-

no question. I disagree with that premise and chart a different course.

The course of this opinion takes three turns. First, I concur in Judge Taranto's reading of § 316(e) as ambiguous to be the fairest reading of the statute and of § 316(a)(9) as authorizing the Patent Office to promulgate a regulation on the burden of persuasion. This means that a majority of the court interprets § 316(e) to be ambiguous as to the question of who bears the burden of persuasion in a motion to amend claims. Second, I determine that the Agency's general discussion finding that the burden of persuasion is borne by the patentee is not an interpretation of the statute that carries the full force of law, nor did the Agency properly promulgate this substantive rule of widespread applicability in compliance with the Administrative Procedure Act. Third, I conclude that § 316(d) and 37 C.F.R. § 42.121 place a default burden of production on the patentee. This last part of the opinion is joined by Chief Judge Prost and Circuit Judges Dyk, Taranto, Chen, and Hughes, collectively representing a majority view of the court.

In conclusion, although I do not join her opinion, Judge O'Malley and I agree to vacate and remand this matter, but for entirely different reasons. I would vacate and remand with instruction for the Agency to review the underlying motion to amend by applying only a burden of production on the patent owner, as § 316(d) and 37 C.F.R. § 42.121 currently permit, and not a burden of persuasion, and a majority of the court agrees. This opinion does not bar the Agency from crafting a wholesome interpretation of the evidentiary burdens allowed under the *inter partes* review statute that could be afforded deference if properly promulgated under APA rulemaking procedures.

## I. AMBIGUITY OF § 316(E)

The Supreme Court has rejected an all-or-nothing view of deference in favor of a nuanced approach that

accounts for the full spectrum of an agency's action. *United States v. Mead*, 533 U.S. 218, 236–37 (2001). Such an approach requires that we begin this inquiry by looking at the nature of the question at issue and the interpretive method used by the Agency. *Barnhart v. Walton*, 535 U.S. 212, 222 (2002) (citing *Mead*, 533 U.S. at 229–31). Indeed, this case turns on the interpretative method used by the Patent Office. As discussed further below, I conclude that the Patent Office has yet to fully consider the *inter partes* review statutes, 35 U.S.C. §§ 316(a)(9), (d), and (e), that this court has been tasked to review. One result is that the Agency action in question is disassociated from the statute at hand. *Chevron* deference is thus not applicable. *See Negusie v. Holder*, 555 U.S. 511, 521 (2009). I further conclude that the Patent Office's attempt to assign a burden of persuasion to be procedurally flawed such that *Chevron* deference is not warranted. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).

The question before the court is whether, under § 316(e), Congress barred the Patent Office from assigning the patent owner, who moved to amend its claims, the burden of proof, also understood as the burden of persuasion, to show its proposed substitute claims are patentable. My view that *Chevron* deference does not apply does not preclude me from reviewing in the first instance the import of § 316(e) with respect to motions to amend. *See Encino*, 136 S. Ct. 2127. Independent of the question of deference, I agree with Judge Taranto's view that § 316(e) can be fairly interpreted to permit the Patent Office to assign the burden of persuasion on the patent owner who moves to amend its claims. Accordingly, I concur with Part III of Judge Taranto's Opinion only with respect to his conclusion that § 316(e) is ambiguous and that the Patent Office has the authority within § 316(a)(9) to promulgate regulations on the burden of persuasion, and I join that limited portion of his opinion. Taranto Op. 8, 25.

## II. PATENT TRIAL AND APPEAL BOARD'S GENERAL DISCUSSION

I now turn to whether the Patent Office has set forth an interpretation of the evidentiary burdens codified in the *inter partes* review statute to which *Chevron* deference would apply. Here, I depart from Judge Taranto and Judge O'Malley, both of whom engage in a *Chevron* two-step analysis. The Patent Office has yet to proffer a fully considered interpretation of the *inter partes* review statute directed to the evidentiary burdens for motions to amend necessary for *Chevron* deference, and its attempt to promulgate a rule through ad hoc adjudication is too procedurally defective to receive *Chevron* deference. *Negusie*, 555 U.S. at 521; *Encino*, 136 S. Ct. at 2125; *Mead*, 533 U.S. at 227.

The nature of this question involves an administrative agency's authority to assign a burden of persuasion—a substantive rule. *Dir., Office of Workers' Compensation Programs, Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267, 271 (1994) (citing *Am. Dredging Co. v. Miller*, 510 U.S. 443, 454 (1994)). The allocation of this burden of persuasion was first addressed in *Idle Free Systems, Inc. v. Bergstrom, Inc.*, where the Patent Trial and Appeal Board, through a panel of six administrative law judges, dismissed a patent owner's motion to amend for failure to confer with the Board before filing its motion in violation of 37 C.F.R. § 42.121. No. IPR2012-00027, 2013 WL 5947697, at *1 (P.T.A.B. June 11, 2013). Instead of stopping at dismissal, the Board continued into dicta. In what it called a "general discussion," the Board established wholly new evidentiary requirements mandating that the burden of persuasion is on the patent owner to show its proposed substitute claims contain a patentable distinction over the prior art. *Id.* at *4. The dicta in *Idle Free* was constructed without any reference to the specific circumstances of the case before the Board.

The Board relied on 37 C.F.R. § 42.20—a general regulation that provides that "[t]he moving party has the burden of proof to establish that it is entitled to the requested relief." *Idle Free*'s "general discussion" did not consider the text of the America Invents Act statute, how various statutory sections interrelate, whether the Board had the statutory authority to issue substantive rules for motions to amend through adjudication, or whether the statute is inconsistent with the Board's interpretation of § 42.20. The Board also provided no rationale as to why the burden of persuasion was best situated with the patent owner.[1]

*Idle Free* was designated informative, which the Chief Judge of the Board can do "for any reason." PTAB Standard Operating Procedure 2 (Rev. 9). Informative decisions provide "Board norms on recurring issues," "guidance on issues of first impression," and "guidance on Board rules and practices." *Id.* at 3. *Idle Free*'s dicta thus became nonbinding guidance. This nonbinding guidance was never converted into a regulation.

Review of *Idle Free* first reached this court in *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1303–08 (Fed. Cir. 2015). In *Proxyconn*, this court narrowly addressed the Board's interpretation of its regulations, 37 C.F.R. §§ 42.20 and 42.121. *Id.* at 1306. But *Proxyconn* contains no discussion of whether the *inter partes* review statute, particularly § 316(e), bars 37 C.F.R. § 42.20 from allocating the burden of persuasion on the patent owner to show its proposed substitute claims are patentably distinct over the prior art. *Id.* at 1307 n.4 (choosing not to

---

[1] Two years passed before the Board proposed a rationale. Proposed Rule, Amendments to the Rule of Practice for Trials Before the Board, 80 Fed. Reg. 50720-01, 50723 (Aug. 20, 2015) (codified at 37 C.F.R. pt. 42).

address "*Idle Free*'s requirement that the patentee [sic] show patentable distinction over all prior art known to the patent owner." (quotation marks and citation omitted)). Significantly, the court in *Proxyconn* did not consider that *Idle Free*'s requirements were dicta disassociated from the statute. The court in *Proxyconn* did not raise or mention the issue of statutory interpretation.

Despite this dearth of statutory interpretation, the Patent Office embraced *Proxyconn* as a ringing endorsement of *Idle Free* in *MasterImage 3D, Inc. v. RealD Inc.*, No. IPR2015-00040, 2015 WL 10709290, at *1 (P.T.A.B. July 15, 2015), stating that under *Idle Free*, "[t]he ultimate burden of persuasion remains with Patent Owner, the movant, to demonstrate the patentability of the amended claims." It was a cold embrace. I agree with Judge O'Malley's well-articulated view on this particular point. Arguments presented in *Proxyconn* did not obligate the court to "engage in any statutory analysis—with respect to § 316(e) or otherwise." O'Malley Op. 16–17.

In *MasterImage*, the Board adopted *Idle Free*'s guidance that the patent owner bears the burden of persuasion to show its proposed substitute claims are patentable and clarified the scope of prior art to be "prior art of record and prior art known to the patent owner." *Id.* at *1. The decision relies heavily on *Proxyconn* for the proposition that "[t]he ultimate burden of persuasion remains with the Patent Owner, the movant, to demonstrate the patentability of amended claims," but fails to acknowledge that *Proxyconn* was limited to reviewing the Patent Office's interpretation of its regulations, primarily 37 C.F.R. §§ 42.20 and 42.121. *MasterImage*, like *Idle Free*, contains no discussion of § 316(e) or of the scope of the Board's rulemaking authority under § 316(a)(9).

On May 10, 2016, almost a year after it was issued, the Patent Office designated *MasterImage* as preceden-

tial.[2] The Patent Office now cites to *Idle Free* as the underlying authority for the proposition that the patent owner bears the burden of persuasion for showing its substitute claims are patentable over the prior art of record.[3]

Given this important aspect of the "full spectrum" of the Agency's action, we should not ignore that the Patent Office's thinking on the allocation of the burden of persuasion in a motion to amend is the *Idle Free* dicta. I do not accept these dicta to be an interpretation of §§ 316(e), 316(d), and 316(a)(9). As *Idle Free* and *MasterImage* lack any discussion of the evidentiary standard codified at § 316(e), or how § 316(e) impacts §§ 316(d) and 316(a)(9), I conclude that the Patent Office has not fully considered or

---

[2] Designating a decision as precedential requires each Board member to vote on the opinion and the Director's concurrence. PTAB Standard Operating Procedure 2 (Rev. 9) 2. Precedential opinions are "binding authority in subsequent matters involving similar facts or issues." *Id.* at 3.

[3] *See, e.g.*, Br. for Intervenor – Dir. of the United States Patent and Trademark Office, *Symantec Corp. v. Veeam Software Corp.*, No. 2015-1894, 2016 WL 380962, at *2–3 (Fed. Cir. Jan. 27, 2016); Br. for Intervenor – Dir. of the United States Patent and Trademark Office, *In re Bosch Automotive Serv. Sols., LLC*, No. 2015-1928, 2016 WL 661516 (Fed. Cir. Feb. 8, 2016); Corrected Br. for Intervenor-Director of the United States Patent and Trademark Office, *Shinn Fu Co. of Am., Inc. v. The Tire Hanger Corp.*, No. 2016-2250, 2016 WL 6833819, at *27–28 (Fed. Cir. Nov. 16, 2016); Br. for Intervenor – Dir. of the United States Patent and Trademark Office, *In re Silver Peak Sys., Inc.*, No. 2015-2072, 2016 WL 661517, at *45–46 (Fed. Cir. Feb. 8, 2016).

interpreted the relevant statutes. Even the underlying Board opinion in this matter lacks any discussion of §§ 316(a)(9), (d), or (e). *Zodiac Pool Sys., Inc. v. Aqua Prods., Inc.*, No. IPR2013-00159, 2014 WL 4244016 (P.T.A.B. Aug. 22, 2014). Without the Patent Office's full consideration of the statutory question currently before the court, there is no ripened interpretation to defer to, and that renders irrelevant the question of *Chevron* deference. *See Negusie*, 555 U.S. at 521 (declining to reach the issue of *Chevron* deference where the agency did not articulate an interpretation based on a full consideration of the statute).

In *Negusie*, the Court held that where an agency fails to fully consider the statutory question presented, courts should not reach the question of *Chevron* deference. 555 U.S. at 523. The agency at issue had relied on a mistaken premise that a Supreme Court decision controlled its interpretation. *Id.* at 516, 522–23. The Court remanded to the agency, finding that it failed to reach an independent interpretation in the first instance and that the agency's full consideration of the statutory question is required before the Court considers deference. *Id.*

Here, like *Negusie*, the Board has not addressed the statutory question of how § 316(e) impacts the evidentiary burdens in a patent owner's motion to amend or the rulemaking scope of § 316(a)(9). This important aspect of the "full spectrum" of the agency action is clear: The Patent Office has made no independent interpretation in the first instance. The Board's *MasterImage* opinion rests on the mistaken premise that *Proxyconn* fully endorses the Patent Office's placement of the burden of persuasion on the patent owner to prove the patentability of its proposed substitute claims. As discussed above, the holding in *Proxyconn* was limited to reviewing the Patent Office's regulations and does not address § 316(e) or the scope of § 316(a)(9). Without the Board's fully considered interpretation of § 316 in the first instance as applied to the

burden of persuasion in motions to amend, *Chevron* deference is not warranted.[4]  *Negusie*, 555 U.S. at 521.  Indeed, under these circumstances, engaging in a *Chevron* analysis would be an exercise in speculation.

I also conclude that the Patent Office does not possess the statutory authority to issue through adjudication a substantive rule that creates and allocates a burden of persuasion.  If at all, it can only do so through the promulgation of a regulation consistent with the APA, 5 U.S.C. § 553.  Where an agency exceeds its delegated authority by improperly issuing a substantive rule, it acts *ultra vires* and the resulting rule is a nullity.  *City of Arlington v. FCC*, 133 S. Ct. 1863, 1869 (2013); *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979); *see also Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999); *Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 94 (1998).[5]  The Patent Office cannot effect an end-run around its congressionally delegated authority by conducting rulemaking

---

[4]    In *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, the Supreme Court reversed a Ninth Circuit decision for failure to apply *Chevron* deference to the Federal Communications Commission's interpretation of Title II of the Communications Act.  545 U.S. 967, 980 (2005).  *Brand X* does not require the court to apply *Chevron* deference where, as here, the Patent Office never considered the statutory question facing the court.  *See Sandoz Inc. v. Amgen Inc.*, 137 S. Ct. 1664, 1678 (2017) (Breyer, J., concurring).

[5]    The *Proxyconn* decision suggests that the Patent Office may possess such adjudicatory rulemaking power for motions to amend.  789 F.3d at 1307.  However, it fails to consider the plain language of § 316(a)(9) that expressly limits the Director's rulemaking power to promulgating regulations.

through adjudication without undertaking the process of promulgating a regulation.

Nor should the Patent Office be permitted to effect an end-run around the APA's rulemaking process. Judge Taranto's opinion thoroughly considers the notice-and-comment periods for proposed amendments for the rules of practice for trials before the Board following *Idle Free*. Taranto Op. 28–29. But those attempts clearly fell short of a proper rulemaking on a burden of persuasion; no final regulation issued on that subject.[6] The Patent Office's commentary fails to adequately address the importance of § 316(e) on a patent owner's motion to amend its claims, or discuss the scope of the Patent Office's authority to promulgate substantive rules through adjudication or regulation under § 316(a)(9). Such general commentary on existing practices is not equivalent to APA rulemaking, which requires notice of the issues involved in formulating a rule that would include the statutory interpretation issues now before the court. 5 U.S.C. § 553(b).

The Patent Office's attempt to "construct policy by adjudication is evident." *First Bancorporation v. Bd. of Governors of Fed. Reserve Sys.*, 728 F.2d 434, 438 (10th Cir. 1984). While I recognize that the choice between

---

[6] The APA's mandate states that "an agency shall afford interested persons general notice of proposed rulemaking and an opportunity to comment before a substantive rule is promulgated." *Chrysler*, 441 U.S. at 313; *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1211 (2015) (Scalia, J., concurring). The Patent Office's attempt to reverse-engineer *Idle Free* into a regulation with the force and effect of law cannot stand because failure to provide the public notice before engaging in substantive rulemaking runs afoul of the APA. *See Chrysler*, 441 U.S. at 316.

rulemaking via adjudication or regulation lies within an agency's discretion, "[t]he function of filling the interstices" of the Patent Act "should be performed as much as possible, through the quasi-legislative promulgation of rules to be applied in the future." *SEC v. Chenery Corp.*, 332 U.S. 194, 202 (1947). An agency's choice to use adjudication to construct rules of general applicability can amount to an abuse of discretion. *NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 295 (1974). Rulemaking through adjudication is a nonstarter here, where the subject rule is a significant game change in the *inter partes* review process by setting out a substantive rule that creates and allocates an evidentiary burden to a party, none of which before existed. *See Morton v. Ruiz*, 415 U.S. 199, 232–36 (1974); *see also* 5 U.S.C. § 552(a)(D). Such a substantive rule of general applicability should not be reached through ad hoc adjudication. *Ford Motor Co. v. FTC*, 673 F.2d 1008, 1009 (9th Cir. 1981); *Matzke v. Block*, 732 F.2d 799, 802 (10th Cir. 1984). This is particularly true in this case because the rule articulated in *Idle Free* and *MasterImage* contains no adjudicative facts specifically relevant to the circumstances of the petitioner or patent owner. *See First Bancorporation*, 728 F.2d at 438.

Thus, while decisions such as *MasterImage* may occasionally be designated as precedential, there must be a principled legal reason for doing so. There is no reason to conclude that Congress intended "to create a *Chevron* patchwork of [adjudicative decisions], some with force of law, some without." *Mead*, 533 U.S. at 234. While I recognize the Director's authority to designate Board decisions as precedential for agency consistency and to establish purely procedural requirements by adjudication, this authority is not a carte blanche to use adjudicative rulemaking without accounting for the nature of the rule at issue and the rule's effect on other litigants. Here, because there was no such accounting, the Director's

designation of *MasterImage* as precedential was little more than an attempt to issue a substantive rule without following established procedural requirements of rule-making under the APA.

Where a statute is silent on the allocation of an evidentiary burden and there is no agency action that earns *Chevron* deference such as a wholesome interpretation of the question at hand, the court's review of the agency's choices typically begins with the ordinary default rules of evidence. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009); *see Schaffer v. Weast*, 546 U.S. 49, 56 (2005). This is because Congress is presumed to draft legislation with these long-standing default rules in mind. *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 91–92 (2008). Here, as discussed further below, § 316(d) and the Patent Office's regulations governing motions to amend claims override any default evidentiary rules by placing only a burden of production on a patent owner to satisfy the requirements of § 316(d) and 37 C.F.R. § 42.121.[7] Under the statute, therefore, the default rule is that the patent owner does not bear the burden of persuasion on the patentability of its proposed amended claims.[8]

---

[7]    On this point, I agree with Judge O'Malley's view solely to the extent that § 316(d) does not unambiguously impose a burden of persuasion on the patent owner. O'Malley Op. 21.

[8]    This same reasoning applies to the second question presented: whether the Board can *sua sponte* raise patentability issues if the petitioner does not raise a patentability argument. The Patent Office has not fully considered whether the *inter partes* review statute can be reasonably interpreted to give the Board this kind of broad discretion, in particular where, as here, the petitioner remains in the *inter partes* review proceeding.

### III. BURDEN OF PRODUCTION

It is important to note that Aqua has not challenged two important aspects of the Board's practice pertaining to the burden of production. First, the obligations the Patent Office may impose on the patent owner to *produce evidence* pertinent to the required assessment of patentability. *See Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 100 n.4 (2011) (distinguishing burdens of persuasion from burdens of production); *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378–79 (Fed. Cir. 2015). The other is the assignment of various pleadings or argument duties, i.e., the scope of obligations the Patent Office may impose on the patent owner to address particular patentability issues in its motion to amend. *See Veritas Techs., LLC v. Veeam Software Corp.*, 835 F.3d 1406, 1414–15 (Fed. Cir. 2016) (noting that issue of what patent owner must address in its motion to amend is distinct from the issue of the ultimate burden of persuasion on the evidence). Section 316(e) does not address either aspect.

With respect to motions practice outside the *inter partes* review context, it is well settled that regardless of which party bears the ultimate burden of persuasion, the movant bears a burden of production. For example, Federal Rule of Civil Procedure 7(b)(1) provides that any motion must "state with particularity the grounds for seeking" a court order and "state the relief sought." "Thus, a motion that fails to state any grounds for relief or a motion that simply states that there are several reasons for relief without explaining those grounds for relief is insufficient . . . ." *Allender v. Raytheon Aircraft Co.*, 439 F.3d 1236, 1240 (10th Cir. 2006); *see also United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 331 (5th Cir. 2003) (noting that a "bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which the amendment is sought, *cf.*

Fed. R. Civ. P. 7(b)—does not constitute a motion within the contemplation of rule 15(a)").

There is no disagreement that the patent owner bears a burden of production in accordance 35 U.S.C. § 316(d). Indeed, the Patent Office has adopted regulations that address what a patent owner must submit in moving to amend the patent. 37 C.F.R. §§ 42.20(a), 42.22(a), 42.121(a)(2)(i). For instance, § 42.22(a) requires a movant to provide in a motion "[a] full statement of the reasons for the relief requested, including a detailed explanation of the significance of the evidence including material facts, and the governing law, rules, and precedent." During rulemaking, regarding rules of practice before the Board, the Patent Office cited § 42.22 to explain,

> In the event that a patent owner files a motion to amend the claims, the patent owner must include a statement of the precise relief requested and a full statement of the reasons for the relief requested, including a detailed explanation of the significance of the amended claims (e.g., a statement that clearly points out the patentably distinct features for the proposed new or amended claims). *See* § 42.22.

77 Fed. Reg. at 48,626. These regulations are not called into question by today's decision. Contrary to Judge O'Malley's suggestion, Part III of my opinion, joined by a majority of this court, is not "dictum." *See* O'Malley Op. 63–64. Instead, Part III of this opinion sets forth the judgment of this court on what the Board may and may not do with respect the burden of production on remand in this case. To that extent, a patent owner is not excused from assisting the Board to perform its statutory obligation to "issue a final written decision with respect to the patentability of . . . any new claim added under section 316(d)." 35 U.S.C. § 318(a).

IV. CONCLUSION

With respect to the burden of persuasion, my colleagues' willingness to dive headlong into a *Chevron* two-step analysis without initially considering whether the Patent Office's position in *Idle Free* and *MasterImage* is an interpretation of the *inter partes* review statute fails to account for the Supreme Court's nuanced approach that reviews the full spectrum of an agency's actions. I decline to extend *Chevron* deference to the Patent Office until it has fully considered the statutory question. Until then, there is nothing to review, the Agency action is a nullity.

Given the foregoing, I would hold that the Agency action under consideration in this case to be contrary to law. *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 1376, 1379 (Fed. Cir. 2016); 5 U.S.C. § 706(2). With this in mind, I would vacate the Board's decision denying Aqua's motion to amend, and remand for further proceedings. Should the Patent Office present a fully considered interpretation of the governing statute and properly promulgate such a rule through APA compliant rulemaking, *Chevron* deference would be on the table. In the interim, the Patent Office must by default abide by the existing language of the *inter partes* review statute and regulations, § 316(d) and 37 C.F.R. § 42.121, which only allocate a burden of production to the patent owner.

# United States Court of Appeals
# for the Federal Circuit

---

**AQUA PRODUCTS, INC.,**
*Appellant*

**v.**

**JOSEPH MATAL, PERFORMING THE FUNCTIONS
AND DUTIES OF THE UNDER SECRETARY OF
COMMERCE FOR INTELLECTUAL PROPERTY
AND DIRECTOR, U.S. PATENT AND TRADEMARK
OFFICE,**
*Intervenor*

---

2015-1177

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2013-00159.

---

TARANTO, *Circuit Judge*, joined by PROST, *Chief Judge*, and CHEN and HUGHES, *Circuit Judges*, dissenting from the judgment, and joined in part in other respects by DYK and REYNA, *Circuit Judges*.

Most of this opinion sets forth a full analysis supporting the following two legal conclusions that are joined by a majority of the court—the four Judges signing on to this opinion in full and Judges Dyk and Reyna. First, in an *inter partes* review (IPR), 35 U.S.C. § 316(a) authorizes the Director of the Patent and Trademark Office (PTO) to

address who has the burden of persuasion on the patentability of substitute claims that the patent owner proposes to add to the patent in a motion to amend the patent. Second, 35 U.S.C. § 316(e) does not unambiguously bar assigning that burden to the patent owner. This opinion also notes my agreement with the majority conclusion, set forth in Judge Reyna's opinion, that certain PTO regulations imposing burdens of production on the patent owner are undisturbed and therefore applicable on remand in this case.

On the other hand, I disagree with a conclusion drawn by a differently constituted majority—Judge O'Malley, the four Judges joining her opinion, and Judges Dyk and Reyna—regarding the assignment to the patent owner of the burden of persuasion regarding patentability of proposed substitute claims. The majority has concluded that the PTO has not made that assignment through action that warrants deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). That conclusion leads the court to vacate the decision of the Patent Trial and Appeal Board, which assigned the burden of persuasion to patent owner Aqua Products. I disagree with the conclusion and therefore the vacatur. In my view, a PTO regulation assigns the burden of persuasion to the patent owner, 37 C.F.R. § 42.20(c), and Aqua Products has presented no sound argument against giving *Chevron* deference to that regulation. Because I would affirm the Board's decision on that basis, I dissent from the judgment of vacatur.

## I. INTRODUCTION

Under the America Invents Act (AIA), Pub. L. No. 112-29, 125 Stat. 284 (2011), the PTO may revisit the patentability of patent claims that have been challenged on statutorily specified grounds by way of a petition for an IPR. The PTO's Director may institute such a review upon determining that "there is a reasonable likelihood

that the petitioner would prevail" as to at least one of the challenged claims. 35 U.S.C. § 314(a). After an IPR has been instituted, the patent owner may file a "motion to amend the patent," proposing "substitute claims" to replace one or more of the challenged claims. 35 U.S.C. § 316(d)(1). Under 35 U.S.C. § 316(e) ("In an inter partes review instituted under this chapter, the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence."), the petitioner undisputedly has the burden of persuasion on the unpatentability of any claims it challenges on which the IPR was instituted. The question involved in this case is who has the burden of persuasion regarding patentability of any substitute claims that the patent owner proposes to add to the patent after institution.

Congress has directed the Board to adjudicate patentability in IPRs, including the patentability of "any new claim added under section 316(d)." 35 U.S.C. § 318(a). Fulfilling that obligation requires a determination of who has the burden of persuasion as to such proposed substitute claims. Congress has expressly granted the PTO Director the authority under 35 U.S.C. § 316(a)(4) and (a)(9) to promulgate regulations "establishing and governing inter partes review" and "setting forth standards and procedures for allowing the patent owner to move to amend the patent" during an IPR. Based on 37 C.F.R. § 42.20(c), a regulation adopted by the Director through notice-and-comment rulemaking pursuant to the § 316(a) authority, the Board, from the outset of the IPR program, has assigned the burden to the patent owner, which is the party requesting an affirmative action from the Board, namely, to add the substitute claims to the patent.

Aqua Products contends that Congress foreclosed that choice through § 316(e). The Director argues otherwise. I agree with the Director. The assignment of the burden to the patent owner for proposed substitute claims, which fits within the Director's § 316(a) regulatory authority,

passes muster under the framework established by *Chevron*. In my view, Section 316(e) does not address the precise issue and does not unambiguously place the burden on an IPR petitioner to prove that the patent owner's proposed substitute claims are unpatentable. Under *Chevron* Step Two, the patent owner may be assigned the burden of persuasion as long as doing so is reasonable. Aqua Products makes no meaningful argument under Step Two independent of its Step One argument about § 316(e).

Aqua Products' only remaining contention amounts to a narrow argument for why the *Chevron* framework should not apply here. I would reject that argument. The assignment to the patent owner of the burden of persuasion regarding proposed substitute claims has from the outset of the IPR program rested on 37 C.F.R. § 42.20(c). That regulation, issued through notice-and-comment rulemaking pursuant to the statutorily granted § 316(a) authority, is a classic example of the kind of agency action that generally warrants application of the *Chevron* framework. Aqua Products' only argument about that regulation is about what the regulation means: Aqua Products argues that the regulation is not properly read actually to assign the burden of persuasion at issue. I conclude otherwise—that, judicially interpreted, even without any deference to the PTO, the regulation does assign the burden of persuasion at issue here. Because I reject Aqua Products' only argument against applying the *Chevron* framework, I would apply *Chevron*.

I do not address other potential objections to the applicability of the *Chevron* framework. No such other objections, including objections to the deficiency of the PTO's rulemaking consideration of the relevant issues, have been raised by Aqua Products or meaningfully briefed by the parties. If the PTO is to assign the burden of persuasion to the patent owner, it will need to launch a

new rulemaking—which can obviate objections to the adequacy of the Director's process and reasoning to date.

## II. BACKGROUND

In 2013, pursuant to 35 U.S.C. §§ 311–319, Zodiac Pool Systems, Inc. filed a petition with the PTO for an *inter partes* review of claims 1–14, 16, and 19–21 of U.S. Patent No. 8,273,183, owned by Aqua Products, Inc. The petition challenged the patentability of those claims on grounds of anticipation and obviousness, based on U.S. Patent Nos. 3,321,787 (Myers), 3,936,899 (Henkin), and 4,100,641 (Pansini). *Zodiac Pool Sys., Inc. v. Aqua Prods., Inc.*, No. IPR2013-00159 (P.T.A.B. Feb. 25, 2013), Paper No. 5. A panel of the Patent Trial and Appeal Board, exercising authority delegated by the PTO's Director, 37 C.F.R. §§ 42.4, 42.108, instituted review of claims 1–9, 13, 14, 16, and 19–21. *Zodiac Pool Sys.*, No. IPR2013-00159 (P.T.A.B. Aug. 23, 2013), Paper No. 18.

Soon thereafter, pursuant to 35 U.S.C. § 316(d) and 37 C.F.R. § 42.121, Aqua Products filed a motion to amend its patent, proposing to substitute claims 22, 23, and 24 for claims 1, 8, and 20, respectively. *Zodiac Pool Sys.*, No. IPR2013-00159 (P.T.A.B. Mar. 3, 2014), Paper No. 42. Zodiac, in addition to pressing its patentability challenge to the issued claims, opposed the motion to amend, arguing that the proposed substitute claims were likewise unpatentable. *Zodiac Pool Sys.*, No. IPR2013-00159 (P.T.A.B. Mar. 10, 2014), Paper No. 45. The Board, in its final written decision, held both the issued and proposed substitute claims unpatentable and denied Aqua Products' motion to amend. *Zodiac Pool Sys.*, No. IPR-2013-00159, 2014 WL 4244016 (P.T.A.B. Aug. 22, 2014).

With respect to the motion to amend, the Board concluded that the proposed substitute claims were unpatentable based on two of the three prior-art references, *i.e.*, Henkin and Myers, that it had invoked in determining that the issued claims were unpatentable. *Id.* at *12–

17, 29–30. The Board simply concluded that Aqua Products had not carried the ultimate burden of persuasion of showing patentability of the proposed substitute claims. *Id.* at \*27, 30. In ruling that the patent owner had that burden of persuasion, the Board relied on one of the Director's 2012 regulations, 37 C.F.R. § 42.20(c), governing IPR and other trial proceedings newly created by the AIA.[1] In *Idle Free Systems, Inc. v. Bergstrom, Inc.*, No. IPR2012-00027, 2013 WL 5947697, at \*4 (P.T.A.B. June 11, 2013), apparently the first Board decision on a motion to amend under the new IPR provisions, a special Board panel had concluded that § 42.20(c) imposes the burden of persuasion on patentability for a proposed substitute claim on the patent owner, the movant in seeking to amend the patent.

On appeal to this court, Aqua Products appealed only the denial of the motion to amend, not the rejection of the issued claims of the '183 patent. After Aqua Products filed its opening brief, the Director intervened to defend the Board's decision; and not long afterwards, appellee Zodiac withdrew from the appeal. A panel of this court concluded that the Board did not err in holding proposed substitute claims 22–24 unpatentable. *In re Aqua Prods., Inc.*, 823 F.3d 1369 (Fed. Cir. 2016). In affirming the Board's denial of the motion to amend, the panel followed several decisions of this court that upheld the PTO's

---

[1] Those regulations relied on the Director's rule-making authority under § 316(a) as well as other rule-making authority relevant to the other proceedings covered by the regulations, *e.g.*, 35 U.S.C. §§ 2(b)(2), 326(a). *See* Final Rule, Rules of Practice for Trials Before the Patent Trial and Appeal Board and Judicial Review of Patent Trial and Appeal Board Decisions, 77 Fed. Reg. 48,612, 48,670 (Aug. 14, 2012) (2012 Final Rule).

assignment to the patent owner of the burden of persuasion on the patentability of proposed substitute claims. *See Nike, Inc. v. Adidas* AG, 812 F.3d 1326, 1332–35 (Fed. Cir. 2016); *Synopsys, Inc. v. Mentor Graphics Corp.*, 814 F.3d 1309, 1323–24 (Fed. Cir. 2016); *Prolitec, Inc. v. ScentAir Techs., Inc.*, 807 F.3d 1353, 1362–65 (Fed. Cir. 2015), *petition for reh'g pending*; *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1307 (Fed. Cir. 2015).

Aqua Products sought en banc rehearing to challenge the burden-of-persuasion assignment regarding proposed substitute claims as impermissible under the statute— specifically, as incompatible with 35 U.S.C. § 316(e). Aqua Products' Pet. for Reh'g En Banc 1. On August 12, 2016, this court vacated the panel's decision and granted en banc review. *In re Aqua Prods., Inc.*, 833 F.3d 1335 (Fed. Cir. 2016) (en banc).

## III. Discussion

This case involves a familiar pattern under the IPR provisions of the AIA. An IPR was instituted to review claims in an issued patent based on a petitioner's challenge. While contesting the challenge to the issued claims, the patent owner also filed with the Board, under § 316(d), a "motion to amend [its] patent" to include new claims as substitutes for some of the issued claims. As is common, the patent owner asked for the substitution to be made only if the issued claims were held unpatentable. The Board, upon concluding that the issued claims were unpatentable, was required to determine, in its final written decision, "the patentability of . . . any new claim added under section 316(d)." 35 U.S.C. § 318(a). An affirmative determination would require the Director to add the substitute claim to the patent. *Id.* § 318(b). Here, the Board denied the motion to amend the patent upon determining that the proposed substitute claims were not patentable and so should not be added to the patent.

It is undisputed that, under § 316(e), a petitioner has the burden of persuasion on the patentability of the issued claims on which the IPR was instituted. The question presented to us involves the burden of persuasion regarding substitute claims that the patent owner, by a motion to amend, asks the PTO to add to the patent. Who has that burden is a question that must be answered for the Board to carry out the adjudicatory task Congress has assigned it in § 318.[2]

I conclude that the Director has answered that question, by assigning the burden of persuasion regarding patentability of proposed substitute claims to the patent owner, in a regulation adopted through notice-and-comment rulemaking in August 2012 in preparation for the September 2012 launch of the IPR program—37 C.F.R. § 42.20(c). As a threshold matter, I conclude that the assignment of that burden comes within the language of the congressional grant to the Director of authority to promulgate regulations "establishing and governing inter partes review," 35 U.S.C. § 316(a)(4), and "setting forth standards and procedures for allowing the patent owner to move to amend the patent," 35 U.S.C. § 316(a)(9). As noted above, assigning the burden of persuasion is necessary for deciding patentability of proposed substitute claims in IPRs. Prescribing an across-the-board rule making the assignment is thus a natural part of establishing and governing IPRs, as authorized by § 316(a)(4), and § 316(a)(9) too is broad enough to reach such a gener-

---

[2]    I agree with Judge Reyna's discussion in Part III of his opinion that nothing in today's decision casts doubt on the PTO's authority or prescriptions regarding the burden of producing evidence or duties to address specified matters in pleadings or other filings. *See* Reyna Op. 13–15.

ic rule for evaluating motions to amend. Moreover, § 316(e)'s title ("evidentiary standards") characterizes assignment and definition of a burden of persuasion as a "standard." And the Covered Business Method Review provision of the AIA, § 18(a)(1), 125 Stat. at 329, requires the PTO generally to "employ the standards and procedures" of the Post-Grant Review program, 35 U.S.C. §§ 321–329, among them a burden-of-persuasion provision just like § 316(e). *See* 35 U.S.C. § 326(e).

I do not think that the burden of persuasion falls outside the Director's § 316(a) authority merely because burdens of persuasion are treated as "substantive" for various legal purposes. *See* O'Malley Op. 53, 57-58. Section 316(a) does not use "substantive" as a criterion of exclusion. The term, often used in contrast to "procedural," lacks a uniform bright-line meaning, and the substance-procedure distinction is not the distinction made by § 316(a)—which, for example, covers both "standards and procedures." The Supreme Court found § 316(a) to cover the choice of the broadest-reasonable-interpretation approach to construing patent claims, which is not self-evidently either a "substantive" or "procedural" matter. *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142–43 (2016).[3]

---

[3] The burden of persuasion, for its part, is "procedural" enough that the Administrative Procedure Act (APA) contains a provision, 5 U.S.C. § 556(d), that assigns the burden of persuasion to the proponent of an agency rule or order. *See Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267, 272–81 (1994); *cf. Cooper v. Oklahoma*, 517 U.S. 348, 367 (1996) (referring to "procedures" as including the burden of persuasion). Such matters are properly distinguished from, importantly, the interpretation of the

Aqua Products' chief argument is that the Director's authority to answer this particular question is superseded by a clear answer given directly by Congress elsewhere in the IPR provisions, namely, in § 316(e). Specifically, Aqua Products argues that § 316(e) precludes the assignment of the burden of persuasion to the patent owner. The Director argues to the contrary.

In addressing that dispute, I follow the *Chevron* framework, which the parties accept with only a brief challenge by Aqua Products. Under *Chevron*'s Step One, the question is whether Congress has "directly spoken to the precise question at issue," answering it "unambiguously." *Chevron*, 467 U.S. at 842–43; *see Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016). Although the ambiguity determination must consider the statute as a whole, *see Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2004), Aqua Products' argument focuses overwhelmingly on § 316(e). If the statute is ambiguous on the question, the Step Two question is whether the choice made by the agency is "reasonable." *Chevron*, 467 U.S. at 844; *Encino Motorcars*, 136 S. Ct. at 2124–25.

I conclude that the suggested statutory bar, § 316(e), does not unambiguously assign to the petitioner the burden of persuasion on the unpatentability of proposed

---

statute's patentability provisions, *e.g.*, 35 U.S.C. §§ 101, 102, 103, 112, over which the PTO has not been granted deference-generating authority. *See In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1279 (Fed. Cir. 2015), *aff'd sub nom. Cuozzo*, 136 S. Ct. 2131. It was the latter, "substantive criteria of patentability" that the Director was distinguishing when characterizing the 2012 rules as "procedural and/or interpretive." 2012 Final Rule, 77 Fed. Reg. at 48,650, 48,651.

substitute claims.  Section 316(e) may properly be understood to reach only issued claims, which the petitioner necessarily challenged (or else they would not be the subject of the instituted IPR), and not to reach proposed substitute claims, which the statute itself makes clear may go unchallenged by the petitioner.  In this case, answering the Step One question in the Director's favor means that the Director's position passes muster under *Chevron* because there is no meaningful dispute that it is among the reasonable choices available if the statute is ambiguous on the point.

Aqua Products, while predominantly arguing *within* the *Chevron* framework that the statute unambiguously forbids the Director's position, makes a brief argument against the applicability of the *Chevron* framework.  It asserts that 37 C.F.R. § 42.20(c) does not address the burden of persuasion regarding patentability and that *Idle Free*, which relied on § 42.20(c) as assigning the burden of persuasion at issue, was not a binding Board decision or otherwise owed any deference.  I conclude, however, that, wholly apart from any deference to *Idle Free* or other Board decisions, § 42.20(c)—a binding regulation adopted through notice-and-comment rulemaking as authorized by 35 U.S.C. § 316(a)—does assign the burden of persuasion on substitute claims to the patent owner.  Aqua Products has not challenged the regulation on other grounds.  There being no meritorious objection raised to relying on § 42.20(c) as making the burden assignment at issue, the formal regulation, adopted through notice-and-comment rulemaking, suffices to make *Chevron* applicable.  *See Encino Motorcars*, 136 S. Ct. at 2124–26; *City of Arlington v. FCC*, 133 S. Ct. 1863, 1874 (2013); *Barnhart v. Walton*, 535 U.S. 212, 217, 227 (2002); *United States v. Mead Corp.*, 533 U.S. 218, 227, 229–30 (2001).

A

1

Within the *Chevron* framework, the Step One question here focuses on 35 U.S.C. § 316(e). Again, that subsection states: "In an inter partes review instituted under this chapter, the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence." The question is whether that provision "unambiguously" applies to a patent owner's proposed substitute claim. *Chevron*, 467 U.S. at 843.

Aqua Products argues that it does. Aqua Products relies almost entirely on a simple, textual argument: that, when a petitioner (like Zodiac in this IPR) opposes addition of a proposed substitute claim on the ground that the claim is unpatentable, the petitioner is asserting "a proposition of unpatentability" covered by § 316(e). The Director, in contrast, contends that § 316(e) applies only to the issued patent claims whose patentability is being adjudicated in the IPR.

Applying *Chevron*'s Step One standard, I would reject Aqua Products' textual argument and conclude that the text admits of being read to apply only to issued claims. The crucial textual fact is § 316(e)'s reliance on a "petitioner" and a "proposition of unpatentability." The significance of that fact is informed by basic features of the IPR statute: (1) The IPR provisions distinguish between issued claims and newly proposed claims. (2) Congress understood that, for issued claims, a "petitioner" would always have advanced a "proposition of unpatentability." (3) Congress recognized that a patent owner's proposed substitute claims may go unchallenged by any "petitioner" and, thus, never lead to any assertion of a "proposition of unpatentability." And yet (4) the Board has a statutory obligation under § 318(a) to determine the patentability of proposed substitute claims, irrespective of whether they have been challenged as unpatentable.

I begin with what § 316(e) does not say: It is not written in terms independent of the presence of a petitioner asserting unpatentability. Thus, it does not expressly mention proposed substitute claims. Nor does it mention "claims" at all, much less in a way that would necessarily imply coverage of proposed substitute claims. Section 316(e) does not use language that broadly declares that to reject any claim the Board must find unpatentability by a preponderance of the evidence. It is not written to refer only to the adjudicator, or only to the patent owner, or only to both.

Rather, § 316(e) is written in terms of what "the petitioner" must prove to establish "a proposition of unpatentability." Aqua Products does not adequately account for that language in asserting a lack of ambiguity under *Chevron* Step One. The congressional tying of § 316(e) to "the petitioner" and its unpatentability assertion provides a textual basis for the sensible view that, in § 316(e), Congress was writing a rule only for the class of claims that it recognized as necessarily having been challenged as unpatentable by a "petitioner" (namely, issued claims) and not for a distinct class of claims that it expressly recognized might be placed before the Board by the patent owner without any opposition from a petitioner (namely, proposed substitute claims).

The provisions governing IPRs make that distinction between issued and proposed substitute claims clear. As to issued claims: An IPR may not be instituted *sua sponte* by the Director, but only upon a petitioner's filing of a petition under § 311. The scope of the IPR is also limited by § 311. The petitioner "may request to cancel as unpatentable" issued claims "only on a ground that could be raised under section 102 or 103." 35 U.S.C. § 311(b). The petition must, among other things, identify with particularity "each claim challenged, the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim." *Id.*

§ 312(a)(3). The Director's determination to institute then is tied to "the information presented in the petition" and the existence of "a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." *Id.* § 314(a). Those provisions imply that only claims challenged by the petitioner may be included in the instituted IPR. From the beginning, the Director's regulations have made that clear. 37 C.F.R. § 42.108(a) ("When instituting inter partes review, the Board may authorize the review to proceed on all or some of the challenged claims and on all or some of the grounds of unpatentability asserted for each claim.").[4] For all issued claims adjudicated in an IPR, then, Congress could take as a given that "the petitioner" necessarily had challenged them through assertion of a "proposition of unpatentability."[5]

In contrast, Congress made plain its recognition that any new substitute claims proposed by the patent owner during an IPR might well go unchallenged by any petitioner. The provisions of chapter 31 that lay out the framework for a petitioner's challenge to issued claims (§§ 311 and 312) do not impose on a petitioner any responsibility with respect to substitute claims. More

---

[4]   That regulation refers to the Board because, as noted, the Director has delegated institution authority to the Board. 37 C.F.R. §§ 42.4, 42.108.

[5]   Section 317 recognizes that, after institution, one or all petitioners may drop out of the proceeding. But that possibility does not contradict the premise, implied in the IPR regime as just indicated, that a petitioner *did* challenge all of the issued claims subject to the instituted IPR—and, indeed, made a record before institution sufficiently strong to support a determination that unpatentability is at least reasonably likely.

specifically and affirmatively, the provision that address-es motions to amend the patent, § 316(d), expressly estab-lishes that Congress contemplated *un*challenged proposed substitute claims. Section 316(d)(2) provides for motions to amend filed "upon the joint request of the petitioner and the patent owner to materially advance the settle-ment of a proceeding." 35 U.S.C. § 316(d)(2). As that provision indicates, there is no reason to assume that a petitioner would always be motivated to oppose a pro-posed substitute claim. Whatever the likelihood in prac-tice, a patent owner may propose substitute claims sufficiently different from the issued claims so as no longer to be of concern to the petitioner—either at all or enough to justify the expense of an adequate opposition. *See* O'Malley Op. 30 ("Congress contemplated narrowing amendments which would relieve a petitioner of any threat of infringement. . . ."). For those practical reasons, as reflected expressly in § 316(d)(2), Congress could not have assumed that a proposed substitute claim will always face opposition from a petitioner.

Yet Congress expressly demanded that the Board ad-judicate the patentability of proposed substitute claims under § 318(a). It is against the background of that Board obligation, and the recognized possibility that a petitioner might not challenge proposed substitute claims, that the language of § 316(e)—specifically, the inclusion of the "petitioner" and "proposition of unpatentability" lan-guage—must be understood. That language, in a provi-sion not referring specifically to "claims," is permissibly read to make the same distinction that is made using other language in certain sections that, unlike § 316(e), do refer to "claims." 35 U.S.C. §§ 314(a), 318(a), 318(b); *see* O'Malley Op. 25. The reference to "the petitioner" in § 316(e) is readily understood to embody a simple categor-ical distinction between issued and proposed substitute claims: for the former, the presence of a "petitioner" assertion of unpatentability is a certainty; for the latter, it

is not. That distinction permits reading § 316(e) to apply only to claims for which the categorical assumption of a petitioner unpatentability assertion applies, namely, issued claims.

Accepting Aqua Products' and others' suggested contrary readings of § 316(e) would require attributing to Congress unproven assumptions about the handling of the clearly contemplated scenario of a proposed substitute claim never opposed by a petitioner. In one such reading, the Board is required simply to issue the proposed substitute claim—even where no examiner ever reviewed it for patentability, even though § 318(a) requires a Board determination regarding patentability, and even when (as in this case) the Board has already concluded that the issued claims on which the IPR was instituted are unpatentable. In another reading of § 316(e), the Board might make a patentability determination on its own, using any tools available for it to do so.

As I read it, Judge O'Malley's opinion agrees that the first, automatic-grant alternative is not tenable under the statute: the Board must assess patentability of proposed substitute claims on the record of the IPR, even if no petitioner opposes the proposed claims. O'Malley Op. 5, 30, 41. But that view leaves an evident problem: if no petitioner opposes a motion to amend, or the opposition is inadequate in the Board's view, the record may not contain readily available prior art or arguments that were immaterial to the issued claims but that would render the substitute claims unpatentable.[6] That record-deficiency

---

[6]    A proposed substitute claim by definition is different from the issued claims and, under 35 U.S.C. § 282(a), must be evaluated on its own terms. *See Altoona Publix Theatres, Inc. v. Am. Tri-Ergon Corp.*, 294 U.S. 477, 487 (1935); *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed. Cir.

problem might be addressed in significant part by a burden of production on the patent owner—which, importantly, this court today is not restricting the Board's authority to impose. *See* Reyna Op. 13–15. But the record may remain deficient, and it is uncertain to what extent the Board can itself make up for the deficiencies.[7]

---

1984). Amendments, which are not permitted to be broadening, 35 U.S.C. § 316(d)(3), typically narrow claims, often by adding a new element. Additional prior art may be needed to evaluate a new claim with a new element: if that element was absent from the claims on which the IPR was instituted, the petitioner may not have initially introduced prior art that addressed the element.

[7] It is at present unclear to what extent the Board may sua sponte introduce evidence or arguments into the record—and rely on them after giving notice and opportunity to be heard—even in adjudicating the patentability of issued claims, much less in assessing proposed substitute claims. IPRs, as the PTO has accepted in briefs to our court, are "adjudications" under 5 U.S.C. § 554, *see Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1080 (Fed. Cir. 2015), and they are partly like district-court adjudications, *see Cuozzo*, 136 S. Ct. at 2143–44. It is therefore relevant that district courts have various record-expanding powers. *See Day v. McDonough*, 547 U.S. 198, 205–11 (2006); *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 558 F.3d 1341, 1346–48 (Fed. Cir. 2009); Fed. R. Evid. 614(a) ("The court may call a witness on its own or at a party's request."), 706(a) ("The court may appoint any expert that the parties agree on and any of its own choosing."); *see also* 37 C.F.R. § 42.62(a) (generally adopting Federal Rules of Evidence for IPRs). *Cuozzo*'s recognition that IPRs are "hybrid" proceedings that are partly court-like and partly "specialized administrative proceeding[s],"

It is not necessary to explore in detail the alternatives to assigning to the patent owner the burden of persuasion on proposed substitute claims. It is enough to say that § 316(e) does not unambiguously require these or any other suggested alternatives to the sensible interpretation of the "petitioner" and "proposition of unpatentability" language in § 316(e) that permits the Director's position.

That interpretation also accords with a general background rule regarding burdens of persuasion in adjudications. A party that is requesting an affirmative action by a tribunal to alter the pre-proceeding status quo generally has the burden of persuasion to show entitlement to have the tribunal take the requested action.[8] For issued claims, it is the petitioner that is seeking such action: a

---

136 S. Ct. at 2143–44, may suggest that Board powers over the record are even greater than those of courts.

[8] *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005) ("'Perhaps the broadest and most accepted idea is that the person who seeks court action should justify the request, which means that the plaintiffs bear the burdens on the elements in their claims.'" (quoting Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence* § 3.1, at 104 (3d ed. 2003)); *id.* at 57–58 ("Absent some reason to believe that Congress intended otherwise, . . . the burden of persuasion lies where it usually falls, upon the party seeking relief."); *see also Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 851 (2014); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009); *Meachem v. Knolls Atomic Power Lab.*, 554 U.S. 84, 92–93 (2008); 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 3.3 (4th ed. 2017); Kenneth S. Broun et al., 2 *McCormick on Evidence* § 337 (7th ed. 2017); Kenneth W. Graham, Jr., 21B *Federal Practice & Procedure Evidence* § 5122 (2d ed. 2017).

ruling of unpatentability followed by cancellation. For proposed substitute claims, it is the patent owner that is seeking such action: a ruling of patentability followed by addition to the patent of claims not part of the patent when the IPR was filed. That distinction makes it sensible to read § 316(e)'s specification of the standard of proof the "petitioner" must meet—a preponderance of the evidence, not clear and convincing evidence, as would be required in a district-court validity challenge—as applying only to the petitioner's requests for affirmative relief, namely, the petitioner's challenges to issued claims.

The general rule that governs the allocation of burdens of persuasion is not limited to judicial proceedings. Section 7(c) of the APA, 5 U.S.C. § 556(d), which governs IPR proceedings as agency adjudications subject to 5 U.S.C. § 554, codifies the rule that the party requesting an order of the tribunal has the burden of persuasion as to the requested order. It provides that "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof," and the Supreme Court has held that the provision's "burden of proof" language refers to the burden of persuasion, *Greenwich Colliers*, 512 U.S. at 272–81. By focusing on the proponent of the relevant action, the Director's interpretation of § 316(e) is consistent with the applicable APA provision, which suggests different treatment, with respect to the burden of persuasion, of a petitioner's efforts to cancel an issued claim and a patent owner's request to add a claim. And because § 316(e) refers to the "petitioner," § 316(e) may sensibly be read to be in harmony with, rather than to depart from, the APA provision.[9]

---

[9] IPR proceedings are adjudications subject to 5 U.S.C. § 554 and hence to 5 U.S.C. § 556. *See Belden*, 805 F.3d at 1080. In contrast, examinations of original appli-

In short, the reference to "petitioner" and "a proposition of unpatentability" in § 316(e) can properly be understood to assume the existence of a petitioner challenge to the patentability of the claims subject to the provision. No guarantee of such a petitioner challenge applies to a patent owner's proposed substitute claims, as Congress recognized in § 316(d). In proposing contrary readings of § 316(e), Aqua Products and others make contrary assumptions that they cannot show Congress unambiguously made. For the reasons set forth, § 316(e) contains language that thus provides a textual basis—one that fits and is confirmed by other provisions in chapter 31—for answering the *Chevron* Step One question in favor of the Director: Congress did not unambiguously address the precise question of the burden of persuasion for motions to amend.

---

cations are outside 5 U.S.C. § 556, which covers rulemakings subject to § 553 and adjudications subject to § 554. Such examinations are not rulemakings, and they also fall outside § 554 because (a) that provision excludes matters that are "subject to a subsequent trial of the law and the facts de novo in a court," 5 U.S.C. § 554(a)(1), and (b) disappointed patent applicants may obtain such a trial under 35 U.S.C. § 145. *See Kappos v. Hyatt*, 566 U.S. 431 (2012) (§ 145 provides for de novo trial on applications); *In re Gartside*, 205 F.3d 1305, 1313 (Fed. Cir. 2000) (examinations not subject to § 556). *Ex parte* reexaminations were subject to 35 U.S.C. § 145 until the AIA amended 35 U.S.C. § 306. IPRs are not subject to 35 U.S.C. § 145 or any de novo court trial. The traditional burdens applicable in examinations therefore cannot be simply transposed to the IPR setting. *See infra* pp. 27–30 (§ III.B.1).

2

Nothing else in the statute or legislative history justifies a different conclusion about the absence of a clear prohibition on the Director's position on the assignment of the burden of persuasion on substitute claims.

a

PTO practice involving proposed claims outside the IPR context does not negate a reading of § 316(e) as reaching only issued claims. It is true that there are other contexts involving patent examination or reexamination in which the patent owner has not been assigned the burden of persuasion on patentability when proposing claims, including amended claims. *See In re Oetiker*, 977 F.2d 1443, 1445 (Fed. Cir. 1992) (initial examination); *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1427 (Fed. Cir. 1988) (*ex parte* reexamination); *In re Etter*, 756 F.2d 852, 856–57 (Fed. Cir. 1985) (same).[10] But as Aqua Products acknowledges, the Director did assign such a burden for proposed substitute claims in interference proceedings and other contested cases—which, like the later IPRs, were adjudicatory, oppositional proceedings. *See Bamberg v. Dalvey*, 815 F.3d 793, 798–99 (Fed. Cir. 2016); Director's Suppl. Br. 18; Aqua Products' Suppl. Reply Br. 19. Indeed, IPRs, like other adjudicatory proceedings, including interference and derivation proceedings, are unlike the typical examination or reexamination, in which a patent examiner performs a prior-art search and independently conducts a patentability analysis of all claims.

---

[10] As to amended claims in those examinational contexts, see *In re Jung*, 637 F.3d 1356, 1360–62 (Fed. Cir. 2011); *In re Morris*, 127 F.3d 1048, 1051–57 (Fed. Cir. 1997); *Ethicon*, 849 F.2d at 1427; *Etter*, 756 F.2d at 856–57.

*See Abbott Labs. v. Cordis Corp.*, 710 F.3d 1318, 1327–28 (Fed. Cir. 2013). At a minimum, that disparity in background practices between adjudicatory and examinational proceedings means that there is no basis for inferring the clear congressional prescription that Aqua Products urges for § 316(e).

b

Aqua Products points to the fact that § 316(e) uses the term "patentability," not "validity," and argues that this choice of language is significant because an earlier bill in the legislative path to enactment used "validity." Aqua Products' Suppl. Br. 12–13; Aqua Products' Suppl. Reply Br. 4–6, 24. That choice, Aqua Products contends, shows that Congress meant to cover not just issued claims (subject to "validity" analysis) but also proposed claims (subject to "patentability" analysis). But the choice of "patentability" as a term does not justify that inference.

Aqua Products cites nothing in the legislative history stating that coverage of proposed claims was the reason for using the word "patentability." And, in fact, there is a readily available explanation for the choice of language that has nothing to do with a desire to reach beyond issued claims to proposed claims. At the time of the America Invents Act, "patentability," as opposed to "validity," was the standard terminology used when the PTO, as opposed to a court, determined compliance with various statutory requirements for patenting; and that usage was standard (if not quite universal) even for already-issued claims, as in reexamination proceedings.[11] There is no

---

[11] *See, e.g.*, 35 U.S.C. §§ 301, 303, 304, 306, 307 (*ex parte* reexamination); *id.* §§ 312, 313, 315, 316 (2006) (*inter partes* reexamination); 37 C.F.R. §§ 1.501, 1.510, 1.515, 1.520, 1.525, 1.530, 1.550, 1.555, 1.560 (2010) (*ex*

basis for attributing the choice of terminology in § 316(e)—and throughout the IPR provisions, 35 U.S.C. §§ 311–319, and Post-Grant Review provisions, *id.* §§ 321–329—to anything but the simple desire to conform to that standard usage. For that reason, the choice of terminology in § 316(e) would make perfect sense even if § 316(e) were expressly limited to "issued claims." The choice of "patentability" thus does not imply coverage of substitute claims proposed to be added to the patent by the patent owner.

Aqua Products correctly notes that the special Covered Business Method Review provision of the AIA refers to "validity," not "patentability." AIA § 18(a)(1), 125 Stat. at 329. But that usage does not weaken the essential reason for finding a textual basis for the Director's view in § 316(e)—the provision's use of "petitioner" language tied to the "proposition of unpatentability." Moreover, there is good reason to believe that the Covered Business Method Review provision's reference to "validity" is unrelated to Aqua Products' proposed distinction. The provision originated in an amendment on the Senate floor just before passage of the bill, not in the same series of committee actions that conformed the other provisions of the bill to the standard "patentability" usage. *See* 157 Cong. Rec. S1038 (daily ed. Mar. 1, 2011). Further, the Covered Business Method Review provision itself elsewhere incorporates the Post-Grant Review regime, which uses "patentability" language in common with the IPR regime.

---

*parte* reexamination); *id.* §§ 1.097, 1.915, 1.923, 1.927, 1.931, 1.933, 1.948, 1.949, 1.953 (2010) (*inter partes* reexamination); Manual of Patent Examining Procedure chs. 22, 26 (8th ed. rev. 8 2010). *But see* 35 U.S.C. § 315(c) (referring to claim "determined to be valid and patentable").

35 U.S.C. §§ 321, 324, 326, 328; AIA § 18(a)(1), 125 Stat. at 329. Thus, there is no basis for inferring a congressional intent to distinguish the terms in this context.

c

Aqua Products asserts that § 316(e) begins with the introductory phrase "[i]n an inter partes review" and that a motion to amend, or at least the proposed substitute claim that is the subject of the motion, is one of the things that are "in" the IPR. Even if Aqua Products were correct, however, the two assertions taken together would not justify its suggested inference about § 316(e) and substitute claims. The "in" aspect of the provision's language is only one requirement for coverage by the provision. As already explained, there is also the "petitioner" and "proposition of unpatentability" language, which, as explained, can be understood as establishing an additional requirement that excludes substitute claims. Satisfaction of one requirement does not imply satisfaction of the other.

d

That § 316(e), which governs "evidentiary standards," is located at the end of § 316 does not imply that its burden-of-persuasion rule clearly applies to all claims in a proceeding, including proposed substitute claims. Section 316 is not a tightly integrated provision whose structure would clearly define the relationship of each part to the others. Rather, following provisions on, *e.g.*, petitions, institution, and relation to other proceedings, § 316 addresses a variety of topics, in separate subsections, concerning the "conduct" of IPRs. In this "conduct" provision, the topics covered are "[r]egulations" the Director is to promulgate on a range of subjects, § 316(a); "[c]onsiderations" governing the Director's adoption of regulations, § 316(b); the "Board" as the designated entity to "conduct" each IPR, § 316(c); "[a]mendment of the patent," § 316(d); and, finally, "[e]videntiary standards,"

§ 316(e).  No clear inference can be drawn about § 316(e)'s scope from its placement within the section.

e

Pointing to the "estoppel" provision of § 315(e), Judge O'Malley suggests that the provision applies to issued and substitute claims and that it is illogical to estop the petitioner as to any claims for which it lacked the burden of persuasion.  O'Malley Op. 32–33.  I do not see the suggested illogic, let alone statutory language supporting the suggestion.  Section 315(e)'s rule denying the petitioner certain second chances applies equally, and makes logical sense, whether the petitioner's first chance (in the IPR) was one for which the petitioner had to carry the burden of proving unpatentability or, instead, had the easier task of arguing that the patent owner failed to prove patentability.  The provision's language and rationale apply in both circumstances.  The provision thus cannot imply that the petitioner has the burden of persuasion on proposed substitute claims.

* * *

For all of the foregoing reasons, the authority of the Director, under § 316(a), readily encompasses assignment to the patent owner of the burden of persuasion regarding substitute claims it proposes in a motion to amend the patent.  Moreover, § 316(e), considered alone and in the context of the overall IPR regime, does not override that authority under the *Chevron* Step One standard requiring a clear congressional resolution of the issue.  Assignment of the burden of persuasion to the patent owner thus clears Step One.  Aqua Products makes no meaningful argument challenging that assignment under Step Two: it does not deny that, for example, the possible absence or inadequacy of any petitioner opposition makes the assignment of the burden to the patent owner a reasonable choice if, as I conclude at Step One, the choice is left to the

Director under § 316(a). The Director's position thus passes muster under *Chevron*.

B

Aqua Products' only remaining contention is a brief challenge to the applicability of the *Chevron* framework here. This contention focuses on 37 C.F.R. § 42.20(c), the regulation that provides the basis for assigning the patent owner the burden of persuasion on the patentability of any substitute claims that it seeks to add to the patent. Aqua Products offers two related arguments. First, Aqua Products argues that § 42.20(c), which was addressed in *Idle Free* and is indisputably binding, does not in fact establish a burden of persuasion regarding the Board's patentability assessment, but only a burden to justify adding a substitute claim to the IPR. Aqua Products' Suppl. Br. 29–31. Second, Aqua Products argues that the Board's "informative" decision in *Idle Free* was not a binding determination, and does not deserve deference for that reason. Aqua Products' Suppl. Br. 25–26.

I would reject the first of Aqua Products' contentions, based on an independent judicial interpretation of the regulation—a conclusion that makes the second of Aqua Products' contentions immaterial. That is, without reliance on deference to agency regulatory interpretations, I conclude that § 42.20(c), when applied to a motion to amend the patent, imposes the burden of persuasion as to patentability of substitute claims on the patent owner. Aqua Products does not develop any argument against the applicability of the *Chevron* framework if, as I conclude, the regulation has that meaning even without special deference as to its interpretation.

A procedurally proper regulation that is within the Director's authority under § 316(a) is subject to the *Chevron* framework. *See Encino Motorcars*, 136 S. Ct. at 2124–26; *Barnhart*, 535 U.S. at 217, 227; *Mead Corp.*, 533 U.S. at 227, 229–30. Aqua Products makes no argument

for procedural impropriety or any other defect in the (notice-and-comment) rulemaking process that produced 37 C.F.R. § 42.20(c). I find meritless the limited objection made by Aqua Products as to what that regulation means. On that basis I conclude that the regulation itself suffices to make *Chevron* applicable. I do not address potential objections that Aqua Products has not made and the parties have not briefed.

1

In February 2012, preparing for the September 2012 launch of the IPR and related programs created by the AIA, the Director proposed various regulations pursuant to various grants of rulemaking authority, including the § 316(a) authority for IPRs generally and motions to amend particularly. *See* 35 U.S.C. §§ 2(b)(2), 316(a), 326(a). As relevant here, one of the proposals was a regulation governing motions, 37 C.F.R. § 42.20. *See* Notice of Proposed Rulemaking, Rules of Practice for Trials Before the Patent Trial and Appeal Board and Judicial Review of Patent Trial and Appeal Board Decisions, 77 Fed. Reg. 6879, 6885, 6909 (proposed Feb. 9, 2012) (2012 Notice).

As proposed (and adopted), § 42.20(c) declares:

*Burden of proof.* The moving party has the burden of proof to establish that it is entitled to the requested relief.

*Id.* at 6909. In proposing § 42.20, the Director made clear that the regulation "would place the burden of proof on the moving party" and that it would apply to "requests to amend the patent." *Id.* at 6885.

In August 2012, after receiving comments from the public, the Director adopted the provision as proposed. 2012 Final Rule, 77 Fed. Reg. at 48,610–20, 48,673. The Director again made clear that the rule "places the bur-

den of proof on the moving party" and that it applies to "requests to amend the patent." *Id.* at 48,619.[12]

Although I rely here solely on the 2012 regulation independently construed, I note again that, in 2013, a special six-member panel of the Board concluded that, "[f]or a patent owner's motion to amend, 37 C.F.R. § 42.20(c) places the burden on the patent owner to show a patentable distinction for each proposed substitute claim over the prior art . . . the burden is not on the petitioner to show unpatentability, but on the patent owner to show patentable distinction." *Idle Free Sys.*, 2013 WL 5947697, at *4.[13] That conclusion has uniformly been understood as referring to the burden of persuasion. Under internal PTO procedures, *Idle Free* was designated "informative." The Director did not need to approve such a designation. *See* Standard Operating Procedure 2 (rev. 9).

In subsequent years, the burden-of-persuasion assignment was applied in numerous IPRs, was approved by this court, *see Proxyconn*, 789 F.3d at 1307, and was reaffirmed in a ruling (which the Director approved as "precedential") by another special panel of the Board, *see*

---

[12] The language of § 42.20(c) is nearly identical to 37 C.F.R. § 41.121(b) (2010), a pre-existing provision governing the few pre-AIA contested cases, such as interferences. The contested-case regulation, when adopted in 2004, was accompanied by the Director's comments referring to the burden of persuasion. *See* Rules of Practice Before the Board of Patent Appeals and Interferences, 69 Fed. Reg. 49,960, 49,987 (Aug. 12, 2004).

[13] The Board panel in *Idle Free* also cited 37 C.F.R. § 42.121, which deals with what the patent owner must address in its motion to amend, not with a burden of persuasion in assessing the evidence.

*MasterImage 3D, Inc. v. RealD Inc.*, No. IPR2015-40, 2015 WL 10709290, at *1 (P.T.A.B. 2015). And the Director, in preparing for and conducting various rulemaking proceedings, solicited comments on the amendment process and explained why she was not proposing to change the assignment. *See*, *e.g.*, Request for Comments on Trial Proceedings Under the America Invents Act Before the Patent Trial and Appeal Board, 79 Fed. Reg. 36,474, 36,476 (June 27, 2014); Proposed Rule, Amendments to the Rules of Practice for Trials Before the Patent Trial and Appeal Board, 80 Fed. Reg. 50,720, 50,723–24 (proposed Aug. 20, 2015); Amendments to the Rules of Practice for Trials Before the Patent Trial and Appeal Board, 81 Fed. Reg. 18,750, 18,754–55 (Apr. 1, 2016).

Those PTO actions show the consistency of the PTO regarding the interpretation of § 42.20(c). Even that fact, however, is not necessary to my conclusion. I rely on none of the activity post-dating the August 2012 promulgation of 37 C.F.R. § 42.20(c) in concluding, on this record, that the *Chevron* framework is applicable.

2

For the Director's position on the assignment of the burden of persuasion regarding proposed substitute claims to trigger application of the *Chevron* framework, it suffices that her formally promulgated regulation, 37 C.F.R. § 42.20(c), embodies that position. I so read the regulation, without the need to rely on deference to a Board or Director interpretation of the regulation. That is, as a matter of independent judicial determination of the best interpretation, I agree with *Idle Free*'s reading of § 42.20(c) as to the burden of persuasion, without relying on deference to *Idle Free* or other agency pronouncements on the regulation's meaning.

Aqua Products correctly accepts that § 42.20(c) applies to a motion to amend the patent, as the Director made clear in 2012 when proposing and adopting the

regulation. But Aqua Products contends that § 42.20(c) means only that the patent owner must show entitlement to "bring[] the proposed substitute claims into the proceeding," which Aqua Products says is the "requested relief," not that the patent owner must show entitlement to add the proposed substitute claims to the patent. Aqua Products' Suppl. Br. 30–31; *see id.* at 31 ("[T]he 'requested relief' is merely to have the proposed amended claims added to the IPR . . . ."). That contention is wrong.

Section 42.20(c), entitled "burden of proof," states that "[t]he moving party has the burden of proof to establish that it is entitled to the requested relief." 37 C.F.R. § 42.20(c). Contrary to Aqua Products' contention, the "requested relief" in a motion to amend the patent is not the addition of the proposed substitute claim *to the IPR*. In a motion "to amend *the patent*," 35 U.S.C. § 316(d)(1) (emphasis added), the requested relief is to add the proposed substitute claims *to the patent*. *See also* 37 C.F.R. § 42.121(a) ("motion to amend *a patent*") (emphasis added).

Of course, the Board may "enter" the motion before deciding whether to grant it. *See* Final Rule, Changes to Implement Inter Partes Review Proceedings, Post-Grant Review Proceedings, and Transitional Program for Covered Business Method Patents, 77 Fed. Reg. 48,680, 48,692 (Aug. 14, 2012). But as the PTO stated, what is "entered" into the IPR proceeding is the "motion," not the proposed substitute claims. *Id.* at 48,690. And such a procedural step does not change what the motion requests, which is addition of the proposed substitute claims to the patent, not addition to the roster of claims at issue in the IPR. From the outset of the IPR program, granting (as opposed to entering) the motion has meant adding the substitute claims to the patent. By its plain terms, then, § 42.20(c) assigns to the movant—the patent owner—"the burden of proof to establish" entitlement to *that relief*.

Aqua Products is therefore wrong in its only real argument against reading § 42.20(c) as assigning the burden of persuasion on patentability to the patent owner. Once it is clear that the motion to amend the patent focuses on what is required to justify addition to the patent, it is also clear what the proper understanding of § 42.20(c) is. Under the terms of 35 U.S.C. § 318(a) & (b), entitlement to addition of the proposed substitute claim to the patent requires patentability of the claim. That is the subject of the "burden of proof." And there is no basis for giving "burden of proof" in § 42.20(c) a different meaning from the indistinguishable phrase in § 316(e)—namely, "burden of proving"—which undisputedly means the burden of persuasion. Indeed, as already noted, the text of § 42.20(c) uses language from a pre-AIA regulation that, when it was promulgated, the Director made clear was addressing the burden of persuasion. *See supra* n.12.

For those reasons, I conclude, without relying on any deference to the agency, that the Director's formally promulgated regulation, § 42.20(c), prescribes the burden-of-persuasion assignment at issue here. In light of that conclusion, Aqua Products' criticism of any reliance on *Idle Free* is immaterial.

3

Aqua Products makes no other objection to applying the *Chevron* framework, despite the Director's repeated invocations of that framework, and § 42.20(c) particularly, before the panel and the en banc court. *See* Director's Suppl. Br. 7–21; Director's Br. 17–24. In particular, Aqua Products does not argue, under *Encino Motorcars*, 136 S. Ct. 2117, that the Director's rulemaking was procedurally inadequate because the Director failed to set forth sufficient reasoning to justify an interpretation of § 316(e) that permits assigning to the patent owner the burden of persuasion on the patentability of substitute claims. Nor does Aqua Products argue that the Director's rulemaking

was somehow defective under *Negusie v. Holder*, 555 U.S. 511 (2009), which held that the *Chevron* framework is not applicable where an agency erroneously perceives the correct interpretation of a statute to be judicially compelled rather than left to the agency's discretion.

Reflecting the fact that Aqua Products did not raise such arguments about the applicability of *Chevron* here, the government has not developed responsive arguments. As a result, it has not presented arguments that address, for example, whether the present adjudication is a proper vehicle for challenging the adequacy of the Director's reasoning in the 2012 rulemaking proceeding, whether the Director had to engage in more statutory analysis than the 2012 rulemaking discloses, and whether for a rule like the one at issue here—which, unlike the rule in *Encino*, reverses no previous rule—the comments filed in the rulemaking proceeding circumscribe what agency reasoning is necessary.

Those kinds of issues about *Chevron*'s applicability do not affect this court's jurisdiction, so we are not obliged to raise them sua sponte. I do not suggest that there is a rigid bar to our addressing such matters, though raising issues sua sponte is generally disfavored. *See, e.g., Arizona v. California*, 530 U.S. 392, 412–13 (2000); *Silber v. United States*, 370 U.S. 717, 718–19 (1962). But I ultimately think it inadvisable to do so here, considering such factors as the interests in full adversarial presentation and the degree of uncertainty in the relevant governing law on the matters not fully developed before us.

In these circumstances, I would apply the *Chevron* framework in this case—under which, as already concluded, the Director's position is valid.

## IV. CONCLUSION

For the foregoing reasons, I would uphold the burden-of-persuasion assignment to Aqua Products. Having

rejected Aqua Products' legal challenge to that assignment, I would reinstate the panel opinion, which affirms the Board's denial of Aqua Products' motion to amend for failure to carry the burden.  Accordingly, although I agree with the majority's resolution of the legal questions about the scope of § 316(a) and the ambiguity of § 316(e), I respectfully dissent from the judgment of the court vacating the Board decision.

# United States Court of Appeals for the Federal Circuit

---

**AQUA PRODUCTS, INC.,**
*Appellant*

v.

**JOSEPH MATAL, PERFORMING THE FUNCTIONS AND DUTIES OF THE UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND DIRECTOR, U.S. PATENT AND TRADEMARK OFFICE,**
*Intervenor*

---

2015-1177

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2013-00159.

---

HUGHES, *Circuit Judge,* joined by CHEN, *Circuit Judge,* dissenting from the judgment.

We took this case en banc to resolve the seemingly straightforward question of whether the statute at issue unambiguously requires the burden of persuasion for motions to amend to remain with the petitioner. A clear majority of the court has decided that it does not. That conclusion alone should resolve the case and require deference to the Director's clear and consistent interpretation of an ambiguous statute that he is entitled to interpret, as evidenced by the Director's regulatory inter-

pretation of the statute and further definitive interpretations of that regulation.  But rather than following traditional rules of administrative law when faced with an ambiguous statute, i.e., determining whether the agency's interpretation is reasonable, we find fault in the sufficiency of the Director's rulemaking procedure—an issue raised for the first time by judges of this court without briefing or argument from the parties.

We err in our role as an appellate court to provide clear rules. Rather, we have compiled five separate opinions numbering over one-hundred pages that provide varying reasons for affirmance or reversal. Reasonable minds can differ about the core issue of this case—plain meaning or not—but the complicated reasons of the majority for the judgment of vacatur do a serious disservice to the issue at hand, and to a stable interpretation of the law. For the reasons set forth below, I concur in part, and respectfully dissent from the judgment of vacatur.

I fully join Judge Taranto's opinion, which concludes that the statutory language at issue does not dictate who bears the burden of proof on motions to amend claims under 35 U.S.C. § 316(d).[1]  The statute delegates rulemaking authority to the Patent and Trademark Office for the conduct of inter partes reviews generally, and to set procedures for the amendment of claims specifically.  In exercising this grant of statutory authority, the PTO engaged in notice and comment rulemaking, and placed the burden of proof for all motions on movants.  In adopting this rule, the PTO expressly considered the amendment provision in its regulation, but declined to provide an exception for motions to amend.  That clear regulatory

---

[1]    I agree with Judge Reyna that the patent owner bears the burden of production on motions to amend claims.  I therefore join Part III of his opinion.

command was within its authority, is entitled to *Chevron* deference, and should resolve this case.

I write separately for two reasons. First, to note that even if the scope of the PTO's regulation—37 C.F.R. § 42.20(c)—on the burden of proof for motions is ambiguous, the PTO is still entitled to *Auer* deference for its interpretation of its own regulation. *Auer v. Robbins*, 519 U.S. 452 (1997). As this court and the Supreme Court have repeatedly found, an agency's interpretation of its own regulation is "controlling unless plainly erroneous or inconsistent with the regulation." *Id.* at 461 (citation and internal quotation marks omitted). Therefore, I would defer to the PTO's reasoned interpretation of its own regulation placing the burden of proof for all motions upon the moving party to include motions to amend. It is in fact the most reasonable reading of that regulation. Thus, I would affirm.

Second, to address the notion that Congress's use of the word "regulation" in a statute delegating authority to an agency limits that agency's authority to promulgating regulations codified in the Code of Federal Regulations (CFR). This is a novel approach to administrative law, without support in precedent or in any statute. The term "regulations" has routinely been found to cover other forms of agency authority. By suggesting that delegation statutes using the word "regulation" narrowly confine agency action to the CFR, this court may "make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise." *SEC v. Chenery Corp.*, 332 U.S. 194, 202 (1947).

I

The question of who bears the burden of proof on motions to amend is guided by the well-established two-step *Chevron* framework. *Suprema, Inc. v. Int'l Trade Comm'n*, 796 F.3d 1338, 1346 (Fed. Cir. 2015) (en banc) (discussing *Chevron* framework). At step one, we look to

whether "Congress has directly spoken to the precise question at issue" because, "[i]f the intent of Congress is clear, that is the end of the matter." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). When the statute is "silent or ambiguous with respect to the specific issue" in dispute, we must proceed to step two. *Id.* at 843. At this step, we deem that "Congress has explicitly left a gap for the agency to fill," and our task is simply to determine "whether the agency's answer is based on a permissible construction of the statute." *Id.*

## A

For the reasons discussed by Judge Taranto, I agree that the statute is sufficiently ambiguous for the PTO to clear the first step of *Chevron*. At step two, we are assessing whether the agency's interpretation "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. A permissible interpretation is one that is not "arbitrary or capricious in substance, or manifestly contrary to the statute." *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 53 (2011) (citation and internal quotation marks omitted). Under this deferential standard, even if the agency's view is not "the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts," we are obligated to defer to it as long as it is *a* reasonable interpretation. *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (emphasis in original). Once we determined that the statute is silent or ambiguous, "the question for the court [is] whether the agency's answer is based on a permissible construction of the statute." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999) (quoting *Chevron*, 467 U.S. at 843). If the agency's interpretation is not in conflict with the statute and represents "a reasonable policy choice for the agency to make," we must defer to it. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005) (quoting *Chevron*, 467 U.S. at 845); *see also Cuozzo Speed Techs., LLC v. Lee*, 136

S. Ct. 2131 (2016) (rejecting Cuozzo's statutory arguments and concluding that the PTO's choice for a claim construction rubric was reasonable under the statute, without considering whether the PTO had evaluated Cuozzo's statutory arguments during the rulemaking process).

The PTO's regulation regarding where the burden of proof lies on motions, 37 C.F.R. § 42.20, is not arbitrary, capricious, or manifestly contrary to the statute. The regulation was promulgated in accordance with the procedures described in § 553 of the APA, which included notice and an opportunity for public comment. 5 U.S.C. § 553(c). In both the proposed rulemaking and final rule, the PTO emphasized to the public that this rule governing the burden of proof for motions would also apply to motions to amend. Rules of Practice for Trials Before the Patent Trial and Appeal Board and Judicial Review of Patent Trial and Appeal Board Decisions, 77 Fed. Reg. 6879, 6885 (proposed Feb. 9, 2012) (hereinafter 2012 Notice); Rules of Practice for Trials Before the Patent Trial and Appeal Board and Judicial Review of Patent Trial and Appeal Board Decisions, 77 Fed. Reg. 48,612, 48,619 (Aug. 14, 2012) (hereinafter 2012 Final Rule). While there were comments regarding certain aspects of amending claims, no one raised comments on the PTO's proposal to place the burden of proof on motions, including motions to amend, on the movant. This may be because "[p]erhaps the broadest and most accepted idea is that the person who seeks court action should justify the request." *Frolow v. Wilson Sporting Goods Co.*, 710 F.3d 1303, 1312 (Fed. Cir. 2013) (quoting *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005)). Accordingly, in the face of statutory ambiguity, placing the burden of proof on movants by adopting 37 C.F.R. § 42.20 through notice and comment rulemaking is a permissible reading of the statute, and the PTO's regulation should receive deference under *Chevron* step two.

B

Despite the preceding, Judge O'Malley and Judge Reyna find that the PTO has not done enough to warrant deference under *Chevron*. *See* O'Malley Op. at 44–56; *see also* Reyna Op. at 3 (faulting the agency for not "fully consider[ing] the inter partes review statutes, 35 U.S.C. § 316(a)(9), (d), and (e) . . . ."). This I cannot agree with. The 2012 rulemaking specifically mentioned that § 42.20 "would place the burden of proof on the moving party," and would apply to "requests to amend the patent." 2012 Notice, 77 Fed. Reg. at 6885. The PTO considered not only the inter partes review statutes but specifically motions to amend when proposing allocating the burden of proof for motions on the movant.

The PTO's failure to explicitly mention 35 U.S.C. § 316(a)(9), (d), and (e) does not mean its proposed regulation was defective. Rather, it necessarily implies that the PTO understood that the inter partes review statutes were ambiguous or silent as to the allocation of proof on a motion to amend, and so did the public, as no one urged otherwise. More importantly, *Chevron* step two does not require, as a threshold matter, the agency to perform a comprehensive statutory analysis during rulemaking to justify each promulgation of a new regulation. Nor does *Chevron* step two direct us to conduct a hypertechnical review of an agency's exercise of its discretion. Our inquiry is much more limited: "we are simply conducting a reasonableness review, we treat the [agency's] interpretation as controlling unless it has reached *a conclusion* that is arbitrary, capricious, or manifestly contrary to the statute." *Mahmood v. Sessions*, 849 F.3d 187, 195 (4th Cir. 2017) (emphasis in original) (citation and internal quotation marks omitted). And here, the PTO's conclusion is neither manifestly contrary to the statute nor arbitrary or capricious.

As best I can tell, my colleagues' conclusion would force an agency to use specific magic words before its exercise of discretion can receive deference. In other words, *Chevron* step two would be transformed into a de novo review of the agency's choices, where we no longer test the reasonableness of the agency's conclusion but examine in detail its mode of reasoning. This will turn agency rulemaking on its head, and the facts of today's case illustrate the herculean task we are placing on agencies. In 2012, when the PTO proposed placing the burden of proof for motions to amend on movants, not a single commenter raised concerns that § 316(e) precludes the PTO from placing the burden on a movant. Between the promulgation of § 42.20 and today's case, I could not find a single party who complained before this court that the § 42.20 was promulgated in a defective manner because the PTO failed to discuss § 316(e). And even in today's case, Aqua did not argue that § 42.20 was procedurally defective because of a failure to discuss § 316(e); it essentially conceded that if the inter partes statutes were ambiguous, the PTO could place the burden of proof for motions to amend on movants. Yet, we now have several judges of this court that believe § 42.20 was promulgated in a defective way because the PTO did not explicitly mention 35 U.S.C. § 316(a)(9), (d), and (e). This line of thinking would force agencies in rulemaking to deal with any and all potential objections to the rule, including those never raised by any commenters, any parties, and raised for the first time, sua sponte, by judges in an opinion. In other words, agencies can no longer be sure that any promulgated rule will withstand judicial review and the sua sponte ideas of courts.

The Supreme Court's decision in *Negusie v. Holder* does not compel a different conclusion. 555 U.S. 511 (2011). In *Negusie,* the agency mistakenly believed that its interpretation of a statute was compelled by a prior Supreme Court case. *Id.* at 518. In the context of the

*Chevron* framework, the agency stopped its analysis at step one, believing that it had *no discretion* to interpret the statute. *Id.* at 523 ("[I]f an agency erroneously contends that Congress' intent has been clearly expressed and has rested on that ground, we remand to require the agency to consider the question afresh in light of the ambiguity we see.") (quoting *Cajun Elec. Power Coop., Inc. v. FERC*, 924 F.2d 1132, 1136 (D.C. Cir. 1991)). Since the agency stopped at step one, the agency never exercised its *Chevron* discretion to interpret the statute in question. Thus, the Supreme Court remanded the case for the agency to consider the statute under step two of *Chevron*. Here, the PTO did reach step two of *Chevron* and exercised its discretion to pass, using notice and comment procedures, a regulation placing the burden of proof on the movants.

Moreover, while I believe the PTO exercised its discretion and sufficiently explained its reasoning, even if it had not, I question the wisdom of remanding this case back to the agency solely because of the mistaken belief that the PTO failed to adequately explain its reasoning. *See, e.g.*, *PDK Labs. v. DEA*, 362 F.3d 786, 808–09 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment). "The rationale that animates all *Prill*[2] remands is real and genuine doubt concerning what interpretation the agency would choose if given the opportunity to apply 'any permissible construction.'" *Id.* at 809. Unlike *Negusie* and *Prill*, where the agency never had the opportunity to apply any permissible construction of the statute, we know how the PTO would choose to interpret

---

[2]    In *Prill v. NLRB*, 755 F.2d 941, 948 (D.C. Cir. 1985), the D.C. Circuit remanded a case to the agency because "a regulation [was] based on an incorrect view of applicable law."

this ambiguous statute because the PTO already reached "its interpretation . . . in the course of a purely discretionary act." *Id.* at 800; *see also* Nicholas Bagley, *Remedial Restraint in Administrative Law*, 117 COLUM. L. REV. 253, 300 n.326 (2017) ("Cases in which an agency changes its mind in response to *Prill* remands are rare, and the circumstances tend to be unusual."). Indeed, when confronted with questions regarding the scope of § 42.20, and particularly, the effect of § 316(e), the PTO has clearly and consistently stated that the burden of proof imposed by § 42.20 applies to motions to amend, even in light of § 316(e). *Idle Free Sys., Inc. v. Bergstrom, Inc.,* No. IPR2012-00027, 2013 WL 5947697, at *4 (P.T.A.B. June 11, 2013); *MasterImage 3D, Inc. v. RealD Inc.*, No. IPR2015-0040, 2015 WL 10709290, at *1 (P.T.A.B. July 15, 2015); 2012 Notice, 77 Fed. Reg. at 6885; 2012 Final Rule, 77 Fed. Reg. at 48,619. Even if we accept that some deficiency exists in the initial rulemaking, a remand is unnecessary because there is no "real and genuine doubt concerning what interpretation the agency would choose." *PDK Labs*, 362 F.3d at 808.

C

Moreover, even if the burden of proof regulation was unclear in the scope of its application, in accordance with *Auer*, we would still be required to affirm the PTO's interpretation here. *Auer*, 519 U.S. at 461; *see also* Cass R. Sunstein & Adrian Vermeule, *The Unbearable Rightness of Auer*, 84 U. CHI. L. REV. 297 (2017). While § 42.20 is a general regulation governing the burdens on motions, no one has adequately explained why, assuming the statute is ambiguous, it should not apply to the more specific context of motions to amend. I believe that it must. During proposed rulemaking, the PTO specifically mentioned motions to amend in discussing its proposed general rules for motion practice. The adopted regulation contains no exception for motions to amend, and if we require a general regulation to specify what specific types

of motions that fall under its umbrella, it would make the notion of a general regulation meaningless.

Under *Auer*, an agency's interpretation of its own regulation is given "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (citation and internal quotation marks omitted). Agency interpretations need not be well-settled or long-standing to be entitled to deference, but they must "reflect the agency's fair and considered judgment on the matter in question." *Auer*, 519 U.S. at 462. *Auer* deference is warranted even if the agency's interpretation first appears during litigation, *see Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 203 (2011), unless "the interpretation is nothing more than a convenient litigating position, or a post hoc rationalization advanced by an agency seeking to defend past agency action against attack." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (citation and internal quotation marks omitted).

Accordingly, if we have doubts regarding the applicability of § 42.20 to motions to amend, we are obligated to defer to the PTO's interpretation under *Auer* unless it is "plainly erroneous or inconsistent with the regulation." "It is well established that an agency's interpretation need not be the only possible reading of a regulation—or even the best one—to prevail." *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 613 (2013). An agency's view need only be reasonable to warrant deference. *Pauley v. Beth-Energy Mines, Inc.*, 501 U.S. 680, 702 (1991) ("[I]t is axiomatic that the [agency's] interpretation need not be the best or most natural one by grammatical or other standards. Rather, the [agency's] view need be only reasonable to warrant deference." (internal citation omitted)).

The inter partes regulations were promulgated by the PTO in 2012. In adopting § 42.20, the PTO made clear that the regulation would place the burden of proof on the movant. To the extent this regulation of general applicability did not call out specific categories of motions that fall under its umbrella, it is entirely reasonable for the PTO to interpret this regulation as applying to motions to amend, especially when it specifically expressed that intention during its rulemaking. 2012 Notice, 77 Fed. Reg. at 6885; 2012 Final Rule, 77 Fed. Reg. 48619. And it certainly is not inconsistent with the text of the regulation.[3]

This interpretation is also not a convenient litigating position or a post-hoc rationalization of the PTO's decisionmaking. The PTO has consistently enforced this position since 2012. In 2013, the PTAB concluded that 37 C.F.R. § 42.20(c) places the burden for motions to amend on the patent owner. *Idle Free.* 2013 WL 5947697, at *4.

In the spring of 2014, the PTO conducted various "roundtables" with the public, making presentations and receiving informal comments on practice under the new rules. In at least some of the roundtables, the PTO showed a slide on "Motions to Amend" that listed the "need to show patentable distinction" and cited *Idle Free.* *See* U.S. Patent & Trademark Office, AIA Trial Roundtables, slide 35, (April 15, 2014), available at https://www.uspto.gov/ip/boards/bpai/ptab_roundtable__sl ides_may_update__20140503.pdf (April 15, 2014).

---

[3] For the reasons expressed in Judge Taranto's opinion, which explains how a motion to amend, per 35 U.S.C. § 316(d), is a "motion to amend the patent"—not merely a motion to have a proposed substitute claim added to the proceeding—I find Judge O'Malley's counterargument to be without merit.

In June 2015, we held that it was permissible to assign to the patent owner the burden of persuasion on patentability of a proposed substitute claim. *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1307 (Fed. Cir. 2015). The next month, a six-member Board panel issued a "clarification" of *Idle Free*. *MasterImage*, 2015 WL 10709290, at *1. In making that clarification, which concerned what subjects the patent owner must address in a motion to amend, the *MasterImage* panel reaffirmed that "[t]he ultimate burden of persuasion remains with Patent Owner, the movant, to demonstrate the patentability of the amended claims," citing *Proxyconn*. *Id.* The *MasterImage* order was designated "precedential," under Standard Operating Procedure 2 (rev. 9), which requires the concurrence of the Director.

In August 2015, when issuing her 2015 Proposed Rule, the Director confirmed that the burden of persuasion rested on the patent owner and set forth reasons why this assignment of the burden serves important policy objectives. She stated that she would not shift the assignment of "the ultimate burden of persuasion on patentability of proposed substitute claims from the patent owner to the petitioner." Amendments to the Rules of Practice for Trials Before the Patent Trial and Appeal Board, 80 Fed. Reg., 50,720, 50,723 (proposed Aug. 20, 2015).

The Director reaffirmed that the patent owner bears the burden of persuasion as to amendments in her final regulatory amendments in 2016. Amendments to the Rules of Practice for Trials Before the Patent Trial and Appeal Board, 81 Fed. Reg. 18,750, 18,754–55 (April 1, 2016).

Thus, the PTO has consistently, since 2012, maintained that the burden of proof for motions to amend falls on the movant. As such, this position is neither a convenient litigating position nor a post-hoc rationalization of

the PTO's decisionmaking.  And if there is any ambiguity regarding the applicability of § 42.20 to motions to amend, *Auer* requires us to defer to the PTO's interpretation.

## II

Finally, I am deeply troubled by the suggestion that, by using the word "regulation" in a statute, Congress intended to foreclose all means of statutory or regulatory interpretation other than notice and comment rulemaking.  O'Malley Op. at 50-52; Moore Op. at 4–8.  This position would severely curtail the PTO's authority to regulate its own proceedings by forcing the agency to codify rules on every procedural issue, even those that are interpretations of existing regulations. This remarkable proposition contradicts both the Supreme Court and our own precedent, and drastically changes administrative law as we know it.  Thus, I disagree that § 316(a) limits the Director's authority to the issuance of regulations appearing in the CFR.

I start with the general principle that agencies, including the PTO, have wide discretion in choosing how to regulate. The Supreme Court has long recognized that "[a]ny rigid requirement" for legislative rulemaking "would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise." *Chenery*, 332 U.S. at 202.  Nor is legislative rulemaking a prerequisite for *Chevron* deference.  In *United States v. Mead*, the Supreme Court explained that "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." 533 U.S. 218, 226–27 (2001).  The fact that an agency "reached its interpretation through means less formal than 'notice and comment' rulemaking does not automati-

cally deprive that interpretation of the judicial deference otherwise its due." *Barnhart v. Walton*, 535 U.S. 212, 221 (2002) (internal citation omitted).

Here, the statutory scheme indicates that Congress intended to give broad discretion to the PTO to regulate IPR proceedings. 35 U.S.C. § 2(b)(2)(A) gives the PTO authority to "establish regulations, not inconsistent with law, which shall govern the conduct of proceedings in the [PTO]." And 35 U.S.C. § 316 further delegates authority to the Director to regulate IPR procedure, including grounds for review, standards for discovery, and the standard for amending claims. Given this statutory delegation of authority, we have long recognized that "the broadest of the [PTO]'s rulemaking powers is the power to" establish rules governing its own proceedings. *Stevens v. Tamai*, 366 F.3d 1325, 1333 (Fed. Cir. 2004). Indeed, "we understand Congress to have 'delegated *plenary authority* over PTO practice'" *Id.* (emphasis added) (internal citation omitted).

Of course, Congress may limit the agency's discretion by statute. Judge O'Malley and Judge Moore argue that Congress did so by using the word "regulation" in § 316(a), which supposedly constrains the PTO's regulatory authority to notice and comment rules codified in the CFR only. However, using a generic term like "regulation" does not mean Congress "expressly determine[d] upon what *and how* the Director may promulgate rules." Moore Op. at 7 (emphasis in original). The terms "regulation" and "rules" are often used interchangeably. For example, in *Cuozzo*, the Supreme Court considered the very same statutory provision before us now, and explained that § 316(a) "allows the Patent Office to issue rules." 136 S. Ct. at 2142; *id.* at 2137 ("[§ 316(a)] grants the Patent Office the authority to issue rules."). And a "rule" under the APA is broadly defined as "the whole or a part of an agency statement of general or particular applicability and future effect. . . ." 5 U.S.C. § 551(4).

Moreover, our own precedent confirms that "regulations" is not limited to rules codified in the CFR. For example, we held that Congress's delegation of authority to "establish regulations" to govern proceedings at the PTO meant that we would afford *Chevron* deference to an interpretative rule published in the Federal Register, even though it did not result in a regulation codified in the CFR. *Cooper Techs. Co. v. Dudas*, 536 F.3d 1330, 1337 (Fed. Cir. 2008). And in *Groff v. United States*, we held that the Bureau of Justice Assistance's (BJA) legal interpretations announced through adjudication were entitled to *Chevron* deference. 493 F.3d 1343, 1348 (Fed. Cir. 2007). In *Groff*, the statue allowed the BJA to establish "rules, regulations, and procedures" to administer a benefits program for public safety officers. *Id.* In that case, we refused to limit the BJA's regulatory authority to notice-and-comment rulemaking. *Id.* at 1350. Instead, we explained that, by authorizing the BJA to establish rules, regulations, and procedures, "Congress intended for the BJA's statutory interpretations announced through adjudication to have the force of law, and that those interpretations are therefore entitled to deference under *Chevron*." *Id.*

Likewise, other regional circuits have afforded *Chevron* deference to legal interpretations not codified in the CFR, even though the delegating statutes use the word "regulation." For example, 29 U.S.C. § 1135 states that "the Secretary [of Labor] *may prescribe such regulations* as he finds necessary or appropriate to carry out [certain] provisions" of the Employee Retirement Income Security Act. (emphasis added). In *Tibble v. Edison International*, the Ninth Circuit applied *Chevron* deference to the Department of Labor's legal interpretation announced through a preamble to a rule. 729 F.3d 1110, 1122 (9th Cir. 2013) *vacated on other grounds*, 135 S. Ct. 1823 (2015). The preamble was published in the Federal Register, but not codified in the CFR. *Id.* Nevertheless,

the court explained that where Congress gave the Secretary of Labor the authority to prescribe regulations, *Chevron* deference is not limited "to materials destined for the pages of the Code of Federal Regulations." *Id.*

As another example, the Federal Food, Drug, and Cosmetic Act (FDCA) gives the FDA authority to "*promulgate regulations* for the efficient enforcement" of the statute. 21 U.S.C. § 371(a) (emphasis added). In *Mylan Laboratories, Inc. v. Thompson*, the D.C. Circuit expressly rejected the argument that "minimal deference is owed to the FDA's interpretation of the FDCA because it was expressed in letters to the parties and 'is not embodied in any regulation, much less a regulation that was subject to notice and comment rulemaking.'" 389 F.3d 1272, 1279 (D.C. Cir. 2004) (internal citations omitted). The court explained that "'the want of notice and comment does not decide the case' against *Chevron* deference." *Id.* (quoting *Barnhart v. Walton*, 535 U.S. 212, 222 (2002)); *see also Apotex, Inc. v. FDA*, 226 F. App'x 4, 5 (D.C. Cir. 2007) (per curium) (holding that Chevron deference applies to FDA's statutory interpretation of the FDCA announced through informal adjudication). Other courts have similarly held that notice and comment rulemaking resulting in codification in the CFR is not required for *Chevron* deference. *See, e.g., Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1273 (11th Cir. 2009) (giving *Chevron* deference to Fish & Wildlife Service Handbook that was not published in the CFR); *Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460, 467 (D.C. Cir. 2007) (holding that a publication in the Federal Register is entitled to *Chevron* deference).

I could not find a definition of "regulation" limiting it to codified agency pronouncements appearing in the CFR and I have not been able to find any support in the AIA or APA for such a narrow interpretation. Nor, apparently, have my colleagues, since their opinions do not explain how they derived their interpretation of "regulation" other

than to state their conclusion based, presumably, on their plain language interpretation of the term "regulation." Contrary to their position, the PTO has broad discretion over how it regulates IPR procedures. And the word "regulation" in § 316(a) does not restrict that authority, as Congress "does not alter the fundamental details of a regulatory scheme" through generic or vague terms. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Aside from the fact that § 316(a) does not limit the PTO's authority to regulations codified in the CFR, another fallacy in my colleagues' position is that the PTO *did* promulgate regulations on the standards and procedures for amending patents. In particular, the PTO established § 42.20 through notice and comment rulemaking. 2012 Notice, 77 Fed. Reg. at 6885; 2012 Final Rule, 77 Fed. Reg. 48619. And the PTO made clear that § 42.20 applies to motions to amend. 2012 Notice, 77 Fed. Reg. at 6885. Likewise, the PTO also promulgated § 42.121, which details the timing, scope and content for motions to amend. Therefore, even if the term "regulation" requires an agency to adopt rules through notice and comment rulemaking, the PTO has done so by promulgating a rule that places the burden of proof on movants as a general matter.

To the extent these regulations fail to address a specific factual scenario, the PTO can clarify or interpret its own regulations without resorting to additional rulemaking. *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 96 (1995) ("The APA does not require that all the specific applications of a rule evolve by further, more precise rules rather than by adjudication."). Accordingly, the PTO's subsequent clarification of its own regulations in *Master-*

*Image* and *Idle Free* is at least entitled to *Auer* deference.[4] "Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations." *NLRB v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 293 (1974). The choice of how to interpret the agency's statutes and regulations "lies in the first instance within the [agency's] discretion." *Id.* at 294. The fact that Congress uses the term "regulation" does not foreclose the PTO from interpreting its own rules through guidance documents or adjudication.

If my colleagues believe that "regulations" in § 316(a) means the Director may only interpret the agency's *own* regulations by promulgating *even more* regulations codified in the CFR, this is a dramatic upheaval of administrative law. *See* O'Malley Op. at 51-52, Moore Op. at 5. As I have discussed, the use of the word "regulation" does not support the notion that Congress expressly intended to limit the PTO to rulemaking in all instances. And I can find nothing else that suggests Congress intended to constrain the PTO's ability to interpret its own regulations. *Mead* acknowledged that Congress can implicitly delegate agency authority by, for example, "provid[ing] for a relatively formal administrative procedure." *Mead*, 533

---

[4]    Judge O'Malley and Judge Moore's opinions do not reach the question of whether the Board's opinions in *MasterImage* and *Idle Free* are entitled to *Auer* deference. However, I believe that a proper application of *Auer* should lead this court to defer to the Board's legal interpretations in those decisions and affirm the decision below, even under my colleagues' narrow interpretation of the term "regulation."

U.S. at 230.  Considering that Congress delegated authority to the PTO to regulate motions to amend, I find it implausible that Congress would undermine the PTO's ability to clarify or expound on its own rules using relatively formal adjudication like IPRs.

This new approach to administrative law has ramifications far beyond this case.  For example, consider the PTO's regulation that a motion to amend cannot "introduce new subject matter" to the patent.  37 C.F.R. § 42.121(a)(2)(ii).  If the PTO sought to clarify what type of amendments constitute "new subject matter," the agency might now, despite long-established precedent to the contrary, have to promulgate regulations in the CFR, using notice and comment rulemaking, for each and every example of "new subject matter."  Essentially, when the PTO is confronted with a new issue in an IPR that it has not foreseen and accounted for in the CFR, it will not able to deal with that issue in a more timely and efficient manner.  Instead, it will have to promulgate regulations in the CFR through a drawn-out rulemaking process. Such a rigid constraint on the PTO will "make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise." *Chenery*, 332 U.S. at 202.

## III

Accordingly, I would affirm.  From the contrary judgment of Judge O'Malley, Judge Moore, and Judge Reyna, I respectfully dissent.